[PUBLISH]

In the

# United States Court of Appeals

### For the Eleventh Circuit

_____

No. 18-13524

_____

CROSLEY ALEXANDER GREEN,

Petitioner-Appellee,

*versus*

SECRETARY, DEPARTMENT OF CORRECTIONS,
ATTORNEY GENERAL, STATE OF FLORIDA,

Respondents-Appellants,

HARDEE CORRECTIONAL INSTITUTION WARDEN,

Respondent.

————————————

Appeal from the United States District Court
for the Middle District of Florida
D.C. Docket No. 6:14-cv-00330-RBD-TBS

————————————

Before JORDAN, TJOFLAT, and TRAXLER,* Circuit Judges.

TJOFLAT, Circuit Judge:

The power of the federal courts to grant a writ of habeas corpus setting aside a state prisoner's conviction on a claim that his conviction was obtained in violation of the United States Constitution is strictly circumscribed. First, the prisoner must have exhausted his state remedies. 28 U.S.C. § 2254(b)(1)(A). He presented the claim to the state courts, and they denied it on the merits. Second, the federal court may not grant the writ on an exhausted claim unless it finds that the state courts' adjudication of the claim "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," 28 U.S.C. § 2254(d)(2). Additionally, factual findings made by state courts are presumed correct until rebutted by "clear and convincing

_____

* The Honorable William. B. Traxler, Jr., Senior Circuit Judge for the United States Court of Appeals for the Fourth Circuit, sitting by designation.

evidence." 28 U.S.C. § 2254(e)(1). Finally, the federal court may only consider the merits of an unexhausted claim if the prisoner establishes "cause and prejudice" for his failure to exhaust, *Engle v. Isaac,* 456 U.S. 107, 129, 102 S. Ct. 1558, 1573 (1982), or that he is "actually innocent" of the crime for which he was convicted. *Murray v. Carrier,* 477 U.S. 478, 495-96, 106 S. Ct. 2639, 2646-49 (1986).

In this case, Crosley Alexander Green, a state prisoner, petitioned the District Court for a writ of habeas corpus vacating his convictions for murder, armed robbery, and kidnapping with bodily injury. His petition presented nineteen constitutional claims. Most had not been exhausted. The Court granted the writ on an unexhausted claim and denied the writ on the rest. The State appeals the granting of the writ, and we reverse. The prisoner cross-appeals the Court's denial of the writ on six of the claims, and we affirm.

We begin by describing the circumstances that led to the prisoner's convictions. From there, we portray step by step the complex and confusing litigation history—initially in state court, and then in federal court—of the claims we decide in these appeals.

## I.

### *A.*[1]

---

[1] The facts set out in subpart A depicting the commission of the crimes charged against Green are based solely on Kim Hallock's trial testimony.

At approximately 10:00 p.m. on April 3, 1989, in the rural part of Brevard County, Florida, Charles "Chip" Flynn Jr., age twenty-one, went to visit his on-again, off-again girlfriend Kim Hallock, age nineteen. About an hour later after watching a movie, they decided to go for a drive in Flynn's pick-up truck. Around 11:25 p.m., the two ended up in a secluded area of Holder Park next to some sand dunes. Flynn parked his truck there, and he and Hallock smoked marijuana and discussed the nature of their relationship.

Hallock and Flynn had been seeing each other for about a year and a half. And while they had once gone steady, their relationship was now an open one. Not only was Flynn seeing Hallock, he was involved with other women as well, including a Patti Larney.

As Hallock and Flynn smoked and discussed their relationship, a sheriff's car drove by but continued on without stopping.[2] Almost immediately after the car passed, a black male approached Flynn's truck and warned Hallock and Flynn, both white, to watch out for police. The man then disappeared into the darkness.

A few minutes later, Flynn, barefoot, got out of the truck to relieve himself. He immediately found himself face to face with the same black male as before, who was now holding a handgun.

---

[2] Brevard County Sheriff's Deputy Mark Rixey testified that he was on patrol that evening and drove through Holder Park sometime between 11:30 p.m. and 1:30 a.m.

Hallock heard Flynn say nervously, "Hold on.  Wait a minute, man.  Hold on.  Put it down." At that point, she retrieved Flynn's handgun from the glove box beneath the dashboard and hid it under a pair of jeans lying next to her on the truck's seat.  The man ordered Flynn to his knees and demanded at gunpoint that Hallock and Flynn give him any money they had.  Hallock gave the man five dollars, but Flynn insisted that he had no money.

The man told Hallock to give him a shoelace from one of Flynn's shoes, which were on the floorboard on the driver's side of the truck, and then used the shoelace to tie Flynn's hands behind his back.  While tying Flynn's hands, the man accidentally discharged his weapon, but no one was injured.  At this point, the man noticed that Flynn had a wallet in his back pocket.  He pulled it out, threw it to Hallock, and told her to count the money it contained.  It amounted to $185.

The man ordered Hallock to start the truck and forced Flynn to get in and sit next to the passenger door.  Then, he got in and positioned himself behind the steering wheel.  Hallock sat between the man and Flynn.  The man drove east on Parrish Road across U.S. 1 until he reached Hammock Road, all the while holding a gun to Hallock's side.  At Hammock Road, the man turned left and drove north 200 to 300 yards before pulling into a remote orange

grove adjacent to Indian River Lagoon[3] and approximately 2.5 miles from Holder Park.

After coming to a stop in the orange grove, the man pulled Hallock out of the truck.  Hallock broke free of the man's grip and tried to run away.  While the man was regaining control of her, Flynn, with his hands still tied behind his back, grabbed the handgun Hallock had hidden beneath the pair of jeans and exited the truck on the passenger side. He fell to the ground in the process and attempted to shoot at the man.  When the man turned his attention to Flynn, Hallock jumped in the truck and drove off.   She heard gun shots as she fled.

Hallock headed south back down Hammock Road to Jay Jay Road and took Jay Jay Road west to U.S. 1.  Once on U.S. 1, she headed south for about half a mile to LaGrange Road, at which point she turned right and proceeded to Flynn's best friend David Stroup's house trailer.  In driving there, she chose not to stop at houses along the way, to proceed on to a hospital located nearby on U.S. 1, or to go to her parent's home.[4]  From Stroup's trailer, Hallock called 911 and reached the communications center at the Sheriff's Office.

*B.*

---

[3] Indian River Lagoon is a grouping of three lagoons on Florida's Atlantic Coast.  The lagoon contains five state parks and a national seashore.

[4] The hospital is located on U.S. 1 approximately eight-tenths of a mile south of LaGrange Road.

The communications center documented the 911 call at 1:11 a.m. on April 4, 1989.  The caller identified herself as Kim Hallock. She stated that a black guy had pulled a gun on her and her boy-friend and "took us somewhere" in the woods "off of Jay Jay Road." She said this was "all I know . . . but I know how to get there."  The operator advised her to "just stay right there . . . and we'll have a deputy come out and then he'll take you out to where . . . this is at."  At 1:12 a.m., Sergeant Diane Clarke and Deputy Mark Rixey, driving separate patrol cars, responded to the call.[5]  The communi-cations center dispatcher initially sent them to the corner of Jay Jay Road and U.S. 1, but on arriving there, they saw nothing of signifi-cance.  They requested further direction from the dispatcher, who sent them east on Jay Jay Road.

Deputy Wade Walker was dispatched to Hallock's location at the trailer park.  He arrived at around 1:30 a.m.  By that time, Hallock had called her mother, who told her not to leave until she got there.  Walker advised Hallock to wait on her mother, delaying them about two minutes.  In the meantime, Clarke and Rixey had been unable to find the orange grove and were requesting addi-tional directions.  Walker and Hallock met up with Clarke and Rixey and Hallock directed them to Flynn.  Upon arriving at the

---

[5] Sergeant Clarke, a supervisor in the Sheriff's Office, heard the 911 call, Hal-lock's description of her and Flynn's abduction, and what had occurred at the orange grove.  Clarke told the communications center dispatcher that she would go with Deputy Rixey, who was working the night-time patrol shift, to try to find the orange grove.

orange grove, Clarke and Rixey parked their patrol cars and proceeded on foot. Walker stayed behind with Hallock.

At 1:42 a.m., Clarke and Rixey found Flynn lying face down, covered in blood, with his arms tied behind his back. His loaded .22-caliber revolver was a few feet away. After untying Flynn's hands, they repeatedly asked Flynn what had happened. His sole response was, "Get me out of here. I want to go home."

Clarke had the dispatcher send a rescue unit to the scene and with Rixey attempted to staunch the bleeding. But they were unable to locate its source, a single gunshot wound in the chest. They initiated a breathing exercise twice while awaiting the rescue unit's arrival. Unfortunately, by the time it arrived, at 1:57 a.m., Flynn had succumbed.[6]

Clarke and Rixey remained on site until Agent Debbie Demers,[7] a criminalist, and Agent Scott Nyquist, [8] a homicide

---

[6] Flynn was officially pronounced dead upon arrival at the hospital.

[7] Agent Demers, a member of the Sheriff's Office Criminalistics Unit handling crime scene investigation, preserved the crime scene in the orange grove and took photographs. These photographs included pictures of footprints found at Holder Park, where Flynn had parked his truck and encountered Green.

[8] Agent Nyquist, a member of the Sheriff's Office Homicide Unit, became the case agent. He was "responsible for maintenance of the case file [and] liaison with [the] crime labs, [the] evidence technicians, [and] the State Attorney's Office. If there [were] any documents that [were] prepared, such as search warrants, etc., he [was] responsible for the preparation of those documents." Nyquist also interviewed witnesses and assimilated the information he received from all who were working under his direction.

investigator, arrived and assumed control of the crime scene. At no point before or after their arrival did Clarke or Rixey see or speak with Hallock, who stayed in Deputy Walker's patrol car with Walker a good distance from the spot where Flynn's body was found. Once Clarke and Rixey left the scene, neither had any further involvement in the homicide investigation.

Walker took Hallock to the North Precinct station of the Brevard County Sheriff's Office in Titusville for questioning. Agent Nyquist interviewed Hallock at around 4:45 a.m., and in a tape-recorded statement she related what had transpired while she was with Flynn. About two hours later, Sergeant Tom Fair,[9] having obtained from the Homicide Unit a box of sixty to seventy mug shot photographs of black males, showed the photographs to Hallock to see if she could identify the individual who had assaulted her and Flynn. She was unable to identify his photograph.

Meanwhile, at 5:10 a.m., Deputy O'Dell Kiser, the Sheriff's Office canine officer, and his dog, Czar, were called to the area in Holder Park where Flynn had purportedly parked his truck.[10] Agents Debbie Demers, Barry Liford, and Randy Arieux of the

---

[9] Sergeant Fair was head of the Homicide Unit of the Sheriff's Office. He designated Nyquist as the case agent.

[10] Czar had been trained in Germany. Kiser was assigned to the dog in 1985. He had worked with Czar for one week in Brooksville, Florida, then for 480 hours at Mid Florida Technical Institute School. These times were spent tracking scent from clothing and footprints. Czar had done scent work for Kiser on at least 700 occasions and had been recertified annually since 1985.

Sheriff's Office Criminalistics Unit were there to meet him. They directed Kiser's attention to some visible footprints. The footprints were "fresh," made by "some type of tennis shoe." Kiser put Czar on the footprints and "told him to track."[11] The footprints were "headed north." Kiser could "tell [that] by the point of the shoe." But he and Czar went "the opposite way of the track," "south on Glendale Boulevard . . . for probably 200 yards," where the "road turns from dirt to pavement,"[12] toward Briarcliff Way. Czar turned right on to Briarcliff Way and "continued west on Briarcliff to a house . . . on the northeast corner of the intersection of Briarcliff and Belvedere." Czar stopped "in the front yard" of the house. They stopped there because two dogs in the carport "started barking." The address for the house was 3658 Briarcliff Way. Two days later, on April 6, Celestine Peterkin, Green's older sister, questioned and said that the house was her residence and that Green "stayed [there] some of the time."[13]

Kiser had Czar run a "second track." Czar started with the former scent, the one picked up at the spot where the first track

---

[11] Kiser selected isolated footprints far from any other footprints "within that general vicinity."

[12] Glendale Boulevard runs north and south. It extends from Parrish Road (which runs east and west) north to Holder Park.

[13] Peterkin said this while testifying in Green's defense in the guilt-innocence phase of the trial.

began, and "went around the baseball fields." That track ended where the first track began.

Shortly after 6:00 a.m. on April 4, Hallock, still at the North Precinct station, met with a police sketch artist who created a composite of the man she and Flynn had encountered at Holder Park. She told the sketch artist that the man "had a wide nose like a flaring nose . . . . His eyes were not big but not small . . . . His lips weren't big." She further described him as wearing "a green like army jacket, jeans, and shoes like a work boot because it was heavy."

The next day, April 5, Florida Today, the major daily newspaper serving Brevard County, reported on the Flynn homicide in its morning edition. The report included a description of the alleged assailant and the composite the sketch artist had created of his face.[14] Dale Carlisle read the report, concluded that the composite sketch was of Crosley Green, and called the Brevard County Sheriff's Office with the following information. He, his wife, and his children had visited Holder Park on the evening of April 3 to watch a baseball game. While there, he saw a man he thought he knew from junior high school days. His nickname back then was

---

[14] Florida Today ran a follow up story on April 6 which included a photograph of Green's face.

Papa Green. So, he approached the man and asked him whether he was "Papa Green." The man replied that he was.[15]

Willie B. Hampton, formerly an auxiliary police officer with the Titusville Police Department, also read the Florida Today April 5 report on the Flynn homicide. He recognized the individual in the artist's sketch and contacted the Brevard County Sheriff's Office to relate what he had observed on the evening of April 3 at Holder Park. At the time, he was umpiring Little League games and saw Crosley Green standing outside the fence watching a game. He recognized Green because he had known Green and his family, his brothers, sisters, and mother, for years. Green stood there behind the fence for the whole game, until it ended at around 10:00 p.m.

Hallock was summoned to the North Precinct station late in the evening of April 5. Her father, Robert Hallock, accompanied her. Sergeant Fair had Agent Nyquist put a photographic lineup together. It contained the photographs of "six black males of similar physical characteristics . . . numbered 1 through 6." Fair told Hallock that one of the photographs "may or may not [be] of the individual who had done these things." She identified the

---

[15] According to the Florida Department of Law Enforcement ("FDLE") "Investigative Summary" dated July 25, 2000, and made part of the postconviction record in this case, Carlisle provided the Sheriff's Office with a sworn recorded statement containing the information indicated in the above text on April 5, 1989, at 1:30 p.m.

18-13524          Opinion of the Court          13

photograph in position No. 2 as being the individual who had kidnapped her and shot Flynn.  No. 2 was a photograph of Crosley Green.[16]

After Hallock identified Green as the assailant, a warrant was obtained for his arrest.  On June 8, 1989, he was found in the Town of Mims and taken into custody.

## C.

On June 20, 1989, a grand jury returned an indictment to the Circuit Court of Broward County charging Green with first-degree felony murder (Count I), a capital crime, robbery with a firearm (Counts II and III), and kidnapping (Counts IV and V).[17]  At

---

[16] At trial, the jury received evidence that established the facts set out in subpart B with the exception of how Sergeant Fair obtained Green's photograph. The jury was not made privy to that information; it is contained in the FDLE Investigative Summary.  Copies of the composite sketch of Flynn's suspected assailant were "circulated within the Mims community."  "On April 4, Deputy J.A. Copenhaver showed the sketch to a Ruby Moorer" who said it looked like "Papa" Green.  A black man identified as "Wilbur" said it looked like "Pop" Green.  On April 5, a Kerwin Hepburn told two relatives of Flynn's that he had heard that "'Papa' Green" committed the murder.  Armed with this and other information suggesting Green's involvement in the Flynn homicide, Agent Nyquist attempted to locate a photograph of Green.  The Sheriff's Office did not have one.  On learning that Green had recently been released from a Florida prison, Nyquist obtained a photograph of Green from the Florida Department of Corrections.  It became No. 2 in the photo array Sergeant Fair showed Hallock.

[17] *See* Fla. Stat. §§ 782.04(1)(a)(2) (murder in the first degree, a capital felony), 812.13(1) and (2)(a) (robbery with a firearm), and 787.01(a)(2) and (a)(3)

arraignment, Green pled not guilty to all counts.  The prosecutor subsequently notified Green that the State would seek the death penalty on Count I.  This required the Circuit Court to conduct Green's trial in two phases, a guilt-innocence phase and a penalty phase.

After months of discovery,[18] the Circuit Court set the case for trial to begin on August 27, 1990.  It started on schedule.

1.

In the guilt-innocence phase, the State established the facts presented in subparts A and B, *supra,* with evidentiary exhibits, witnesses Agent Nyquist and his team identified prior to Green's indictment, and three individuals the team uncovered as their investigation progressed. These three individuals were Sheila Green, Lonnie Hillery, and Jerome Murray; each testified that Green had confessed to killing Flynn.

Sheila Green[19] said Green was "my oldest brother." The day after Flynn's murder, she was with Green at her sister Celestine

---

(kidnapping).  Counts II and IV alleged offenses against Flynn, while Counts III and V alleged offenses against Hallock.

[18] Discovery under Florida Rules of Criminal Procedure 3.330 is extensive and reciprocal.  In this case, scores of depositions were taken, even of witnesses who would not be testifying at trial.

[19] Sheila Green, Lonnie Hillery, and several others had been indicted in federal court for "conspiracy with intent to distribute and possession with intent to distribute cocaine."  All were convicted except Hillery.  Sheila Green was awaiting sentencing when she testified as a prosecution witness at Green's

Peterkin's house at 3658 Briarcliff Way in Mims. The "rumor was out" that Green had killed Flynn. She asked him if he "did kill that dude." He said he "didn't intentionally make it happen that way," that "the dude pulled the gun . . . and motioned for the . . . the girl to run for help." "He said he went struggling with the dude. It was him or either the dude, [sic] but the dude had the gun."

Lonnie Hillery, Sheila Green's boyfriend and the father of two of her children, saw Green in the early morning hours of April 4, 1989, in a field by the government housing project located "by [Green's] 'grandfather's barbecue stand.'" Hillery, who knew "Papa" Green, said he seemed "shaky" and "scared," "like he was high on something," and he was dirty, "like really scuffed up like, you know, like he'd been in the dirt or something." When he asked Green what was wrong, Green said, "I fucked up, man. I fucked up." "Man, some people came through and was trying to buy something from [me] and they tried to get [me], and [I] just fucked up." "[I]t was a man and woman." "He said they tried to get him, they hustled a little bit and the girl took off and that's where he fucked up." A few days later, Green told Hillery that he had gotten rid of his clothes and that everything was going to be all right.

---

trial. The presentence report recommended that she be imprisoned for ten years. She anticipated that Christopher White (who was prosecuting the charges against Green) would appear at her sentencing hearing and inform the federal judge of the testimony she gave for the State at Green's trial.

Jerome Murray was in Mims one afternoon standing and talking with twenty or thirty "cocaine heads" on a street corner. Murray was drunk. At some point, Green "came and said he just killed a man." Green said, "I'm going to disappear" but nothing else. Murray added: "I heard what he said, and then I read it in the paper the next day, but the description didn't fit it until another paper came out and then had his name underneath of it."

After presenting evidence sufficient to establish the facts stated in subparts A and B, the State rested its case in chief. Green moved for a directed verdict and made multiple motions for mistrial.[20] The Court denied the motions.

Green's attorney called five witnesses to testify in Green's defense: Terrell Kingery, Charles Smith, Brenda Harper, James Carn, and Celestine Peterkin. Kingery, the first called, was an expert in the "field of shoe and tire impressions." He testified that he had examined four of the plaster casts that had been made (at the Sheriff's Office request) of foot impressions Deputy Kiser had observed while Czar was following the scent in the Holder Park area. According to Kingery, all four impressions were of tennis shoes of "a size ten and not larger than a size twelve." The impressions were made of several named brands, perhaps more than ten.

---

[20] Green moved for a mistrial on the basis of objections he made regarding Hallock's photographic and in-court identifications of him, Czar's tracking at the hands of Deputy Kiser, and Robert Hallock's testimony involving conversations he had with Hallock, his daughter.

Charles Smith was the "Chief Umpire" at the Holder Park baseball fields. He was at the Park umpiring a game in the evening of April 3, 1989. Green was there too.[21] Smith umpired a game and visited with Green "between innings, and . . . talked to him after the game." Green "was wearing tennis shoes." He was "sure" that Green wasn't wearing "any kind of field jacket or army jacket." Before Smith left Holder Park "a few minutes after 9:00," Green asked him for money. "It was probably more than $2."

Brenda Harper lived across the street from Hallock. Hallock came to her house on April 4 at around 11:00 a.m. on Hallock's way home from the Sheriff's office. Harper said Hallock "had a grass stain, dirt, right here on her shirt" and then indicated where the stain was located.

James Carn, a maintenance mechanic, was employed by North Hydro in Rockledge, Florida. On April 3, 1989, he got off work at 11:00 p.m. and went to Carleen Brothers' house in Mims. Carn was seeing Brothers, a cousin of Green's, at the time. When he arrived at 11:50 p.m., he discovered that another man was in the house. An argument ensued and the man left. At that point, Brothers, followed by Carn, went across the street to a "friend's house, Aretha's," arriving "at about 12:10 or 12:15." They stayed there "another ten or fifteen minutes, and arrived back at Brothers' house around 12:30 p.m." "About five or ten minutes after that

---

[21] Smith drove to Holder Park with Green's brother, O'Connor Green. Smith had known Green for "as long as I've been here."

that's when Papa came to the door . . . . Mr. Green." He entered and stayed, "sitting there with us watching TV" for a while. Then Carn went to bed, at "about [a] quarter to 2:00." Between Green's arrival at Brothers' house and "about [a] quarter to 2:00," Green was with Carn "the entire time."[22]

Celestine Peterkin testified that when she visited her younger sister Sheila Green in prison, Sheila never told her that Green admitted to killing Flynn. Sheila was in prison pending sentencing for cocaine distribution.[23] Peterkin said Sheila loved her kids and "would do anything to be with her kids." Peterkin told the police on April 6, 1989, that Green "was living with [her] and her cousin in Mims, Carleen."

The defense rested after Peterkin testified. The State, in rebuttal, called one witness, Agent Nyquist. He testified that on April 5, 1989, in an article about the Flynn murder, Florida Today published the artist's sketch of Hallock's description of the murder suspect. The sketch had been made at around 6:00 a.m. The

---

[22] On cross-examination by prosecutor White, Carn admitted the following: when law enforcement subsequently questioned Brothers at her house about Green's possible involvement in the Flynn homicide, he was present and never mentioned seeing Green at Brothers' house as he testified on direct examination. The first time he told the police or the State Attorney or any attorney for the defendant about seeing Green at Brothers' house on April 4, 1989, was shortly before prosecutor White took his deposition on May 14, 1990.

[23] *See supra* note 19.

newspaper ran a second story the next day, and it contained a photo of Green's face.

Nyquist was asked about the distance between the orange grove where Flynn was found and Brothers' house in Mims. He said it was 1.5 miles. On cross-examination by defense counsel, he was asked about the distance between Holder Park and the orange grove and how long it took to drive it. He said the distance was 2.9 miles, and he drove it in five to six minutes.

Green presented no surrebuttal, and following a charge conference with the Court, the parties delivered their closing arguments to the jury. The State's first chair, Christopher White, delivered the State's opening argument. It was relatively brief. White summarized what the evidence disclosed—namely, the facts recited in subparts A and B—and asked the jury to return a verdict of guilty on all charges.

John Parker responded for the defense. His strategy was to focus on the holes he saw in the State's case. He claimed that the problems with Hallock's story began with the fact that she was under the influence of marijuana the night of the murder—something she initially lied about to police. Add to that the fact that it was pitch black that night—with no artificial lighting in the park (and potentially no interior light on in the truck)[24]—and it became practically impossible for her to have gotten a "good look, as the State

---

[24] Green's counsel noted that "Miss Hallock [could not] recall whether or not the interior light even came on."

would have [the jury] believe, at [the] man who committed" the crimes.

Parker reminded the jury that Hallock initially told police that the first time she saw the black man he was a "blur." And when the police asked whether the man had any facial hair, Hallock responded that she was "not really sure." She, in her own words, "didn't even get a good look at him" because she was "really scared."

He argued that Hallock was simply "relying on what the police told her." When showing Hallock the photo line-up, the police informed her that their suspect's photograph was one of the photos. Once she picked Green, they confirmed that she had picked the right person. Then, after the line-up, Hallock read all of the newspaper articles, some of which contained Green's name and photograph, and saw Green on a trip to the Brevard County Jail for school. So, Parker argued that while Hallock believed Green committed the crime, this belief was based not on her own observation but on her having seen his picture in the paper and having been told by the police that he was the suspect.

Parker claimed that Hallock was likely drawn to Green's photograph in the line-up because Green had the darkest skin color in the line-up. It was also possible that Green's photograph was the only new image she was shown. The loose box of photographs had vanished, so for all they knew, Hallock could have already seen photos of the five other men and concluded they were not the kidnapper. Plus, Hallock was, at first, only "pretty positive" Green

was the perpetrator. It was not until police repeatedly asked whether she was sure that she confirmed that it was him. In Parker's mind, when you keep being asked if you are sure, "sooner or later you get the message."

He also suggested that none of the witnesses to whom Green allegedly confessed, or who supposedly saw Green at the ballpark in a green army jacket, could be trusted. Jerome Murray's timing of events did not line up; he claimed that Green confessed to him at 10:30 p.m., several hours before the kidnapping and murder. Murray was also "wasted," having consumed two six-packs of sixteen-ounce malt liquor before speaking with Green. The prosecutor also spoke to a judge on Murray's behalf, getting Murray out of jail once after he was arrested.

Parker also reminded the jury that Sheila Green was facing many years in prison on federal drug charges during which she would be separated from her four children. Parker claimed that she did not come forward on her own before she was convicted, and she never told her sister Celestine Peterkin that her brother had confessed to killing someone. What's more, Peterkin testified that Sheila did not even live in Mims during the time she supposedly heard this "tale" at Peterkin's house.

Nor did Lonnie Hillery, Sheila's lover and the father of two of her children, come forward originally. Parker asked the jury to

think  about what he would be willing to say to keep Sheila from going to prison.[25]

Parker further argued that Green's appearance did not match Hallock's description of the assailant on the night of Flynn's murder.  Dale Carlisle, who before the baseball game had not seen Green since the ninth grade, claimed Green had short, cropped hair the day of the murder.  Parker pointed out that this contrasted with Green's hair at the time of the offense,[26] his hair in the photo line-up, and Hallock's description of the man's hair at her deposition: greasy hair with a sort of sheen or perm.  Carlisle also said Green was wearing desert boots or casual-type wear, not the heavy work boots Hallock described.

Willie Hampton, in his initial statement to the police, said Green was wearing some sort of garment but not a field jacket.  At the time, he could not remember if it was black or blue.  Parker claimed it was only the newspaper article that "refreshed" Hampton's memory.

Green's witness, Charles Smith, on the other hand, said Green was not wearing an army jacket and that he was wearing tennis shoes.  Furthermore, James Carn testified that Green was with him at the time of the murder.  Contrary to the State's claim

---

[25] Hillery was acquitted of the same federal drug offenses for which Sheila was convicted.

[26] Green's counsel cited Hampton and Smith's testimony that Green's hair was very short at the ballpark on the day of the murder.

that Carn might be mis-remembering which night he saw Green—Carn did not come forward until a year later—Parker argued that Carn remembered the night he saw Green because of the argument at Brothers' house.

Parker also argued that it was impossible to know how Czar tracked to Peterkin's house. The scent of other animals or humans could have disturbed the track, and the smell of the dogs at Peterkin's home could have attracted Czar. The police also neglected to have Czar attempt to track the individual or individuals who made additional prints at the Holder Park scene.

In the end, Parker highlighted a litany of facts which he believed pointed to Hallock as the killer, not Green: Flynn's hands were tied "for comfort" rather than security; Hallock was allegedly jerked from the truck more than once but had no injuries; her left handprint and fingerprints were all over the truck, but Green's were not; Hallock initially told police she did not know where the perpetrator was when she fled but later claimed she saw the man poised to shoot as she drove away; Hallock was consistently able to escape the armed kidnapper's grasp without getting shot; there were no tracks in the grove, which would indicate the black man fled on foot; Flynn failed to identify the shooter when asked, repeating only "I want to go home. Just get me out of here"; the handgun Flynn supposedly fired was found four to five feet away from him; Flynn suffered an injury to his right rear thigh, consistent with someone dragging him headfirst; Hallock drove to Flynn's best friend's house to get help, not her parent's house, or the

hospital on US 1; miraculously, no one was injured when the gun discharged while the man was tying Flynn's hands behind his back; Flynn was sleeping with another woman at the same time as Hallock, and Hallock was not happy about it; the bullet that killed Flynn could have come from his own gun; and the truck's glove box was broken, causing it to dump its contents on the floor when opened, yet the perpetrator somehow did not notice when Hallock opened it and removed Flynn's gun. While he never explicitly named Hallock as the killer, Parker left the firm impression with the jury that, in his mind, she was the culprit.

Philip Williams, the State's second chair, gave the State's rebuttal. He focused on what the State considered to be Green's real defense—that Hallock, "a jealous lover," did the killing. Except that Parker would not come right out and say it. Parker "alluded to the fact that the killer . . . may have been Kim Hallock." So, Williams asked, "why wouldn't Parker just say it?" The answer: "He wouldn't because it's ludicrous, and he doesn't have the courage just to come right out and say it. I think she killed" Flynn. Parker, he said, was just "grasping at straws."

Williams accused Parker of misrepresenting Hallock's testimony about the alleged encounter with Green. So, he proceeded to review Hallock's testimony about it in detail. Then, he turned to Czar's tracking of the footprints to Peterkin's house on Briarcliff Way, where Green lived according to his sister, Sheila. From there, it was only a "quarter of a mile by foot on a road . . . up to the dunes" where Flynn parked his pickup truck.

Williams explained the absence of Green's fingerprints on Flynn's truck. "They couldn't [even] find the prints of the guy who owned the truck," he said. Finally, to rebut Parker's criticism of Hallock's identification of Green based on her observations of him that night, Williams walked the jury through her testimony.

Williams closed by reminding the jury of the damning testimony of Sheila Green, Lonnie Hillery, and Jerome Murray, and asked the jury to use its common sense.

2.

At the end of the guilt-innocence phase, the jury found Green guilty of all charges. The penalty phase on the trial of Count I followed. The State introduced proof that Green had been convicted of armed robbery in New York in 1977 and urged the jury to recommend a death sentence based on four aggravating factors: (1) Green was previously convicted of a violent felony; (2) the capital felony was committed while Green was engaged in kidnapping; (3) the murder was committed for pecuniary gain; and (4) the murder was especially heinous, atrocious, and cruel. With that, the State rested.

Green's defense was brief. Parker called two witnesses, Shirley and Damon Jones. They testified about Green's upbringing in a dysfunctional family. When Green was in prison in New York, his father shot and killed his mother before committing suicide; this tragedy had a devastating effect on Green.

26                    Opinion of the Court                    18-13524

The jury recommended the imposition of a death sentence by a vote of eight to four, and the Circuit Judge imposed the sentence after finding the aggravating factors listed by the State and no statutory or non-statutory mitigating factors. *Green v. State* (*Green I*), 641 So. 2d 391, 395–96 (Fla. 1994).

## D.

Green appealed his convictions and death sentence to the Supreme Court of Florida. *Green I*, 641 So. 2d at 391. He challenged the validity of his convictions on four grounds[27] and his death sentence on five.[28]   He was unsuccessful.   The Florida

---

[27] The four grounds for overturning Green's conviction were:

> Whether (1) the trial court erred in admitting evidence of dog scent tracking; (2) the trial court erred in denying Green's motion to suppress Kim Hallock's identification; (3) the trial court erred in denying Green's motion for the jury to view the murder scene; (4) the trial court erred in instructing the jury on flight.

*Green I*, 641 So. 2d at 394 n.1.

[28] The five grounds for overturning Green's death sentence were:

> (5) the trial court erred in considering as separate aggravating circumstances that Green committed the murder for pecuniary gain and Green committed the murder during a kidnapping; (6) the trial court erred in finding that the murder was heinous, atrocious, and cruel; (7) the trial court improperly refused to find mitigating circumstances; (8) the death penalty is disproportionate; and (9) the heinous, atrocious, or cruel aggravator is unconstitutionally vague.

*Green I*, 641 So. 2d at 394 n.1.

Supreme Court rejected all but one of the grounds[29] on the merits and affirmed the Circuit Court's judgment. One of the grounds the Court rejected is pertinent here: the Florida Supreme Court rejected Green's argument that the Circuit Court erred in denying Green's motion to suppress Hallock's identification of him as Flynn's killer in the pretrial photographic lineup and at trial. *Id.* at 395 n.2.

## II.

On March 18, 1997, Green, represented by Capital Collateral Regional Counsel ("Collateral Counsel"), moved the Circuit Court of Brevard County pursuant to Florida Rule of Criminal Procedure 3.850[30] to vacate his convictions and death sentence.[31] The motion was amended on November 30, 2001. In the interim, the Florida Department of Law Enforcement ("FDLE") conducted a post-trial

---

[29] The Florida Supreme Court ruled in Green's favor on the ground (9) challenge to his death sentence but did not set aside the sentence. As indicated *infra* part II.C, however, the sentence was subsequently vacated, and Green was sentenced to life imprisonment instead.

[30] Green filed the motion under Rule 3.851 as well as Rule 3.850 because Rule 3.851 applies to capital cases. For purposes here, the rules are identical. We refer to them as Rule 3.850.

[31] The motion was a mere "shell." It had to be filed in skeleton fashion to toll the time in which Green would have to petition a federal court for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 in the event the state courts failed to grant him the relief he requested.

investigation into Green's case, portions of which were relied upon by Green in the amended motion.

As amended, Green's motion contained twelve numbered claims, I through XII. All were brought under the First and/or Fifth and/or Sixth and/or Eighth Amendments and the Fourteenth Amendment. Many contained multiple independent claims and subclaims, some of which were mutually exclusive.[32]

### A.

Of the twelve claims presented to the Circuit Court, only the first five challenged Green's conviction and thus are relevant here; the remaining seven claims challenged Green's death sentence. Claims I and III incorporated numerous subclaims: Claim I had three subclaims, while Claim III had eight subclaims denoted A through H, with Claim III-H having an additional five subclaims of its own. The Circuit Court only considered the four claims[33] the Court deemed as stating a plausible claim for relief: Claim I-2, Claim III-F, Claim III-H-4, and Claim IV.

---

[32] One of the Circuit Court's tasks in ruling on Green's Rule 3.850 motion was to identify the claims rendered legally insufficient because other claims effectively foreclosed them.

[33] These four claims were all based on the Due Process Clause of the Fourteenth Amendment and/or the "Assistance of Counsel Clause" of the Sixth Amendment as made applicable to the States. *Gideon v. Wainwright,* 372 U.S. 335, 83 S. Ct. 792 (1963).

18-13524                Opinion of the Court                29

Claim I-2 alleged that defense counsel rendered ineffective assistance of counsel under the *Strickland v. Washington*[34] standard in failing to move the trial court to excuse a prospective juror for cause or strike the juror peremptorily.  Claim III-F alleged that defense counsel was ineffective under *Strickland* in failing to obtain and impeach Hallock at trial with a statement defense counsel was or should have been aware of—that Green made her tie Flynn's hands behind his back with a shoelace.  Claim III-H presented five claims for violations of the *Brady* and *Giglio* rules.[35]  Claim III-H-4,

---

[34] 466 U.S. 668, 104 S. Ct. 2052 (1984).

[35] Claim III-H, entitled "Suppression of favorable impeaching and/or exculpatory evidence," alleged the following four additional *Brady* claims, none of which are at issue in this appeal.

Claim III-H-1 alleged that Green was with Lori Rains at the time of Flynn's murder and that Sheriff's Office "agents Fair and Nyquist . . . threatened to . . . charge her with accessory to murder" if she testified in Green's defense as an alibi witness.  As a result, Rains did not appear for trial.

Claim III-H-2 alleged that Sergeant Fair failed to disclose to the defense as required by the *Brady* rule "around 70 loose photographs" that he showed to Hallock at the North Precinct station on April 4, 1989.

Claim III-H-3 alleged Agent Nyquist failed to disclose to the defense as required by the *Brady* rule notes Sheryl Mattieu, Kim Hallock's sister, made during an interview with Agent Nyquist about a conversation she had with Hallock regarding the murder.

Claim III-H-5 was presented in a written argument Collateral Counsel submitted to the Circuit Court following the evidentiary hearing it held subsequent to the *Huff* hearing.  The Court therefore considered it.  The claim concerned the State's failure to disclose some three by five cards of the

which provided the principal basis for the writ of habeas corpus the District Court issued,[36] alleged that the prosecutor failed to disclose to the defense as required by *Brady* the handwritten notes he made of a pretrial conversation he had with Diane Clarke and Mark Rixey. These notes included several investigative facts from the night of the murder, some of which Clarke and Rixey personally observed on the night of the murder and some of which were based on hearsay, that led them to suspect that Hallock killed Flynn. Claim IV alleged that newly discovered evidence consisting of the recantation of the trial testimony of three prosecution witnesses, Sheila Green, Lonnie Hillery, and Jerome Murray, rendered Green's convictions constitutionally unreliable.[37]

After the State responded to the amended Rule 3.850 motion, the Circuit Court convened a hearing with the parties' counsel on May 13, 2002, pursuant to *Huff v. State*, 622 So. 2d 982 (Fla. 1993). This hearing, known as a *Huff* hearing, provides counsel

---

approximately seventy mugshots Sergeant Fair and Agent Nyquist showed to Hallock at the North Precinct station on April 4, 1989.

[36] *See infra* part V.

[37] Claim IV sought a new trial under Florida law based on newly discovered evidence, and that is how the Florida Supreme Court viewed the claim. It decided the claim based on Florida law, not a holding of the United States Supreme Court. *See Green II,* 975 So. 2d at 1099. Later, in a successive Rule 3.850 motion, Green would present a claim that the State induced Sheila Green, Lonnie Hillery, and Jerome Murray to testify falsely at trial in violation of the Supreme Court's holding in *United States v. Giglio*, 405 U.S. 159, 92 S. Ct. 763 (1972). *See infra* part VI.C.

with an opportunity to be heard on an initial (as distinguished from a successive) 3.850 motion. *Id.* at 983. At the hearing, the court entertains argument on the legal sufficiency of the claims the motion presents. It identifies the claims that can be adjudicated without an evidentiary hearing solely on the basis of the record of the movant's criminal prosecution and the claims that require an evidentiary hearing. *Id.*

After considering what counsel had to say, the Circuit Court identified the plausible claims. Of the claims relevant here, it concluded that Claims I-2, III-F, and IV required an evidentiary hearing but Claim III-H-4 did not. The Court therefore adjudicated Claim III-H-4 based on the records of the pre-trial and trial proceedings in Green's prosecution, the *Huff* hearing, and Claim III-H-4's factual allegations. On July 22, 2002, the Circuit Court issued a written order denying relief on Claim III-H-4.

The Circuit Court held evidentiary hearings on the remaining three claims on April 24–25, 2003, October 28–29, 2003, February 24–26, 2004, June 24–25, 2004, and October 4, 2004. Then, in an order entered on November 22, 2005, the Court decided Claims I-2, III-F, and IV based on the record of Green's prosecution *and* the testimony and other evidence the parties presented during the evidentiary hearing.

Below, we describe these four claims in full and relate the findings of fact and conclusions of law the Circuit Court made in denying them. We start with Claim III-H-4 because the Court decided it without an evidentiary hearing.

32                    Opinion of the Court                    18-13524

1.

Claim III-H-4 consisted of two paragraphs:[38]

---

[38] The style of Claim III-H reads:

Claim III

> MR. GREEN WAS DENIED THE [1] EFFECTIVE
> ASSISTANCE OF COUNSEL PRETRIAL AND AT
> THE GUILT/INNOCENCE PHASE OF HIS TRIAL
> IN VIOLATION OF THE SIXTH, EIGHTH, AND
> FOURTEENTH AMENDMENTS.        COUNSEL
> FAILED   TO   ADEQUATELY   INVESTIGATE,
> PREPARE AND PRESENT THE DEFENSE CASE
> AND CHALLENGE THE STATE'S CASE. [2]
> WHERE   EXCULPATORY   EVIDENCE   WAS
> SUPPRESSED OR CONCEALED, MR. GREEN IS
> ENTITLED TO RELIEF UNDER *BRADY* AND/OR
> *GIGLIO.*
>
> . . . .
>
> H.    SUPPRESSION    OF    FAVORABLE
>       IMPEACHING AND/OR EXCULPATORY
>       EVIDENCE.

Although the style of the heading of Claim III combines Green's claims that defense counsel provided ineffective assistance of counsel under *Strickland* with his very different claims that the State concealed exculpatory evidence in violation of the *Brady* and/or *Giglio* rules, neither counsel nor the Court mentioned the ineffective assistance language in the style of Claim III when they considered Claim III-H at the *Huff* hearing on May 31, 2002. The Circuit Court reduced Claim III-H-4 to a claim that the State—specifically, prosecutor White—failed to disclose the August 28, 1989, notes to the defense in violation of the *Brady* rule. The Claim III claims of ineffective assistance of counsel

18-13524                Opinion of the Court                      33

51.    A handwritten police statement dated 8/28/89 with the names Diane Clarke and Mark Rixey underlined on the front page . . . was not disclosed to the defense at trial.[39]    It contains the following statements:

Found gun on the ground around 4-5 ft. from W/M. There was no indication that he had moved.[40]

---

were explicitly asserted elsewhere in Claims III, in A through G, as follows: "Defense counsel rendered prejudicially ineffective assistance of counsel during the guilt/innocence phase of the trial in ways including but not limited to the following"—A, "Failure to obtain and maintain file"; B, "Failure to Investigate and Develop issues Relating to Cross-Race Identification, 1. Failure to retain an expert witness, 2. Failure to request a special instruction, 3. Failure to cross examine and argue"; C, "Failure to Investigate and Preserve Exculpatory and Impeaching Evidence Relating to Impressions"; D, Failure to Investigate and Present Exculpatory and Impeaching Evidence Relating to Footprint Impressions"; E, Failure to Investigate and Present Exculpatory and Impeaching Evidence Relating to the Alleged Murder Weapon"; F, "Failure to Investigate and Present Exculpatory and Impeaching Evidence Relating to the Initial Police Investigation"; G, Failure to Investigate and Challenge the State's Theory of Flight."

[39] The "police statement" was actually prosecutor White's notes.  Green obtained the notes in a public records request made pursuant to Chapter 119 of the Florida Code, *i.e.*, Fla. Stat. § 119.01.

[40] Clarke and Rixey observed the first two investigative facts after arriving in the orange grove where they found Flynn.

Did see puddle of blood right under the V. Also saw clothes near the victim & another location saw blood on the ground a foot or two from the gun.

. . . .

Mark [Rixey] & Diane [Clarke] suspect girl did it, She changed her story couple time[41] . . . . [?] *She [?] said she tied his hands behind his back.*[42]

Thinks she gave them very good [?] directions (J.J.[?] & U.S. 1) and had driven all the way to Oak. Park Tr. Pk.

Also noticed she never asked how victim was while at homicide.[43]

---

[41] Clarke and Rixey left the orange grove scene after Criminalist Demers and Agent Nyquist arrived and had no further involvement in the homicide investigation. Their source for this statement in White's notes likely came from Deputy Walker or one or more Sheriff's Office investigators involved in the investigation—or from pure scuttlebutt.

[42] Clarke and Rixey never saw or spoke to Hallock. The only other reference to Hallock tying Flynn's hands appeared in Deputy Walker's police report, which was approved by Sgt. Clarke. In his deposition, Walker testified that he did not recall speaking with Clarke or Rixey about the investigation. Therefore, Clarke and Rixey probably learned of this "tied his hands" statement from Walker's report.

[43] Clarke and Rixey likely learned this from Walker.

18-13524                Opinion of the Court                35

Didn't see any footprint – didn't see any cas-
ing.[44]

She wouldn't go down there to the scene.[45]

Why wouldn't guy say who shot him. Just said
"I want to go home."[46] Was fairly calm while
there.

52.    The first sentence indicates that Flynn went
down right where he was shot. That the gun was four
to five feet away from the victim and that there was
no indication that he had moved indicates that he was
not in possession of the gun at the time he was shot.
This contradicts Ms. Hallock's version of a gunfight.
The fact that Ms. Hallock refused to lead the police to
the scene where her companion lay bleeding to death,
gave bad directions, coupled with other evidence
such as the fact that she drove past the hospital when
supposedly fleeing the scene, strongly suggest that

---

[44] Clarke and Rixey either observed this at the orange grove or acquired the information from those who came to the orange grove after they left.

[45] The source of this statement is also unknown, and its meaning questionable. In his deposition, Rixey testified that he "was a little nervous being out there, because it "was dark, [b]oth of [our] flashlights had died," they "[w]ere hearing noises," and "there was somebody running around with a gun." Clarke testified that Hallock "didn't dare go down there," so she "told Deputy Walker to . . . stay with her." Walker also testified that Hallock "refused to go any further," so Clark and Rixey proceeded alone.

[46] Unlike many of the other claims in this handwritten statement, Clarke and Rixey personally heard Flynn say this.

36                     Opinion of the Court                    18-13524

she did not want the victim to live to tell the truth. The statements should have been disclosed to defense counsel, but were not.[47]

During the *Huff* hearing, Collateral Counsel, Christopher White, and the Court engaged in a free-flowing discussion about these statements to determine whether an evidentiary hearing would be necessary to flesh them out. This is what was said:

> COLLATERAL COUNSEL: [Claim III-H is] a very general claim about . . . possible suppression of exculpatory evidence. I go through a number of instances.
>
> . . . .
>
> [T]here were notes . . . made by Mr. White.
>
> They reflect the results of his speaking to . . . Diane Clark[e] and Mark Rixey.
>
> And they include statements to the effect that they think the girl did it and some specific questions about the crime scene and so on and so forth.
>
> I allege those should have been turned over to the defense counsel at the time. The State won't agree with that position.

---

[47] The Circuit Court omitted paragraph fifty-two, which consists of Collateral Counsel's interpretation of White's notes, in adjudicating Claim III-H-4.

18-13524                Opinion of the Court                37

Now that they are there, I argue the information should [have been] made available to defense counsel.

I think that concludes that.

THE COURT: Mr. White. [48]

. . . .

MR. WHITE:

. . . .

It's not as if Mr. Parker failed to understand that there was an issue here with Kim.

[In his closing argument to the jury,] he walked right up the line of trying to accuse her of actually being the killer which is the point of the gun.

There is only one gun and actually Kim shot it.

He even went so far as to say at one point on page 1864 of the trial transcript.

_____

[48] After responding to Collateral Counsel's other Claim III-H *Brady* claims (which the Court and counsel had been discussing), White addressed the claim based on his handwritten notes. What follows are White's comments on whether defense counsel, John Parker, was aware of what the notes revealed, including Clarke's and Rixey's suspicion that Hallock shot Flynn.

Chip was sleeping with another woman while he was sleeping with Kim and we know that Kim wasn't very happy about it.

So that is one of the more dramatic statements they made.

He walked right up to the line and he never came right out and said ladies and gentlemen Kim Hallock killed Flynn.

The reasons he didn't was because of all the evidence that indicates that there was someone else there; all the footprints; the wallet at the scene and so on and on.

But at any rate that is my argument as to that

. . . .

The only other issue . . . under this claim are the arguments relating to Walker and Clark[e].

The first one is the allegation in the notes that I made, those are my notes that indicate that they saw a puddle of blood on the ground four or five feet from the white male.  This was Chip.

There is no indication that he had moved.

I guess from that they extrapolate that the gun is four or five feet away and it is really too far away for it to have been caused to be there by Chip.

I'm not sure how [Collateral Counsel] reaches that conclusion.

But somehow he appears to be headed to somehow exculpatory evidence I should have given [Parker], and this puddle of blood within a foot or two of the gun and obviously . . . where Chip was.

All of those things are in the photographs and they're all available in testimony of witnesses.

I don't believe I have any duty to say to the defense have you guys thought about this angle and this angle?

I gave them all the evidence.

Mark and Diane suspect – most – to the idea to try to make it out Kim did it.

Their testimony and their opinions are not going to be (unintelligible).  Why do I have to tell Mr. Parker that they have opinions and (unintelligible) that she did not.

I don't have this obligation.

. . . .

Nothing in the testimony other than that Mark and Diane . . . think she had done it.

There was nothing in the form of *Brady* evidence and neither of them talked to Kim.

*And all of the stuff* lying (phonetic) from this or that *they are getting out of the records in the case Mr. Parker already ha[d]*.

I submit to you an evidence hearing is not required and *Brady* violation fails for all of those reasons.

I think that pretty much covers it.

THE COURT: Rebuttal?

(Emphasis added).

Collateral Counsel offered no rebuttal to White's comments about the handwritten notes of August 28, 1989, instead changing topics to an unrelated matter. More to the point, he did not ask for an evidentiary hearing to dispel White's statement to the effect that what Clarke and Rixey told White came "out of the records in the case Mr. Parker already ha[d]."

In its July 22 order denying Claim III-H-4, the Circuit Court found no merit in the allegation that White's failure to disclose the notes violated the *Brady* rule. "All of the information in the . . . notes [was] disclosed and known by [Parker] before trial," and "the Defendant has shown no prejudice." Parker acquired most of the information during the extensive pretrial discovery he and the Assistant Public Defender who preceded him conducted, particularly in examining Sergeant Clarke, Deputy Rixey, Deputy Walker, and

Hallock on deposition.[49]  After quoting White's notes as set out in Claim III-H-4, *supra,* the Circuit Court also identified what Parker knew and its source:

> Deputy Rixey testified that he found a .22 revolver four to five feet from the victim. Deputy Rixey testified at trial that when he found the victim, he was lying in blood.  Deputy Rixey also testified that he found clothes items along the side of the road. In his deposition, Deputy Rixey testified that he found clothes near the body. During his deposition, Deputy Rixey testified that also he found blood near the victim. The purported opinion of Deputies Rixey and Clarke that they suspected that Hallock murdered Flynn would not have been admissible at trial.  The Defendant also alleges that Hallock gave bad directions, but that issue was also known by defense counsel as demonstrated by the deposition of Diane Clark[e]. Furthermore, the allegation that evidence was suppressed regarding Hallock's failure to ask

_____

[49] The Assistant Public Defender, Greg Hammel, took Rixey's deposition on September 6, 1989.  Parker deposed Clarke on February 12, 1990, Hallock on February 13, 1990, and Walker on March 5, 1990, all well prior to the commencement of Green's trial.  In addition to the testimony of these deponents, Parker had copies of the statements Hallock made during questioning at the Sheriff's North Precinct station on April 4, 1989, at 8:20 a.m., 9:20 p.m., and 9:32 p.m.  Parker also had the report Walker filed with the Sheriff's Office on April 5, 1989, which included what Hallock related to him about her encounter with Green, Rixey's police report, and access to several other reports and exhibits the State disclosed, some of which were introduced into evidence at Green's trial.

about the victim's welfare is without merit as Deputy Wade Walker's deposition demonstrates that counsel knew there was no reference to her asking how he was. The fact that Hallock did not drive to the hospital after the shooting and refused to go back to the scene was a matter of record at trial. The hospital was an option as a place to go for help, but she turned off U.S. 1 and drove an equal distance to the home of a friend, David Stroup, to call for help. During cross-examination of Hallock, Parker questioned her failure to stop at houses of other friends, her decision not to go to the hospital, and why she did not just drive to her parents' house. During closing argument, Mr. Parker noted that she could have gone to houses along the roads near the orange grove and that she did not go to the hospital. Moreover, any suggestion that Kim Hallock was the murderer defense counsel knew both before and at trial as evidenced by argument at trial and a pre-trial motion in which he requested Hallock's father's gun to see if it was the murder weapon. Parker knew at trial that no casings were found at the scene, as he specifically questioned Sergeant Russell Cockriel about this fact. Moreover, Parker was aware that no bare footprints were at the scene, as evidenced by his cross-examination at trial of Sergeant Russell Cockriel as to this fact. Flynn's failure to identify the suspect while he was dying was also known to counsel as shown by the depositions of Deputy Rixey and Clark[e].

18-13524                Opinion of the Court                    43

Thus, the Court found that White's failure to disclose his notes could not have prejudiced the defense.[50] The facts underlying Rixey and Clarke's suspicion were known to defense counsel prior to trial and, the non-disclosure aside, "[t]he purported

---

[50] The Circuit Court did not recite the elements of a *Brady* claim when deciding Claim III-H-4. The Supreme Court of Florida, in reviewing one of Green's other *Brady* claims, correctly recited the elements of a *Brady* claim and the defendant's burden in proving it:

> To establish a *Brady* violation, the defendant has the burden to show (1) that favorable evidence—either exculpatory or impeaching, (2) was willfully or inadvertently suppressed by the State, and (3) because the evidence was material, the defendant was prejudiced. *Strickler v. Greene,* 527 U.S. 263, 281–82, 119 S. Ct. 1936, 144 L.Ed.2d 286 (1999); *see also Way v. State,* 760 So. 2d 903, 910 (Fla.2000). To meet the materiality prong, the defendant must demonstrate a reasonable probability that had the suppressed evidence been disclosed the jury would have reached a different verdict. *Strickler,* 527 U.S. at 289, 119 S. Ct. 1936. A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Way,* 760 So. 2d at 913; *see also Strickler,* 527 U.S. at 290, 119 S. Ct. 1936. The remedy of retrial for the State's suppression of evidence favorable to the defense is available when "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Strickler,* 527 U.S. at 290, 119 S. Ct. 1936 (quoting *Kyles v. Whitley,* 514 U.S. 419, 435, 115 S. Ct. 1555, 131 L.Ed.2d 490 (1995))

*Green II,* 975 So. 2d 1101–02. Green made no objection in the Circuit Court to the Court's application of *Brady* to Claim III-H-4. As indicated *infra,* he did not appeal the Circuit Court's disposition of the claim to the Supreme Court of Florida.

opinion of Deputies Rixey and Clark[e] that they suspected that Hallock murdered Flynn would not have been admissible at trial." Clarke and Rixey were the first law enforcement officers to respond to the scene of the murder.  After Criminalist Debbie Demers and case agent Scott Nyquist arrived, Clarke and Rixey left the scene and had no further involvement in the criminal investigation.  Obviously, their suspicion that Hallock shot Flynn was based on hearsay.  As the Circuit Court found, "any suggestion that Kim was the murderer" was known and exploited by Parker before and at trial. Rixey and Clarke simply connected the dots much like Parker did in his argument to the jury at the close of the guilt-innocence phase of Green's trial.

★          ★          ★

In identifying in its July 22 order what Parker knew and its source, the Circuit Court did not mention the statement in White's notes, "She [?] said she tied his hands behind his back."  The source of the statement was the report Deputy Walker filed in the Sheriff's Office on April 5, 1989.  It reads as follows:

> I responded to Oak Park Trailer Park, Lot #33 and met with Kim S. Hallock.  Ms. Hallock stated that her boyfriend, Charles L. Flynn Jr. had been shot in an orange grove.  I stated to Ms. Hallock that she should go with me to show where the incident occurred.  She agreed and led myself and Deputy Rixey . . . and Sgt. Clarke . . . to the scene where the shooting occurred. Ms. Hallock stated that she and Mr. Flynn were in his 1982 Chevy pickup at Holder Park when this black

male approached the pickup.  Mr. Flynn exited the pickup and then Ms. Hallock was told to tie Mr. Flynn's hands behind his back with a shoe string.  The black male then told both Mr. Flynn and Ms. Hallock to sit in the truck and look at the floorboard.  The truck was then driven by the black male to the orange groves off Hammock Rd. . . .

Parker was in possession of Walker's report no later than when he deposed Deputy Walker on March 5, 1990.  Clarke and Rixey, who never saw or spoke to Hallock and had no further investigative role, simply told White what they had heard from Walker.  This explains the statement's appearance in White's notes of August 28, 1989.

At the *Huff* hearing, Collateral Counsel said nothing in response to White's comment that what Clarke and Rixey told him came "out of the records in the case Mr. Parker already ha[d]."  Parker had all the information White's notes contained including the "she tied his hands" statement.  The statement was in Walker's report that had been disclosed to Parker.

Did Collateral Counsel say nothing about the hands-tying statement because he knew that Parker had access to Walker's report?  This is inferable from the allegations Collateral Counsel made in Green's Rule 3.850 motion in support of Claim III-F.  Claim III-F alleged that Parker had access to Hallock's hands-tying statement but failed to confront Hallock with it in cross-examining her at trial and that the failure constituted ineffective assistance of

counsel.  As indicated in our discussion of Claim III-F, *see infra* part II.A.3, the statement was memorialized in Deputy Walker's report and presumably in the notes Walker made on a notepad he kept. Parker questioned Walker about his report and the notepad when he took Walker's deposition on March 5, 1990.   Walker testified that Hallock told him nothing about what happened other than what was included in his report, but agreed to hold onto the notepad at Parker's request.

2.

18-13524                Opinion of the Court                47

Claim I-2[51] alleged that Parker was ineffective under the *Strickland* standard[52] for failing to move the trial court to excuse prospective Juror Harold Guiles for cause or to strike him from the jury venire peremptorily. During *voir dire*, Guiles revealed that his niece had been murdered three years earlier. He was also "ineffective for failing to ask follow-up questions after Juror Guiles stated that his niece had been murdered."

---

[51] The style of Claims I reads:

CLAIM I

> MR. GREEN WAS DENIED HIS RIGHTS UNDER THE FIRST, SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION. . . . [1] *BECAUSE OF JUROR MISCONDUCT.* [2] *DEFENSE COUNSEL WAS INEFFECTIVE* FOR FAILING TO QUESTION JUROR GUILES REGARDING THE MURDER OF HIS NIECE, CHALLENGE HIM FOR CAUSES, OR TO HAVE HIM EXCUSED BY EXERCISING A PEREMPTORY CHALLENGE. [3] THE COURT COMMITTED FUNDAMENTAL ERROR BY FAILING TO EXCUSE JUROR GUILES SUA SPONTE.

Of the three subclaims in Claim I, only Claim I-2 is relevant here.

[52] The *Strickland* standard is set out in note 119 *infra.* There is no question that in deciding Green's ineffective assistance claims—Claims I-2 and III-F—the Circuit Court and the Florida Supreme Court applied the *Strickland* standard.

This is the part of Guiles' *voir dire* which, according to Green, should have prompted Parker to ensure that Guiles did not serve on his jury:

> The Court: Have any of you been the victim of a crime or has any member of your immediate family been the victim of a crime?
>
> . . . .
>
> Mr. Guiles: My niece was murdered, but that's not immediate family.
>
> The Court: How long ago was that?
>
> Mr. Guiles: Three years ago.
>
> The Court: Three years ago?
>
> Mr. Guiles: (Nods head.)
>
> The Court: Where was it?
>
> Mr. Guiles: In Naples.
>
> The Court: Would you be able to set aside that?
>
> Mr. Guiles: Well, it doesn't seem like it's the same kind of thing.
>
> The Court: Would you be able to set it aside and not let it affect the case?
>
> Mr. Guiles: Yes.

Neither the Court nor Parker nor the prosecutor questioned Guiles further regarding his niece's murder.  Parker did not move the Court to excuse Guiles from the venire for cause on this basis, and he did not remove him with a peremptory challenge.

The Circuit Court concluded that Green failed to establish both prongs of a *Strickland* ineffective assistance claim—deficient performance and resulting prejudice—and therefore denied Claim I-2.  Parker could not have challenged Guiles for cause because, as the Circuit Court found, Guiles demonstrated that he could serve as an impartial juror by answering "yes" to the last question put to him.  This answer, in the Court's view, "rehabilitat[ed]" Guiles as a potential juror.

In denying Claim I-2, the Court did not overlook that Parker could have pursued a challenge for cause by questioning Guiles further or, if unsuccessful, could have exercised a peremptory challenge.  But Parker's testimony during the evidentiary hearing demonstrated to the Court's satisfaction that he was not *Strickland* deficient in neglecting to pursue either course.

Parker testified that he tried to dismiss Guiles because of pretrial publicity, but the judge denied that motion.  Parker also had legitimate reasons for not peremptorily striking Guiles. The Circuit Court stated in its November 22, 2005, order that Parker

> did not exercise a peremptory challenge to strike Mr. Guiles because he was concerned "that by exercising peremptories, that we may, indeed, get people that we wish we didn't have."  Mr. Parker testified that he

was quite pleased that there were eight women on the jury, which he believed would be more favorable to the defense, and that he feared that by exercising additional peremptory challenges that more men could end up on [Green's] jury than women. Mr. Parker testified that he thought that female jurors would not believe Kim Hallock's testimony. Mr. Parker further testified that he discussed "heavily" with [Green] and his paralegal, Ms. Quinn, whether Juror Guiles should be removed from the jury. Mr. Parker testified that "we were satisfied that Mr. Guiles would be able to follow the law regarding the weighing of the evidence, [and] separate himself from the fact that his niece had been killed."

The Circuit Court concluded that these reasons for not peremptorily striking Guiles were more than sufficient to defeat an ineffective assistance claim.

3.

Claim III-F[53] alleged that Parker was ineffective under the *Strickland* standard for failing "to investigate and present

---

[53] The style of Claim III-F reads:

Claim III

> MR. GREEN WAS [1] *DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL* PRETRIAL AND AT THE GUILT/INNOCENCE PHASE OF HIS TRIAL IN VIOLATION OF THE SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS.    COUNSEL

18-13524               Opinion of the Court                    51

> FAILED TO ADEQUATELY INVESTIGATE, PREPARE AND PRESENT THE DEFENSE CASE AND CHALLENGE THE STATE'S CASE.  WHERE [2] *EXCULPATORY EVIDENCE WAS SUPPRESSED OR CONCEALED*.  MR. GREEN IS ENTITLED TO RELIEF UNDER *BRADY* AND/OR *GIGLIO*.
>
> . . . .
>
> F.    FAILURE TO INVESTIGATE AND PRESENT EXCULPATORY AND IMPEACHING EVIDENCE RELATING TO THE INITIAL POLICE INVESTIGATION.

(Emphasis added).  Green's position in the District Court and here on appeal was and is that Claim III-F presented essentially two claims, one alleging ineffective assistance of counsel and the other a *Brady* violation.  We disagree.

Claim III-F was based on the explicit allegation that Parker should have been aware of Hallock's statement to Deputy Walker on April 4, 1989, that she tied Flynn's hands behind his back, because Parker had access to Walker's police report.  Parker rendered ineffective assistance because he failed to cross-examine Hallock with her statement at Green's trial.  Parker also knew that Walker kept a notepad where he wrote down what Hallock told him.  Walker agreed to hold on to the notepad so Parker could see it, but Green alleged that Parker was "deficient . . . in failing to obtain this notebook or notepad."  Claim III-F further alleged that what Walker wrote in his report was consistent with what White's notes of August 28, 1989, revealed: "Mark & Diane suspect the girl did it.  She changed her story couple of times. . . [?] She [?] said she tied his hands behind his back."  It was also alleged to be consistent with the FDLE report of its interview of Walker in 1999, which did not exist at the time of the trial.

52                      Opinion of the Court                      18-13524

exculpatory and impeaching evidence relating to the police inves-tigation." Specifically, Claim III-F alleged that Parker was ineffec-tive for failing to investigate the "hands-tying" statement in Deputy Walker's report and impeach Hallock's testimony at trial with it. Hallock testified at trial that Green ordered her to give him a shoe-lace from one of Flynn's shoes, which he then used to tie Flynn's hands behind his back. However, Claim III-F alleged that Hallock told Deputy Walker that "she was the one who tied Flynn's hands behind his back" per Green's orders. In the report he filed in the Sheriff's Office on "4/5/89, at 2:05:50," Walker wrote: "Ms. Hal-lock stated that she and Flynn were in his 1982 Chevy pickup when this black male approached the pickup. Mr. Flynn exited the pickup and then Ms. Hallock was told to tie Mr. Flynn's hands behind his back."[54]

Claim III-F also relied upon the FDLE interview of Walker that took place in 1999—well after the trial—and White's notes from his 1989 interview of Clarke and Rixey that said: "Mark & Di-ane suspect the girl did it. She changed her story couple of times. .

---

Green's position that Claim III-F pled a *Brady* claim was based on the inclusion of this quotation in Claim III-F's factual allegations. However, Claim III-F cannot be fairly read as presenting the same *Brady* claim that was alleged in Claim III-H-4. And even if it had, the *Brady* claim fell by the wayside during the discussions and ruling at the *Huff* hearing.

[54] At that moment, Flynn was on his knees and Green was holding a gun to Flynn's head. A reasonable inference is that Hallock did what Green told her to do.

. [?] She [?] said she tied his hands behind his back." Claim III-F alleged that what "Diane Clarke and Mark Rixey" told White about the tying of Flynn's hands was "consistent with Dep. Walker's recollection that Hallock said that she was the one who did the actual tying of Flynn's hands, and inconsistent with Hallock's subsequent statements and eventual trial testimony." What Clarke and Rixey told White about the tying of Flynn's hands was consistent with what Walker wrote in his report because what they told White came from Walker. He was their source.

Green's factual position was that Parker should have been aware of what Walker wrote in his report, but

> [Parker] did not confront Hallock at trial . . . with Deputy Walker's report that she had been the one to tie Flynn's hands . . . . [He] should have known about the hands-tying issue because it was contained in Deputy Walker's report, but [he] did not ask any questions about it in Walker's deposition or at any time during the trial.

To Green, this constituted ineffective assistance of counsel under *Strickland*.

To prevail on Claim III-F, however, Green had to prove that Hallock actually told Walker that she was the one who tied Flynn's hands and that Parker knew this prior to Green's trial.[55] If he could

---

[55] Unless he was armed with Hallock's alleged statement to Walker, Parker would not have been able to confront Hallock about a prior inconsistent

54                    Opinion of the Court                    18-13524

have, Green should have proved the point during the evidentiary hearing the Circuit Court held on Claim III-F. But he did not.

First, Green did not summon Walker to testify at the evidentiary hearing. If he had summoned him and Walker had difficulty recalling what Hallock told him on April 4, 1989, Green could have used his report to refresh his recollection.[56] Second, Green could have obtained the notepad on which Walker jotted down what Hallock said. Walker told Parker about the notepad when Parker took his deposition pre-trial, on March 3, 1990. The notepad happened to be in Walker's "locker" at the time. Parker asked him to "hold on to it," and Walker said he would.[57] Green alleged that Parker "was ineffective for failing to obtain the notepad or notes."

Without Walker's testimony or his report or notepad in evidence,[58] the Circuit Court realized that it would have to speculate in order to find that Hallock told Walker that she tied Flynn's hands

---

statement in the event she insisted that she told Walker that Green tied Flynn's hands. Parker needed Hallock's alleged statement to Walker to impeach her testimony that Green was the one who tied Flynn's hands.

[56] It may also have been admissible in evidence under the official records rule or as Walker's past recollection recorded. *See* Fla. Stat. § 90.803(5), (8) (2001).

[57] Like the report, the notepad could be used to refresh Walker's recollection of what Hallock told him. If that failed, the notepad may have been admissible as Walker's past recollection recorded. *See* Fla. Stat. §§ 90.613, 90.803(5) (2001).

[58] According to the Court, the location of the notepad at the time of the evidentiary hearing was "unknown."

and thus that Parker rendered ineffective assistance of counsel in failing to use the statement to impeach her testimony at trial, as Claim III-F alleged.[59] But, the Court said, the "ineffective assistance of counsel claim [could] not be based on speculation."[60]

> At the evidentiary hearing, Officer Walker was not called to testify. Consequently, this Court is only left with the allegation made by the Defendant in his post-conviction motion as to what Officer Walker purportedly said in 1999 to FDLE concerning what Kim Hallock told him. There has been no evidence produced to establish the truthfulness that Kim make this statement to Officer Walker. As to counsel's alleged failure to obtain the notepad or notes, an ineffective assistance of counsel claim cannot be based on speculation that such notes might have contained helpful information.

Because speculation was all that Green had to rely on, the Court denied Claim III-F.

⋆          ⋆          ⋆

Green's position in the District Court was that Claim III-F alleged both ineffective assistance of counsel and a *Brady* violation. That is his position here as well. That position enabled him to

---

[59] In deciding Claim III-F, the Circuit Court applied the *Strickland* standard.

[60] Collateral Counsel had White's notes prior to the evidentiary hearing the Circuit Court held on Claim III-F. Neither Clarke nor Rixey was asked who told them that Hallock made the statements White's notes reflected.

convince the District Court to reject the State's argument that Claim III-H-4 had not been exhausted. And he hopes we will reject the State's argument too.

Collateral Counsel, who drafted the Rule 3.850 motion, did not see the *Brady* violation Green saw in the District Court and sees here now. Collateral Counsel included the "she did it" and "she tied his hands" statements (from White's notes) in presenting Claim III-F—to buttress the claim's allegation that Parker was aware of the statements and was derelict in failing to cross-examine Hallock with the hands-tying statement at trial. That Collateral Counsel was pleading an ineffective assistance claim, not a *Brady* claim, becomes clear when one reads the transcript of the *Huff* hearing. It was readily agreed that Claim III-F, alleging ineffective assistance, would receive an evidentiary hearing, while Claim III-H-4, based on White's notes, would not. This no doubt explains why Collateral Counsel, during the discussion about White's notes, said nothing in response to White's statement, obviously made with reference to his notes, that "Parker already ha[d]" "all of the stuff."

To put a lid on this discussion, consider the brief Green filed in the Florida Supreme Court in appealing the Circuit Court's determination of his Rule 3.850 motion. It contains not a word about the Circuit Court's denial of Claim III-H-4—but it does challenge the Circuit Court's denial of Claim III-F. The argument that the Circuit Court's Claim III-F ruling should be reversed replicates the White notes' statements Claim III-F cited in Green's Rule 3.850

motion. But the argument contains not even a hint that the statements were there to prove a *Brady* violation. The Florida Supreme Court, in affirming the Claim III-F ruling, did not see a *Brady* claim at all. All it saw was an ineffective assistance of counsel claim. *Green v. State* (*Green II*), 975 So. 2d 1090, 1104 (Fla. 2008).

4.

Claim IV[61] alleged that Green's convictions were constitutionally unreliable in light of the fact that Sheila Green, Lonnie Hillery, and Jerome Murray had recanted the testimony they gave during the guilt-innocence phase of Green's trial. The Circuit

---

[61] As expressed in the "Table of Contents" of Green's brief to the Florida Supreme Court in the appeal of the Circuit Court's disposition of his Rule 3.850 motion, Claim IV was this:

Green's Convictions are Constitutionally Unreliable in Violation of the Fifth, Sixth, and Fourteenth Amendments as Established by newly Discovered Evidence.

1. The Court erred in rejecting Shelia Green's recantation.
2. The Court erred in rejecting Lonnie Hillary's recantation by relying on trial testimony which was shown to be incredible.
3. The Court erred in relying on the State's presentation of newly discovered evidence of guilt,
4. The Court erred in considering MDNA testing results.
5. The Court erred in considering newly discovered evidence of guilt, thereby violating the Defendant's right to trial by jury under the Sixth and Fourteenth Amendments.

58                    Opinion of the Court                    18-13524

Court denied Claim IV based on these findings of fact, which the
Florida Supreme Court effectively adopted:[62]

> First, Green argues that his convictions are
> constitutionally unreliable in light of the fact that
> Sheila Green, Lonnie Hillery, and Jerome Murray,
> three of the State guilt phase witnesses, have recanted
> their trial testimony. The trial court made the follow-
> ing factual findings: First, Jerome Murray testified at
> Green's trial that, shortly after the murder, Green ad-
> mitted committing it and said he was going to

---

[62] The Florida Supreme Court effectively adopted the Circuit Court's findings
of fact in adjudicating Claim IV under the "competent, substantial evidence"
standard:

> When the trial court rules on a newly discovered evidence
> claim after an evidentiary hearing, we review the trial court's
> findings on questions of fact, the credibility of witnesses, and
> the weight of the evidence for *competent, substantial evi-
> dence. Melendez v. State,* 718 So. 2d 746, 747–48 (Fla.1998);
> *Blanco v. State,* 702 So. 2d 1250, 1251 (Fla.1997). As with rul-
> ings on other post-convictions claims, we review the trial
> court's application of the law to the facts de novo. *Cf. Hendrix
> v. State,* 908 So. 2d 412, 423 (Fla.2005) (reviewing de novo the
> trial court's application of the law to the facts in ruling on a
> postconviction claim that the government withheld material
> evidence); *Gore v. State,* 846 So. 2d 461, 468 (Fla.2003) (review-
> ing de novo the application of the law to the facts on a claim
> of ineffective assistance of trial counsel).

*Green II*, 975 So. 2d at 1100 (emphasis added).

18-13524          Opinion of the Court          59

disappear. At the postconviction evidentiary hearing, the defense introduced three out-of-court statements made by Murray in which he recanted his trial testimony. In these statements, Murray stated that his entire testimony was a lie and that he was under pressure from law enforcement to fabricate. However, at the evidentiary hearing, Murray claimed that he did not remember making these post-trial statements because he was either tired or drunk. When questioned about whether his post-sentencing statements were inconsistent with his trial testimony, Murray exercised his Fifth Amendment privilege against self-incrimination.[63]

Second, Sheila Green is Crosley Green's sister. At Green's trial, Sheila testified that the day after the homicide, Green admitted his involvement in the shooting to her. Sheila had been convicted in federal court for drug offenses and testified against Green in return for consideration for a more lenient sentence

---

[63] Murray gave the first of the three statements in writing to defense investigator, Paul Ciolino, on August 3, 1999, the second statement via videotape to Ciolino on August 3, 1999, and the third statement to the FDLE on October 13, 1999. In the first two statements, Murray said that his "trial testimony 'was a lie'." In the third statement, he said he lied about Green saying that he had killed a man. At the evidentiary hearing, Murray testified that "when FDLE took his statement, he was advised that if he did not make the statement, he could go to jail." When asked at the evidentiary hearing "whether his post-sentencing statements were inconsistent with his trial testimony," he "exercised his Fifth Amendment privilege against self-incrimination" and refused to answer.

for herself. At the evidentiary hearing, Sheila testified that her testimony at Green's trial was untrue and that Green never confessed to murdering Charles Flynn.

Third, Lonnie Hillery is the father of Sheila Green's child, and was her boyfriend at the time of Green's trial. Hillery also testified that Green admitted his involvement in the shooting to him. At the evidentiary hearing, Hillery said that he made up the story as part of a plea deal to help Sheila receive a more lenient sentence in her case.

*Green II*, 975 So. 2d at 1100.

The Circuit Court found that Murray's statements, if introduced as substantive evidence on retrial, would not change the outcome of the trial, stating: "There [was] not a reasonable probability that this would produce an acquittal on re-trial, given the other evidence presented at trial." Sheila Green "was not being forthright at the evidentiary hearing regarding the alleged falsification of her trial testimony." Indeed, her testimony at the evidentiary hearing was not credible. She was "presenting this unbelievable testimony at the evidentiary hearing in an effort to please her brother (the Defendant) and her family." The Court likewise found Lonnie Hillery's testimony at the evidentiary hearing not credible and that the outcome of the trial would not have been different if [he] had not testified.

★          ★          ★

18-13524                Opinion of the Court                61

Claim IV alleged that Green's convictions were unreliable in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments.[64] But Claim IV was nothing more than a Rule 3.850 motion based on state law.  *See Green II*, 975 So. 2d at 1100–01.  In his habeas petition to the District Court, though, Green transformed the claim into a *Giglio* claim: "[T]he State 'elicited or allowed to go uncorrected critical false testimony from key witnesses in violation of *Giglio v. United States . . .* [T]he State 'clearly relied on the false testimony of' Sheila Green, Hillery, and Murray.'"  The District Court recognized Claim IV as a *Giglio* claim—"based on these witnesses' recantation of their trial testimony"—and concluded that the Circuit Court and the Florida Supreme Court treated it as such in denying relief.

*B.*

The Circuit Court granted Green's Rule 3.850 motion in part and denied it in part.  The Court granted the motion and vacated Green's death sentence after finding that defense counsel was ineffective under *Strickland v. Washington* during the penalty phase of Green's trial.[65]  The Court therefore held that Green was

---

[64] We assume that the constitutional provision reasonably in play was the Due Process Clause of the Fourteenth Amendment.  Since Green was prosecuted under state law and was represented by counsel, the Fifth, Sixth, and Eighth Amendments could not be used to challenge his convictions.

[65] During the penalty phase, the prosecution introduced evidence of Green's prior unrelated felony convictions in New York as an aggravating factor. These convictions were vacated prior to Green's trial for the Flynn murder. The Circuit Court found that Parker was ineffective in failing to investigate

62                    Opinion of the Court                    18-13524

"entitled to a new penalty phase" proceeding on Count I of the in-
dictment.  The Circuit Court denied the Rule 3.850 motion as to
Green's convictions, concluding that he was "not entitled to a new
guilt phase" proceeding.

Green appealed the Circuit Court's denial of the motion as
to his convictions.  The State cross-appealed the vacation of
Green's death sentence and grant of a new trial of the penalty
phase. *Green II*, 975 So. 2d at 1099, 1109.

## C.

Green's appellee brief to the Supreme Court of Florida pre-
sented twelve arguments.  Arguments IV through IX[66] were

---

and discover the current status of the New York convictions and that the fail-
ure "was sufficiently prejudicial to [Green] in the penalty phase of this case to
warrant a new penalty phase proceeding."

[66] The Table of Contents of Green's brief labeled the six arguments in
this way:

ARGUMENT IV

GREEN'S CONVICTIONS ARE CONSTITUTIONALLY
UNRELIABLE IN VIOLATION OF THE FIFTH, SIXTH,
EIGHTH, AND FOURTEENTH AMENDMENTS AS
ESTABLISHED BY NEWLY DISCOVERED EVIDENCE.

. . . .

ARGUMENT V

THE COURT ERRED IN DENYING GREEN'S BRADY
CLAIM BASED ON SUPPRESSION OF 3 X 5 CARDS AND
RELATED DOCUMENTS.

ARGUMENT VI

    THE COURT ERRED IN DENYING GREEN'S CLAIM FOR RELIEF BASED ON INDIVIDUAL INSTANCES OF INEFFECTIVE ASSISTANCE OF COUNSEL AND NONDISCLOSURE OF EXCULPATORY EVIDENCE.

        Ineffective assistance for failure to maintain file

        Exculpatory and impeaching evidence relating to the initial police investigation

        Failure to impeach Jerome Murray

ARGUMENT VII

    THE COURT ERRED IN SUMMARILY DENYING GREEN'S CLAIM BASED ON DEFENSE COUNSEL'S FAILURE TO CHALLENGE CROSS-RACE IDENTIFICATION.

    . . . .

ARGUMENT VIII

    THE COURT ERRED IN DENYING RELIEF WITH REGARD TO DOG TRACKING EVIDENCE.

ARGUMENT IX

    THE COURT ERRED IN DENYING GREEN'S INEFFECTIVENESS CLAIM BASED ON TRIAL COUNSEL'S FAILURE TO CHALLENGE A PROSPECTIVE JUROR.

ARGUMENT X

    THE COURT ERRED IN SUMMARILY DENYING GREEN'S DUE PROCESS CLAIM BASED ON JUROR MISCONDUCT.

The Supreme Court of Florida, in an obvious effort to align the brief's arguments with the claims as alleged in Green's Rule 3.850 motion and as

64                    Opinion of the Court                    18-13524

addressed to the Circuit Court's denial of relief from his convictions.  In presenting these arguments, the brief rearranged some of the claims as pled in Green's Rule 3.850 motion so that the claims as pled and the arguments in the brief did not coincide.  The brief also expanded some claims to include facts not presented to the Circuit Court when it adjudicated the claims.

For clarity, we will refer to the claims challenging Green's convictions by their designations in the Rule 3.850 motion, not by

considered by the Circuit Court, treated the appellee brief as presenting "six guilt phase issues":

> (1) Green's convictions are constitutionally unreliable as established by newly discovered evidence; (2) Green was denied due process under *Brady v. Maryland,* 373 U.S. 83, 83 S. Ct. 1194, 10 L.Ed.2d 215 (1963), when the State suppressed evidence; (3) trial counsel provided constitutionally ineffective assistance; (4) the trial court erred in denying relief with regard to dog tracking evidence; (5) the rules prohibiting Green's lawyers from interviewing jurors are unconstitutional; and (6) the trial court erred in summarily denying Green's claims regarding juror misconduct and counsel's failure to challenge cross-race identification.

*Green II,* 975 So. 2d at 1099.  In addition to these guilt phase issues, the brief addressed and defended the Circuit Court's decision vacating Green's death sentence based on defense counsel's ineffective assistance "in failing to investigate" the disposition of Green's New York conviction.  *Green II,* 975 So. 2d at 1109–10.  As alternative grounds for affirming the vacation of his death sentence, Green argued that the Circuit Court erred in rejecting the other claims relating to the sentence's validity.  Those claims are inapposite here because the retrial of the penalty phase did not occur, and Green was sentenced to life imprisonment on the Count I murder charge.

18-13524                Opinion of the Court                        65

their corresponding designations in the appeal of that motion to the Supreme Court of Florida. Green's appellee brief addressed Claim I-2 as Argument IX and Claim III-F as Argument VI. The brief did not deal with Claim III-H-4, which the Circuit Court adjudicated without an evidentiary hearing, although the brief does refer to the notes White made on August 28, 1989, in Argument VI.[67] The brief addressed Claim IV in Argument IV.

_____

[67] Argument VI was based on the evidence presented at the evidentiary hearings the Circuit Court held following the *Huff* hearing. Argument VI contained three headings: "Ineffective Assistance for Failure to Maintain File," "Exculpatory and Impeaching Evidence Relating to the Initial Police Investigation," and "Failure to Impeach Jerome Murray." In presenting argument under the second heading, the brief alluded to White's notes of August 28, 1989, in these words:

> A handwritten police statement dated 8/28/89 with the names Diane Clark[e] and Mark Rixey underlined on the front page was obtained through the Ch. 119. It was not disclosed to the defense at trial. It contains the following statement: "Mark and Diane suspect the girl did it, she changed her story couple times . . . . [?] She [?] said she tied his hands behind his back.

The brief then stated that

> [t]his is consistent with Dep. Walker's recollection that Hallock said that she was the one who did the actual tying of Flynn's hands, and inconsistent with Hallock's subsequent statements and eventual trial testimony.
>
> Defense counsel testified during the evidentiary hearing on October 29, 2003, having reviewed the 1999 written statement by Deputy Walker to the FDLE, that had he had the information contained in the statement by Deputy Walker at the time of trial he would have used it to impeach Ms. Hallock

66                    Opinion of the Court                    18-13524

The Florida Supreme Court affirmed both the Circuit Court's decision granting a new trial of the penalty phase, *Green II*, 975 So. 2d at 1109–14, and the Court's denial of relief as to Green's convictions. *Id.* at 1116. The Florida Supreme Court ruled on the merits of three claims that the Circuit Court decided and that are pertinent here: Claims I-2 and III-F, both alleging ineffective assistance of counsel under the *Strickland v. Washington* standard, and Claim IV, alleging that Sheila Green, Lonnie Hillery, and Jerome Murray recanting their trial testimony made Green's conviction constitutionally unreliable. As Green did not brief Claim III-H-4 to the Florida Supreme Court, the Court did not review it.

1.

The Florida Supreme Court affirmed the Circuit Court's denial of Claim I-2 with this statement:

> . . . . Defense counsel did not confront Hallock at trial with . . . Deputy Walker's report that she had been the one to tie Flynn's hands. Defense counsel did, however, argue to the jury that Flynn's hands appeared to have been tied "for comfort."
>
> . . . . As the prosecutor put it, defense counsel was "alluding" to the theory that Kim Hallock, "a jealous lover of Chip Flynn," was the real killer.

In alluding to White's notes dated August 28, 1989, Argument VI made no mention of the Circuit Court's adjudication of Claim III-H-4. The argument was written as if that adjudication had not occurred.

We affirm the trial court's denial of this claim because Green fails to meet both prongs of the *Strickland* standard. First, Green was not prejudiced by Parker's failure to remove Guiles for cause because the trial court inquired whether the murder of Guiles' niece would affect his decision in the case. Guiles said that it would not. Thus, Guiles met the test for juror competency enunciated in *Davis v. State,* 461 So. 2d 67, 70 (Fla.1984) ("The test for determining juror competency is whether the juror can lay aside any bias or prejudice and render his verdict solely upon the evidence presented and the instructions on the law given … by the court."). Second, Parker did not render ineffective assistance in failing to ask Guiles more questions, because an allegation that there would have been a basis for a for cause challenge if counsel had followed up during *voir dire* with more specific questions is speculative. *Johnson v. State,* 903 So. 2d 888, 896 (Fla.2005); *Reaves v. State,* 826 So. 2d 932, 939 (Fla.2002). Third, Parker's performance was not deficient for failing to exercise a peremptory strike to remove Guiles. At the evidentiary hearing, Parker testified that he was satisfied that juror Guiles would be able to follow the law regarding the weighing of the evidence and separate himself from the fact that his niece had been killed. This decision does not fall outside the wide range of professionally competent assistance. *See Davis,* 461 So. 2d at 70.

68                     Opinion of the Court                    18-13524

*Green II,* 975 So. 2d at 1104–05.[68]

2.

The Florida Supreme Court affirmed the Circuit Court's de-
nial of Claim III-F with this statement:

Green claims that defense counsel Parker rendered in-
effective assistance in failing to impeach Kim Hallock
at trial with *a police report*[69] containing an alleged

---

[68] The Florida Supreme Court articulated the *Strickland* standard thus:

In *Strickland v. Washington,* 466 U.S. 668, 104 S. Ct. 2052, 80
L.Ed.2d 674 (1984), the [Supreme] Court established a two-
prong standard for determining whether counsel provided
constitutionally ineffective assistance. First, a defendant must
point to specific acts or omissions of counsel that are "so seri-
ous that counsel was not functioning as the 'counsel' guaran-
teed the defendant by the Sixth Amendment." *Id.* at 687, 104
S. Ct. 2052. Second, the defendant must establish prejudice by
"show[ing] that there is a reasonable probability that, but for
counsel's unprofessional errors, the result of the proceeding
would have been different." *Id.* at 694, 104 S. Ct. 2052. A rea-
sonable probability is a "probability sufficient to undermine
confidence in the outcome." *Id.*

*Green II*, 975 So. 2d at 1103. The Florida Supreme Court applied this standard
in adjudicating Claims I-2 and III-F.

[69] In referring to "a police report," the Florida Supreme Court must have been
referring to the report Deputy Walker filed on April 5, 1989, the day after the
Flynn homicide occurred. According to Green's Rule 3.850 motion, the report
was "stamped 4/5/89 at 2:05:50 a.m." *See supra* part II.A.3. This report was
disclosed to Parker prior to trial and he discussed it with Walker when he took

prior inconsistent statement that she, rather than Green, had been the one to tie Charles Flynn's hands. According to Green, Deputy Wade Walker stated in a report filed in 1999 pursuant to a Florida Department of Law Enforcement (FDLE) investigation that Hallock told him that the perpetrator made her tie Flynn's hands behind his back with a shoestring. Green argues that the information in the FDLE report contradicts Hallock's subsequent statements and trial testimony that Green himself tied Flynn's hands. However, Walker was not called to testify at the evidentiary hearing. Therefore, the trial court was left only with the allegations in Green's postconviction motion as to what Walker purportedly said in the FDLE report.

*Id.* at 1104 (emphasis added). In short, the Florida Supreme Court affirmed the denial of Claim III-F because Green provided "no supporting evidence" to establish that Hallock actually told Deputy Walker that she tied Flynn's hands.[70] *Id.*

3.

---

Walker's deposition on March 5, 1990. The Court could not have been referring to what Walker is reported to have told the FDLE in 1999 since the FDLE Investigative Summary did not exist at the time of Green's trial.

[70] Collateral Counsel did not present Walker as a witness or introduce the report filed on April 5, 1989.

The Florida Supreme Court affirmed the Circuit Court's denial of Claim IV.[71]  In doing so, it explained that to obtain a new trial under Florida law based on newly discovered evidence, Green had to satisfy two requirements:

> First, the evidence must not have been known by the trial court, [Green], or counsel at the time of trial, and it must appear that [Green] or defense counsel could not have known of it by the use of diligence.  Second, the newly discovered evidence must be of such nature that it would probably produce an acquittal on retrial.  *See Jones v. State,* 709 So. 2d 512, 521 (Fla.1998) (*Jones II*).  Newly discovered evidence satisfies the second prong of this test if it "weakens the case against [the defendant] so as to give rise to a reasonable doubt as to his culpability."  *Id.* at 526 (quoting *Jones v. State,* 678 So. 2d 309, 315 (Fla.1996) (*Jones I*)).

*Id.* at 1099 (quoting *Jones v. State*, 709 So. 2d 512, 521 (Fla. 1998)).  If Green met these requirements, the trial court must then "'consider all newly discovered evidence which would be admissible,'

---

[71] Claim IV alleged that the recantations of Murray, Sheila Green, and Hillery rendered Green's verdict "constitutionally unreliable."  But the brief cited no United States Supreme Court constitutional holding, much less a lower federal court decision, in support of its reliability argument.  Rather, the brief supported the argument only with state law cases.  As indicated from the *Green II* passages quoted in the following text, the Supreme Court treated Claim IV as a Fla. R. Crim. P. 3.850(c)(7) motion for a new trial based on newly discovered evidence.

and must 'evaluate the weight of both the newly discovered evidence and the evidence which was introduced at the trial.'" *Id.* (quoting *Jones v. State,* 591 So. 2d 911, 916 (Fla.1991)). In doing so, the court would have to consider "whether the evidence [was] cumulative to other evidence in the case . . . and any inconsistencies in the newly discovered evidence." *Id.* at 1099–1100 (quoting *Jones*, 709 So. 2d at 521).

The Court explained that Green's new evidence was insufficient to warrant a new trial because

> Jerome Murray's out of court recantation would not likely produce an acquittal on retrial because it would only serve as impeachment to his original testimony. . . . [B]oth Sheila Green's and Lonnie Hillery's recantations [were] incredible based on their responses, demeanor, and body language. Moreover, when weighed against the other admissible evidence, the recantations of Jerome Murray, Sheila Green, and Lonnie Hillery d[id] not create a reasonable probability of acquittal on retrial.

*Id.* at 1100–02.

★          ★          ★

Following the Florida Supreme Court's decision, the State filed a notice stating that it would not proceed with a retrial of the penalty phase and requested that the Circuit Court sentence Green to a term of life imprisonment. On August 31, 2009, after entertaining evidence Green presented in support of his argument that

72                     Opinion of the Court                 18-13524

he was actually innocent of the offenses of which he had been con-
victed, the Circuit Court resentenced him to life imprisonment on
Count I and concurrent prison terms of seventeen years on Counts
II through V, with the Count I sentence to run consecutively to
those counts.  Green appealed his sentences to the Fifth District
Court of Appeal.  The Court affirmed the sentences *per curiam* on
August 24, 2010.  *Green v. State,* 43 So. 3d 707 (Fla. 5th DCA 2010)
(Table).

## III.

### A.

On February 4, 2011, Green filed a Successive Motion to Va-
cate Judgment of Convictions and Sentences in the Brevard County
Circuit Court, under Rule 3.850 ("Successive Motion" or "Mo-
tion").[72]  By this time, Green was no longer represented by

---

[72] Rule 3.850 governs successive motions.  Subsection (h) of the rule states in
pertinent part:

**(h) Successive Motions.**
>    (1) A second or successive motion must be titled: "Sec-
>    ond or Successive Motion for Postconviction Relief."
>    (2) A second or successive motion is an extraordinary
>    pleading. Accordingly, a court may dismiss a second or
>    successive motion if the court finds that it fails to allege
>    new or different grounds for relief and the prior deter-
>    mination was on the merits or, if new and different
>    grounds are alleged, the judge finds that the failure of
>    the defendant or the attorney to assert those grounds
>    in a prior motion constituted an abuse of the proce-
>    dure or there was no good cause for the failure of the

18-13524              Opinion of the Court                    73

Collateral Counsel.  He had been replaced by private appointed counsel.  The Motion presented three "Grounds for Post-Conviction Relief."    All appeared under this heading: "NEWLY DISCOVERED EVIDENCE OF INNOCENCE ESTABLISHES THAT MR. GREEN'S CONVICTION AND SENTENCE VIOLATE THE FIFTH, SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS OF THE UNITED STATES AND FLORIDA CONSTITUTIONS."[73]  The second and third grounds are relevant

---

defendant or defendant's counsel to have asserted those grounds in a prior motion. When a motion is dismissed under this subdivision, a copy of that portion of the files and records necessary to support the court's ruling shall accompany the order denying the motion.

Fla. R. Crim. P. 3.850(h).  The text of this subdivision formerly appeared in Fla. R. Crim. P. 3.850(f).  We cite to subdivision (h) in this opinion.

This was Green's third attempt to file a successive Rule 3.850 motion to vacate his convictions.  Green filed a "First Amended Successive Motion" on September 27, 2010, and a "Second Amended Successive Motion" on January 7, 2011.  The February 4, 2011, motion (referred to in the above text) was also styled as the "Second Amended Successive Motion."  On January 24, 2011, the Circuit Court denied the January 7 motion without prejudice because the oath appended to the January 7 motion failed to comply with Fla. R. Crim. P. 3.987 and instructed Green to file a corrected motion within thirty days. *Green v. Sec'y Dep't of Corrs.*, 877 F.3d 1244, 1246 (11th Cir. 2017).  Green filed a corrective motion on February 4, 2011, as indicated in the above text.

[73] Rule 3.850 addresses newly discovered evidence.  Subsection (b), which the Successive Motion cited as the basis for the motion's grounds for relief, states in pertinent part:

74              Opinion of the Court              18-13524

here, but only insofar as counsel has sought to reassert them on federal habeas review.[74]

1.

The second ground, "The State Withheld Exculpatory Evidence," constituted a reassertion of Claim III-H-4 from the first motion, but with a significantly expanded, and purportedly "newly discovered," factual base. [75]   Recall that the record before the Circuit Court when it ruled on Claim III-H-4 on July 22, 2002, following

---

**b) Time Limitations.** A motion to vacate a sentence that exceeds the limits provided by law may be filed at any time. No other motion shall be filed or considered pursuant to this rule if filed more than 2 years after the judgment and sentence become final unless it alleges that:

(1) the facts on which the claim is predicated were unknown to the movant or the movant's attorney and could not have been ascertained by the exercise of due diligence, and the claim is made within 2 years of the time the new facts were or could have been discovered with the exercise of due diligence.

Fla. R. Crim. P 3.850(b).

[74] The first ground was "Layman Layne's Recantation Demonstrates Mr. Green's Rights Were Violated."

[75] In its response to the Successive Motion, the State argued that the second ground was barred by Rule 3.850(h) as impermissibly successive because the second ground had been presented and litigated as Claim III-H-4 at the *Huff* hearing held on Green's first Rule 3.850 motion.  Alternatively, assuming the second ground was not barred as impermissibly successive, the State argued that statements Clarke and Rixey made to White speculating that Hallock killed Flynn would have been inadmissible at Green's trial.

18-13524                Opinion of the Court                  75

the *Huff* hearing, consisted of the record of Green's prosecution and direct appeal in *Green I,* Claim III-H-4's factual allegations, and the statements the Court, the State's attorney, and Collateral Counsel made on the record at the *Huff* hearing.  In contrast, the record before the Circuit Court in the proceedings held on the Successive Motion included the evidence presented at the evidentiary hearings the Court held in 2003 and 2004 on Claims I-2, III-F, and IV, the facts asserted in the Successive Motion, and affidavits Diane Clarke and Mike Rixey executed in June 2010 that accompanied the Motion.[76]

Addressing the Circuit Court's July 22, 2002, adjudication of Claim III-H-4 (as presented at the *Huff* hearing) in light of the additional evidence presented in support of the Successive Motion, Green argued that the Circuit Court erred in denying Claim III-H-4 for two fundamental reasons.  First, Green argued the Court mistakenly held that "the purported opinion[s] of Deputies Rixey and Clarke that they suspected Hallock murdered Flynn would not have been admissible at trial" and that their opinions "were . . . not *Brady* material."  Second, Green argued the Court erred in finding as fact that "all information in [White's] notes was disclosed and known by defense counsel before trial.'"  In other words, Green new postconviction counsel sought to raise arguments in the

_____

[76] As indicated in the affidavits, Clarke signed her affidavit on June 15, 2010, and Rixey signed his on June 1, 2010.

Successive Motion that Collateral Counsel did not raise to the Florida Supreme Court on direct appeal from the Circuit Court's decision.

Drawing on the expanded factual base supporting the Successive Motion, Green elaborated at length on why Claim III-H-4 was meritorious and should have been upheld by the Circuit Court in its order of July 22, 2002:[77]

> The fact that Flynn's ex-girlfriend was the initial prime suspect of police officers who investigated Flynn's murder would have been admissible at trial under clearly established Florida law. . . . The real impact of Clarke and Rixey's statements to the investigators and prosecutors is revealed in the witness statements that resulted from interviews only recently conducted by Mr. Green's current counsel in the last year.
>
> [T]he recently-obtained sworn affidavits of Sergeant Clarke and Deputy Rixey do tend to prove that Mr. Green is innocent and that a third party – the State's sole eyewitness and the victim's ex-girlfriend Hallock – was the true perpetrator of the crime and, at the very least, had a strong motive to fabricate her testimony to cast blame on someone else. Specifically, their statements point out that: (1) Hallock changed the details of her story several times that

---

[77] This order was adopted and incorporated into the Circuit Court's final decision on November 22, 2005.

night, including the location of the grove and who tied Flynn's hands; (2) Hallock appeared emotionally detached when she was brought to the crime scene, seemed unconcerned about Flynn's condition, and never once asked how Flynn was doing; (3) the physical evidence at the crime scene was not consistent with Hallock's story, including that the clear and unmarred tire tracks at the grove indicated a slow and deliberate exit; (4) Hallock drove all the way to Stroup's trailer for help, bypassing numerous houses and at least one public telephone and a hospital to seek immediate assistance, which could have saved Flynn's life; (5) Hallock never mentioned an abduction in her initial statement transmitted over the radio; and (6) when the officers asked Flynn – who was still lucid – who shot him, he only replied that he wanted to go home, never once mentioning an assailant or a "black guy". Clarke's and Rixey's conclusions, when taken in conjunction with the demonstrated contradictions between Hallock's version of the events and the physical evidence, the numerous material inconsistencies in her statements, *and* the fact that there is no physical evidence linking Mr. Green to the crime, are strong evidence of Hallock's guilt and Mr. Green's innocence. At the very least; they are more than sufficient to establish that a reasonable jury likely would not find guilt beyond a reasonable doubt.

. . . .

The new evidence presented here could not be previously presented to this Court because the State withheld its existence from Mr. Green's counsel. It was only discovered recently by the efforts of Mr. Green's subsequently retained counsel. Further, these affidavits evince facts not contained in White's notes. White's notes only contained Clarke's and Rixey's conclusions that Hallock killed Flynn. Clarke's and Rixey's affidavits contain their impressions based on the facts and circumstances of that night. This information was neither available to Mr. Green's counsel at trial nor during the first 3.850 proceeding – but it was known by the State.

. . . .

The testimony of the officers – alone and in tandem with the other compelling evidence of Mr. Green's innocence – would certainly have had a powerful impact on any jury and would likely have resulted in Mr. Green's acquittal of the charges for which he was convicted.

To Green, all of this showed that the prosecution's failure to disclose this exculpatory evidence violated the *Brady* rule and deprived him of his right to present a defense. "There is more than 'a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'"

The Circuit Court denied the claim, apparently agreeing with the State that the second ground amounted to nothing more

than Claim III-H-4 recast with a new evidentiary foundation and thus impermissibly successive under Rule 3.850(h).[78]  The Court concluded that Green's argument that "Deputy Rixey and Sergeant Clarke observed facts indicating that Hallock shot Chip Flynn . . . was addressed in the first post-conviction motion and denied."

2.

The third ground the Successive Motion presented was that Green's trial attorney Parker rendered ineffective assistance of counsel in failing to investigate and establish Green's alibi.  Several prosecution witnesses, including Sheila Green, Lonnie Hillery, and Jerome Murray, had recanted their testimony after the trial, and eight potential alibi witnesses had stated in sworn affidavits that at the time of Flynn's murder, Green was in the "projects" in Mims, far from the scene of the crime.  The eight affiants were Brandon Wright, Reginald Peters, Lori Rains, Carleen Brothers, Tyrone Torres, O'Conner Green, Kerwin Hepburn, and Cheryl Anderson.[79]

---

[78] Citing Fla. R. Crim. P. 3.850(h) and *Schoenwetter v. State*, 46 So. 3d 535, 561 (Fla. 2010), the Circuit Court observed that "a successive post-conviction[] motion is not intended to be a second appeal, nor is it appropriate to use a different argument to re-litigate issues already decided."

[79] In its response to the Successive Motion, the State argued that the third ground was barred by Rule 3.850(h) as impermissibly successive.  In his first Rule 3.850 motion, Green presented the claim that Parker rendered ineffective assistance of counsel under *Strickland v. Washington* in not calling Lori Rains as an alibi witness, and the Circuit Court denied the claim.  As for Reginald Peters and Brandon Wright, whose testimony (according to the Court) would

The Circuit Court realized that Green's attorneys were attempting to avoid the dismissal of the third ground as procedurally defaulted (because they failed to present the ground in Green's first Rule 3.850 motion)[80] by representing that Green only recently "found three additional witnesses who attest[ed] that [he] was with them in the Mims projects during the night of the murder," Reginald Peters, Brandon Wright, and Randy Brown. However, the Court decided to proceed regardless and held an evidentiary hearing on Green's new ineffective assistance claim.

The Court heard the testimony of Peters and Wright on May 27, 2011, and along with their testimony, received Brown's affidavit in evidence. Assuming the truth of what they said, these are the facts their testimony would have established at Green's trial:

Peters, then age nineteen, sold drugs to Green "throughout the night" of April 3 and into the early morning hours of April 4, 1989, in Mims at Lori Rains' residence. Peters would be impeached with his criminal record, which he acknowledged; Peters had

---

"do nothing to add to the arguments made previously," Green could have found the two witnesses and presented their statements to the Circuit Court "[t]hrough due diligence" in advancing his first Rule 3.850 motion.

[80] Impermissibly successive claims cannot be relitigated in later post-conviction relief proceedings. *See supra* note 78. Merely adding three more alibi witnesses does not change the underlying nature of the claim when those alibi witnesses could have been found through due diligence in the first post-conviction relief motion.

18-13524                 Opinion of the Court                 81

"approximately ten felony convictions and four retail theft convictions."

Wright, [81] then fourteen, saw Green at Rains' house around 11:15 p.m. and "on and off again the rest of the night." Wright was "one of several juveniles referred to as the 'jitterbugs' who sold drugs from Lori Rains' house . . . [Green] was 'getting high' the night of April 3," which is why he was at "Rains' house." Green was "'in and out' that evening going from Carleen Brothers' house to Lori Rains' house." Wright was "a drug seller. . . [also going] 'in and out' between 11:15 p.m. on April 3 and 3:00 a.m. on April 4, 1989." The Circuit Court found that "Wright's testimony that he did not know until last year [2010] that [Green] was convicted of murder and sentenced to death was wholly unbelievable, given his testimony that he was with [Green] off and on during the night of Chip Flynn's murder, observed the police in the area investigating [the] murder, and saw the police sketch of the suspected murderer."

Brown saw Green "on the evening of April 3, 1989, and the early morning hours of April 4, 1989, 'in the projects in Mims' at the home of Lori Rains."

The Circuit Court concluded that even if the testimony of these witnesses was true and not barred, it would not "constitute

---

[81] Like Peters, Wright would also be impeached at trial with his criminal record, which contained several felony convictions.

alibi evidence." Moreover, "there [was] not a reasonable probability that the testimony . . . would produce an acquittal on re-trial."

The Circuit Court recalled Parker's testimony at the hearing on Green's first Rule 3.850 motion: Green told him that he had been at Lori Rains' house the evening of the murder. They were smoking crack and he was falling asleep, so Green could not specify times. Parker said that he "could see [Green] testifying, well, I was cracked out of my mind. I don't remember, really, what happened, but you talk to Lori.'" Parker testified, "there was no way that I was going to try and utilize that as an alibi." The Circuit Court concluded that Parker was not constitutionally deficient for failing to investigate or call them to testify at Green's trial.

In the end, the Circuit Court denied the Successive Motion in full as barred by Rule 3.850(h). The Court denied the Motion's third ground as it related to Lori Rains because the claim that "trial counsel was ineffective for not calling Lori Rains and others to establish an alibi was made previously [in the first Rule 3.850 motion] and denied." "Rains was known to [Green's] counsel at trial." As for Wright, Peters, and Brown, who could put Green in the projects in Mims around the time of the Flynn homicide, the Court found that by "[u]sing due diligence the Defendant could have discovered the names and obtained the statements of these three additional witnesses." Green's new counsel "discovered the names of these witnesses by interviewing Lori Rains."

The Court held alternatively that Green failed to establish a claim of ineffective assistance under *Strickland v. Washington.*

18-13524                Opinion of the Court                83

"There [was] not a reasonable probability that the testimony of these witnesses would produce an acquittal on re-trial, given the plethora of other evidence presented."  The Court also noted that "[t]he testimony of the 'alibi witnesses' placing Green in the Mims projects during the early morning hours of the murder is damning and further implicates the Defendant by putting him near the crime scene right after the crime was completed."

*B.*

Green appealed the Circuit Court's decisions denying his *Brady* and *Strickland* claims in his Successive Motion for postconviction relief under Rule 3.850 to the Florida Fifth District Court of Appeal.[82]  The State's answer brief argued that the claims were procedurally barred under Rule 3.850.  The *Brady* claim was foreclosed on two grounds: (1) it had been raised and denied in Green's first Rule 3.850 motion and (2) it was procedurally barred, having been raised in a successive motion filed "well beyond the two year time limitation set forth in Florida Rule of Criminal Procedure 3.850 for raising claims of ineffective assistance of counsel."  The *Strickland* claim was barred by Rule 3.850(h) because using due diligence, Green could have found witnesses Wright, Peters, and Brown prior to the evidentiary hearing held on his first Rule 3.850 motion.  The Florida Fifth District Court of Appeal affirmed *per curiam* without

---

[82] Green also appealed the Circuit Court's denial of his state-law based motion for a new trial due to the three prosecution witnesses recanting.

84              Opinion of the Court              18-13524

opinion. *Green v. State* (*Green III*), 145 So. 3d 116 (Fla. DCA 2013) (Table).

## IV.

### A.

On February 27, 2014, Green filed a petition for a writ of habeas corpus under 28 U.S.C. § 2254 in the United States District Court for the Middle District of Florida seeking relief from his convictions; Green later amended this petition on March 26, 2014. The petition presented six "grounds" for relief.[83]  They included claims

---

[83] The grounds for relief consisted of claims under multiple constitutional provisions.  In its Amended Order granting Green's petition in part and denying it in part, the District Court identified six "claims," some of which consisted of multiple independent claims.  The six grounds as presented in Green's habeas petition were:

> Ground One: Mr. Green was deprived of his constitutional rights under the Fifth, Sixth, and Fourteenth Amendments by the State's improper suppression of exculpatory and impeachment evidence and its knowing reliance on false testimony.

> Ground Two: Mr. Green was denied due process of law and a fair trial in violation of the Fifth, Sixth, and Fourteenth Amendments by the trial court's failure to suppress his out-of-court photographic identification and subsequent in-court identification.

> Ground Three: Mr. Green's constitutional rights under the Fifth, Sixth, and Fourteenth Amendments were violated by the admission of unreliable dog-tracking evidence.

18-13524                Opinion of the Court                85

of Circuit Court error the Florida Supreme Court rejected on the merits in the direct appeal of Green's convictions in 1994 in *Green I* and in its review of the Circuit Court's disposition of Green's first Rule 3.850 motion in 2008 in *Green II*. The petition also included a claim Green presented in his first Rule 3.850 motion that was denied on the merits but not appealed; claims Green presented in his Successive Motion that were denied as impermissibly successive by the Circuit Court and the Fifth District Court of Appeal in *Green III*; and claims not presented to the Florida courts at all. Green argued that the District Court should review the merits of all the claims the Florida courts would reject as procedurally defaulted as

---

Ground Four: Mr. Green's trial counsel provided assistance that falls well below the standard for effective assistance of counsel mandated by the Sixth and Fourteenth Amendments.

Ground Five: Mr. Green was denied his constitutional rights under the Fifth, Sixth, and Fourteenth Amendments by the State's repeated improper references to Mr. Green's race and making knowingly false representations of the facts and the evidence to the jury and to the court.

Ground Six: Mr. Green was denied his constitutional due-process rights under the Fifth, Sixth, and Fourteenth Amendments because the jury prejudged him guilty based on their exposure to external publicity.

86                    Opinion of the Court                18-13524

well as those he never presented to the state courts[84] because he had shown legal cause for the procedural defaults.

The State responded to the petition by moving the District Court to dismiss it as time-barred because Green had not filed it within the one-year limitations period established by 28 U.S.C. § 2244(d)(1)(A). The Court granted the State's motion and dismissed the petition with prejudice. Green appealed. This Court held Green's petition timely filed and remanded his case for further proceedings. *Green v. Sec'y, Dep't of Corrs.*, 877 F.3d 1244, 1249 (11th Cir. 2017). On remand, the State responded to the claims the petition presented, and the District Court took those claims and the State's response under advisement without oral argument.

### B.

The District Court's authority to grant a writ of habeas corpus vacating Green's convictions was circumscribed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub.L. No. 104–132, 110 Stat. 1214 (codified as amended at 28 U.S.C. §§ 2241–55). A district court may not grant a state prisoner a writ of habeas corpus on a federal claim unless the prisoner establishes that the state courts adjudicated the federal claim on the merits and that the adjudication "was contrary to, or involved an unreasonable application of, clearly established Federal law, as

---

[84] If Green attempted at this point in time to exhaust such claims, we assume the Florida courts would deny them pursuant to Rule 3.850(h) as impermissibly successive.

determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," § 2254(d)(2).

The Supreme Court has explained the meaning of the three phrases contained in § 2254(d)(1). The phrase "clearly established Federal law" refers only to "the holdings, as opposed to the dicta, of [Supreme] Court's decisions as of the time of the relevant state-court decision." *Williams v. Taylor,* 529 U.S. 362, 412, 120 S. Ct. 1495, 1523 (2000). A state court decision is "contrary to" a Supreme Court holding "if the state court arrives at a conclusion opposite to that reached by [the] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Id.* at 412–13, 120 S. Ct. at 1523. A state court decision "involve[s] an unreasonable application of" a Supreme Court holding "if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413, 120 S. Ct. at 1523. A merely incorrect application of federal law, however, is not enough to warrant habeas relief. As for whether the state court decision "was based on an unreasonable determination of the facts," we must bear in mind that AEDPA establishes a presumption that the state court's findings of fact are

correct, and only "clear and convincing evidence" can rebut that presumption. § 2254(e)(1).[85]

Therefore, any federal claims presented to a district court in a habeas petition from a state prisoner must have first been exhausted in the state court system.[86] Comity requires that the state courts be given the "opportunity to pass upon" the prisoner's claims and, should they find any valid claims, to take appropriate corrective action. *Baldwin v. Reese*, 541 U.S. 27, 29, 124 S. Ct. 1347, 1349 (2004). Specifically, the prisoner must "use the State's established appellate review procedures before he presents his claims to

---

[85] The precise relationship between the "unreasonable application" standard of § 2254(d)(2) and the "clear and convincing" standard of § 2254(e)(1) when reviewing a state court's factual determinations under AEDPA is unclear. *See Burt v. Titlow*, 571 U.S. 12, 18, 134 S. Ct. 10, 15 (2013) ("we have not defined the precise relationship between § 2254(d)(2) and § 2254(e)(1)"); *Wood v. Allen*, 558 U.S. 290, 300, 130 S. Ct. 841, 849 (2010) ("we have explicitly left open the question whether § 2254(e)(1) applies in every case presenting a challenge under § 2254(d)(2)"). As Green's arguments fail under either standard, we decline to address the nature of the relationship between § 2254(d)(2) and § 2254(e)(1) at this time.

[86] In Florida, a claim for postconviction relief in a capital case is exhausted once it is reviewed by the Florida Supreme Court. Fla. Const. art. V § 3 (providing for the review in the Florida Supreme Court of judgments in capital cases). In a non-capital case, which this case became once the Florida Supreme Court affirmed the vacation of Green's death sentence and he was resentenced to a prison term, exhaustion is complete when the Florida District Court of Appeal decides the claim on the merits. *Barritt v. Sec'y, Fla. Dep't of Corrs.*, 968 F.3d 1246, 1249 n.3 (11th Cir. 2020).

18-13524                Opinion of the Court                89

a federal court." *O'Sullivan v. Boerckel*, 526 U.S. 838, 845, 119 S. Ct. 1728, 1733 (1999).

Comity also requires that the claims the prisoner presents to the district court be the *same claims* the prisoner exhausted in the state courts. To the extent the claims are not the same—in terms of their "legal theory and facts on which [they] rest[]"—as the claims exhausted in the state courts, the federal court will treat the claims as unexhausted. *Henderson v. Campbell,* 353 F.3d 880, 898 n.25 (11th Cir. 2003); *see also Kelly v. Sec'y, Dep't of Corrs.*, 377 F.3d 1317, 1344 (11th Cir. 2004) ("the prohibition against raising nonexhausted claims in federal court extends not only to theories of relief, but also to the specific assertions of fact that might support relief").

A federal court may only entertain the merits of an unexhausted claim if the prisoner establishes one of two exceptions. The first is the "cause and actual prejudice" exception. *Engle v. Isaac*, 456 U.S. 107, 129, 102 S. Ct. 1558, 1573 (1982). The second is the "actually innocent" exception, also known as the "fundamental miscarriage of justice" exception, applicable in extraordinary circumstances. *Murray v. Carrier,* 477 U.S. 478, 495–96, 106 S. Ct. 2639, 2646–49 (1986); *Johnson v. Singletary*, 938 F.2d 1166, 1174–76 (11th Cir. 1991). Green relies on the actually innocent exception as his excuse for failing to exhaust the claims the Florida courts would not now entertain.

*C.*

90                    Opinion of the Court                    18-13524

The District Court identified nineteen separate claims amongst the six "claims" Green presented in his habeas petition[87] and explicitly ruled on seven, implicitly denying the other twelve as meritless.[88]  The Court concluded that four of the seven had been exhausted and accordingly undertook the task of determining whether the state appellate court's adjudication of each claim was entitled to AEDPA deference.  The four claims were as follows: first, the State denied Green due process of law under *Brady v. Maryland* when the prosecutor, Christopher White, withheld from the defense the notes he made on August 28, 1989, of the conversation he had with Diane Clarke and Mark Rixey.  Second, the State denied Green due process of law when the Circuit Court overruled his motion to suppress Hallock's out-of-court identification of him as unduly suggestive and his objection to Hallock's in-court identification as unreliable.  Third, John Parker denied Green his Sixth Amendment right to the effective assistance of counsel under

---

[87] The District Court essentially ignored the several constitutional provisions Green's petition cited in support of its six grounds for relief.  Some of the six claims the Court identified consisted of several separate subclaims.  For example, the Court treated "Claim One" as consisting of five *Brady* claims, which the Court labeled as "Issues."  The Court granted the writ of habeas corpus on "Issue One of Claim One."  The Court treated "Claim Four" as presenting eight instances of ineffective assistance of counsel.  Claims Five and Six were based on additional instances of ineffective assistance of counsel.

[88] The claims rejected as meritless included Green's Claim III-F claim that Parker was ineffective for failing to develop the hands-tying statement contained in Walker's 1989 report.  Green has not appealed the district court's denial of this claim.

*Strickland v. Washington* in failing to challenge Juror Guiles, whose niece had been murdered. Fourth, the State denied Green due process of law under *United States v. Giglio* when the prosecutor introduced false testimony from Sheila Green, Lonnie Hillery, and Jerome Murray and allowed it to remain uncorrected.

The District Court found merit in the first claim and granted Green relief, a writ of habeas corpus vacating his convictions. The State appeals the ruling. We consider the State's appeal in part V. The Court denied the writ on the second, third, and fourth claims, and Green cross-appeals those rulings. Because we reverse the Court's decision on the first claim, we must consider Green's cross-appeal. We do so in part VI.

The District Court denied relief on the remaining three of the seven claims on the ground that they had been procedurally defaulted and were therefore unexhausted. Green cross-appeals those rulings, arguing that the Court should have decided the claims on the merits because he established a lawful excuse for the defaults, his actual innocence of the crimes for which he stands convicted. In part VII, we consider those three claims and whether the Court erred in rejecting Green's actually innocent excuse for the defaults. In part VIII, we address the litigation tactics that have been employed by Collateral Counsel and Green's current counsel which, in large part, led to the District Court's erroneous grant of federal habeas relief to Green. In Part IX, we conclude.

V.

*A.*

The District Court found the first claim, Claim III-H-4, in "Ground One" of Green's habeas petition.[89] Claim III-H-4 alleged that in violation of the *Brady* rule, the State withheld the notes White made on August 28, 1989, of a conversation he had with Diane Clarke and Mark Rixey. Green's petition to the District Court stated that:

> During the course of the investigation, first responders and experienced officers Deputy Mark Rixey and Sergeant Diane Clarke told . . . Assistant State Attorney Christopher White, that the evidence pointed to Hallock as Flynn's killer. Handwritten notes from White's August 1989 interview of Rixey and Clarke . . . contain the following statement: "Mark & Diane suspect girl did it, she changed her story couple times . . . . She 1st said she tied his hands behind his back." White wrote that Rixey and Clarke were suspicious because Hallock never asked about Flynn's condition, would not go to the scene, and drove all the way to the trailer park to ask for help. There were also no footprints or shell casings at the orange grove. The

---

[89] Ground One alleged that Green was "deprived of his constitutional rights under the Fifth, Sixth, and Fourteenth Amendments by the State's improper suppression of exculpatory and impeachment evidence and its knowing reliance on false testimony."

2010 sworn affidavits of Clarke and Rixey further de-
tail their suspicions. [90]

Green went on to suggest that Rixey and Clarke's suspicion
that Hallock killed Flynn was based on the following facts:

> The gun found at the scene was Flynn's, and there
> was no physical evidence linking Mr. Green to the
> crime. No fingerprints of Mr. Green were found.
> The only evidence at trial that the State connected to
> Mr. Green were Win Streak shoe prints found at
> Holder Park, where many people had attended a
> baseball game the evening of April 3. No proof was
> presented at trial that these were Mr. Green's shoe
> prints, yet the prosecutors told the jury that they
> were.

The District Court correctly stated the *Brady* standard under
which Green had to prevail for Claim III-H-4: "[t]he evidence at
issue must be favorable to the accused, either because it is exculpa-
tory, or because it is impeaching; that evidence must have been
suppressed by the State, either willfully or inadvertently; and prej-
udice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281–
82, 119 S. Ct. 1936, 1948 (1999). The Court also stated the correct
prejudice standard: to establish prejudice a petitioner must show
that "there is a reasonable probability that, had the evidence been

---

[90] Ground One, to the extent it alleged a *Brady* violation based on White's
notes, mimicked the allegations of Claim III-H-4 of Green's first Rule 3.850
motion. In Part II.A.1, *supra,* we quote the claim as alleged in that motion.

94                    Opinion of the Court                    18-13524

disclosed to the defense, the result of the proceeding would have been different." *Wright v. Sec'y, Fla. Dep't of Corrs.*, 761 F.3d 1256, 1278 (11th Cir. 2014) (quoting *Kyles v. Whitley*, 514 U.S. 419, 433, 115 S. Ct. 1555, 1565 (1995)). "A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *United States v. Bagley*, 473 U.S. 667, 682, 105 S. Ct. 3375, 3383 (1985).

The State, in its response to Green's petition, argued that the District Court was precluded from reviewing Claim III-H-4 because the claim had not been exhausted in the Florida state courts. Specifically, in appealing to the Florida Supreme Court in *Green II* the Circuit Court's order denying Claim III-H-4, Green did not assign the denial of the claim as error in his appellate brief, nor did he offer any factual basis or argument in support of the claim. The State argued alternatively that Green failed to show that the Circuit Court's adjudication of Claim III-H-4 was not entitled to AEDPA deference.

Green countered the State's arguments in his reply to the State's response. Regarding exhaustion, he represented that in *Green II* he asserted as error the Circuit Court's denial of Claim III-H-4 and that the Supreme Court affirmed the denial "with no explanation."[91]  According to Green, this means the District Court

---

[91] In his habeas petition, Green represented that the Florida Supreme Court affirmed the Circuit Court's denial of Claim III-H-4 in *Green II.* He made the same representation in his reply to the State's response to his habeas petition: "the issue was raised on appeal of his first post-conviction motion and 'affirmed on appeal to the Supreme Court of Florida.'"  The quotation is taken

18-13524                Opinion of the Court                95

had to "look through" the *Green II* decision to the last "reasoned decision" on Claim III-H-4, *i.e.,* the decision the Circuit Court reached on July 22, 2002. *See Ylst v. Nunnemaker,* 501 U.S. 797, 804, 111 S. Ct. 2590, 2595 (1991). If the District Court did so, Green argued that it would come to two conclusions: (1) that the Circuit Court's denial of Claim III-H-4 constituted an "unreasonable application of *Brady v. Maryland*" under § 2254(d)(1) and (2) that the Circuit Court's determination that the defense had access to all of the information contained in White's notes was an "unreasonable determination of the facts" under § 2254(d)(2). Having so concluded, Green contended the Court would have to consider Claim III-H-4 *de novo.*

### B.

The District Court accepted Green's representation that Claim III-H-4 had been exhausted in *Green II* without mention or explanation.[92] The District Court instead proceeded directly to the

---

from the Circuit Court's order of August 31, 2011, denying Green's Successive Motion. The Circuit Court could not have read the opinion in *Green II* as affirming the denial of Claim III-H-4 because the opinion contains no mention of Claim III-H-4 or any of the facts underpinning the claim—specifically, White's notes of August 28, 1989, or any of the contents of the notes. The quoted statement that Claim III-H-4 was "affirmed on appeal to the Supreme Court of Florida" finds no support in the *Green II* decision, and had to have come from another source, one that we were unable to identify.

[92] The District Court did so notwithstanding the fact that in *Green II* neither Green's brief nor the Florida Supreme Court's decision contained one word

96                      Opinion of the Court                   18-13524

merits and looked through the *Green II* opinion to examine the Circuit Court's decision adjudicating Claim III-H-4; if the Circuit Court's decision failed under either § 2254(d)(1) or § 2254(d)(2), the Court would decide Claim III-H-4 *de novo.*

The District Court concluded that the adjudication of Claim III-H-4 failed both tests. It failed the § 2254(d)(1) test because the Circuit Court ceased its inquiry into the matter of *Brady* prejudice after concluding that Clarke's and Rixey's suspicion—that Hallock "did it"—would have been inadmissible as opinion testimony at Green's trial.[93] The Circuit Court erred because it ceased its prejudice inquiry without determining whether the officers' suspicion that Hallock killed Flynn was material, *i.e.*, whether it could have been helpful to the defense. The District Court concluded it would have been:

> [T]he information that the first officers at the scene evaluated the evidence as implicating Hallock as a suspect went to the heart of the defense strategy.
>
> It is difficult to conceive of information more material to the defense and the development of

---

about Claim-III-H-4. Both Green's brief and the Florida Supreme Court's decision in *Green II* were part of the record before the District Court.

[93] The District Court mind read the Circuit Court as having based its evidentiary ruling on *Martinez v. State*, 761 So. 2d 1074, 1079 (Fla. 2000) ("We begin . . . with the basic proposition that a witness's opinion as to the guilt or innocence of the accused is not admissible.").

defense strategy than the fact that the initial respond-
ing officers evaluated the totality of the evidence as
suggesting that the investigation should be directed
toward someone other than Petitioner. Thus, the
withheld evidence was clearly material and the failure
to disclose it was a *Brady* violation which undermines
confidence in the outcome of the trial. [94]

To the District Court, the Circuit Court's failure to recog-
nize the materiality of Clarke's and Rixey's suspicion constituted
an unreasonable application of *Brady*.  The Court determined that
"[i]t was contrary to established federal law, as set down in *Brady*,
and objectively unreasonable for the State court to end the preju-
dice inquiry once it made an admissibility determination on the
prosecutor's notes concerning the Deputies' suspicions that Hal-
lock murdered Flynn."

The District Court also found that the Circuit Court made
an "unreasonable determination of the facts" when it concluded
that the defense had access to all the information contained in
White's notes.  As the District Court expressed it,

---

[94] In finding that Clarke's and Rixey's suspicion went to "the heart of the de-
fense strategy," the District Court drew on testimony Parker gave at the evi-
dentiary hearings the Circuit Court held on Claims I-2, III-F, and IV. These
evidentiary hearings did not, however, address Claim III-H-4, as the Circuit
Court determined Claim III-H-4 did not require an evidentiary hearing.

98                        Opinion of the Court                        18-13524

Conspicuously absent from this list[95] is the information contained in the prosecutor's note that "[H?] said she tied his hands behind his back." Hallock was never cross examined as to whether she, as opposed to the assailant, tied Flynn's hands behind his back. This was a critical issue at trial as the defense focused instead on the theory that the hands were tied "for comfort." Defense counsel testified that this issue was "the heart of the defense" and that he would have used the information at trial, had he known of it.

The District Court seized on the absence of the hands-tying statement in the Circuit Court's Order of July 22, 2002, as proof that the Circuit Court did not consider the statement in deciding

_____

[95] In referring to "this list," the District Court is citing the Circuit Court's order denying Claim III-H-4, in which the Circuit Court set out the information known to defense counsel pretrial. *See supra* part II.A.1. Immediately prior to setting out the list, the Circuit Court recited the statements contained in White's notes, including: "Mark & Diane suspect the girl did it. She changed her story couple times. . . [?] She [?] said she tied his hands behind his back." The Circuit Court's order stated that Parker was aware of "[a]ll of the information in [White's] notes," and this obviously included the hands-tying statement. Moreover, in prosecuting Claim III-F, Green alleged that Parker had access to Deputy Walker's April 5, 1989, report and thus the hands-tying statement. This was part of Green's claim that Parker rendered ineffective assistance of counsel in failing to cross-examine Hallock with the statement from Walker's report. *See supra* part II.A.3 (discussing the allegation and the ineffective-assistance claim); *see also Green II,* 975 So. 2d at 1104 (discussing and affirming the Circuit Court's denial of this ineffective-assistance-of-counsel claim).

Claim III-H-4.  Then, turning to whether the non-disclosure of this information prejudiced Green's defense, the District Court said:

> Hallock was never cross examined as to whether she, as opposed to the assailant, tied Flynn's hands behind his back. This was a critical issue at trial as the defense focused instead on the theory that the hands were tied "for comfort."  Defense counsel testified that this issue was "the heart of the defense" and that he would have used the information at trial, had he known of it.  This impeachment information contained in the prosecutor's notes was unquestionably material as it seriously undermined the testimony of Hallock that the assailant tied Flynn's hands behind his back and that the gun discharged in the process.  The initial suspicion that Hallock was the shooter coupled with this significant inconsistency in her story would have provided powerful impeachment material and a basis to argue that Hallock had some motivation to fabricate. The failure to disclose this information, was a *Brady* violation considering the totality of the circumstances and the absence of any direct evidence of guilt beyond the identification by Hallock. The trial court's determination otherwise was contrary to, or an unreasonable application of *Brady*.[96]

---

[96] In relying on Parker's testimony, which was given at the evidentiary hearing held *after* the Circuit Court adjudicated Claim III-H-4, the District Court was effectively deciding a new Claim III-H-4, one that had not been exhausted. We point this out in the text *infra* part V.C.1.

The District Court thus concluded that the Circuit Court's adjudication of Claim III-H-4 was based on an unreasonable application of *Brady* per § 2254(d)(1) and an unreasonable determination of the facts in light of the evidence presented to the Circuit Court per § 2254(d)(2). Given these circumstances, the District Court proceeded to decide Claim III-H-4 *de novo.*

In doing so, the District Court considered the record that was before the Circuit Court when it adjudicated the claim on July 22, 2002, *i.e.,* the records of the pre-trial and trial proceedings in Green's prosecution, the *Huff* hearing, and Claim III-H-4's factual allegations. The District Court also considered the record of the evidentiary hearings the Circuit Court held in 2003 and 2004 on Claims I-2, III-F, and IV, and therefore Parker's testimony; Green's Successive Motion, which included the record of the evidentiary hearing the Circuit Court held on the Motion; and the affidavits Clarke and Rixey executed in June 2010, which contradicted the testimony they gave on deposition prior to Green's trial and afterwards at his trial.[97] None of that was before the Circuit Court when it decided Claim III-H-4 on July 22, 2002.

---

[97] The District Court recognized the contradiction. In testifying on deposition and at trial, Clarke and Rixey stated that they had no involvement at all in the investigation of the Flynn murder. Indeed, their participation in the case ended when the criminologist and the homicide case agent arrived at the orange grove. Moreover, and as the District Court observed, they never saw or spoke to Hallock while they were at the orange grove. She was with Deputy Walker in his car. Therefore, Clarke and Rixey had no first-hand knowledge

On this expanded record, the District Court concluded that Green had shown *Brady* prejudice. The Court concluded there was a reasonable probability that had White's notes been disclosed to the defense pretrial—specifically, Clarke's and Rixey's suspicion that Hallock killed Flynn and Hallock's statement that she was the one who tied Flynn's hands—the result of the guilt-innocence phase of Green's trial might have been different. The District Court ruled, contrary to the Circuit Court's ruling, that Green had shown prejudice because it was "unknown and unknowable" whether Parker could have elicited the essence of the testimony from the officers in a fashion that may have persuaded the Circuit Court to allow the evidence to come in under Rule 402. The Court therefore issued a writ of habeas corpus vacating Green's convictions.

## C.

The State appeals the District Court's Claim III-H-4 decision on two grounds. First, Claim III-H-4 was not exhausted because Green did not assign as error in *Green II* the Circuit Court's denial of the claim. Second, assuming Claim III-H-4 was exhausted in *Green II,* in reviewing the Circuit Court's decision on the claim as *Ylst* directed, the District Court erred in failing to accord the decision AEDPA deference. We consider these two grounds in order.

---

of the investigation and so had no basis for contradicting their earlier testimony.

1.

Under 28 U.S.C. § 2254(b)(1)(A), we may not grant federal habeas relief to a state prisoner unless the prisoner "has exhausted the remedies available in the courts of the State." The State courts must have been given a "fair opportunity" to act on their claims." *Baldwin*, 541 U.S. at 29, 124 S. Ct. at 1349. "To provide the State with the necessary 'opportunity,' the prisoner must "fairly present" his claim in each appropriate state court (including a state supreme court . . ., thereby alerting that court to the federal nature of the claim." *Id.* The exhaustion requirement applies "not only to broad legal theories of relief, but also to the specific assertions of fact that might support relief." Kelley, 377 F.3d at 1344. Presentation of a claim "under the same general legal umbrella but with entirely different factual underpinnings [also] does not constitute fair presentation of the . . . claim." Henderson, 353 F.3d at 898 n.25. We "require that petitioners present their claims to the state courts such that the reasonable reader would understand each claim's particular legal basis and specific factual foundation." *Kelley,* 377 F.3d at 1344-45.

a.

The State supports its failure-to-exhaust argument by pointing to Green's brief in *Green II.* The brief contains not a word about Claim III-H-4, much less a statement that the State violated the *Brady* rule when White withheld his notes from the defense. It also contains no semblance of the arguments that Green's current counsel presents to this Court in support of the claim. The brief

18-13524              Opinion of the Court              103

does assign as error, though, the denial of a different *Brady* claim, Claim III-H-5, which alleged that the State violated the *Brady* rule in failing to disclose the mugshots, in the form of three by five cards, shown to Hallock on April 4, 1989.[98]  Appellant-Cross Appellee Br. at ii.  The opinion in *Green II* confirms this.  Having had that claim "fairly presented" to it, the Florida Supreme Court discusses *that Brady* claim at length in the section headed "B. Suppression of Evidence" and affirms the Circuit Court's decision rejecting the claim.  *Green II,* 975 So. 2d at 1101–03.  But that section contains no mention of White's notes or Green's claim that the State's failure to disclose them violated the *Brady* rule.

Green responds to the State's failure-to-exhaust argument with a point he did not raise in the District Court.  We nonetheless consider it.  The point is that he exhausted the Circuit Court's denial of Claim III-H-4 in *Green II* in assigning as error the Circuit Court's denial of Claim III-F.  Here's what his brief tells us about that:

> In Green's 2006 Florida Supreme Court Appeal Brief, under a heading stating "*The Court Erred in Denying Green's Claim For Relief Based on …NonDisclosure of Exculpatory Evidence,*"[99]    Green devoted three

---

[98] *See supra* note 35.  This claim is not before us.

[99] The heading (as set forth by Green) makes it appear that the discussion following it related to the Claim III-H-4 *Brady* violation due to the words: "Based on. . . NonDisclosure of Exculpatory Evidence."  However, the brief writer

pages of argument to both the law and facts related to
the very issue [the State] claims now was defaulted.
This Claim was plead as Claim III in the motion for
postconviction . . . relief.[] As for the facts, under the
heading "Exculpatory and impeaching evidence relat-
ing to the initial police investigation," Green specifi-
cally identifies the suppressed notes: "Mark and Diane
suspect girl did it, she changed her story a couple of
times…[?] She [?] said that she tied his hands behind
his back." Green's 2006 Florida Supreme Court Ap-
peal Brief then argues at length that the prosecutor's
notes and other suppressed facts constituted exculpa-
tory evidence that went to the "heart of" the defense
strategy.    Indeed, Green's 2006 Florida Supreme
Court Appeal Brief quoted the *exact same testimony
from Parker as was quoted by the District Court in*

---

used an ellipsis to omit the following words, which we highlight. When those
words are included, the claim reads:

ARGUMENT VI

THE COURT ERRED IN DENYING GREEN'S
*CLAIM FOR RELIEF BASED ON INDIVIDUAL
INSTANCES OF INEFFECTIVE ASSISTANCE OF
COUNSEL* AND NONDISCLOSURE OF
EXCULPATORY EVIDENCE.

Ineffective assistance for failure to maintain file

*Exculpatory and impeaching evidence relating
to the initial police investigation*

Failure to impeach Jerome Murray

(Emphasis added).

> *support of its habeas finding that the notes "went to the heart" of the defense strategy.* Thus, Parker's evidentiary hearing testimony about the dramatic impact disclosure of the *Brady* material would have had at trial was presented to *both* the Florida Supreme Court in Green's 2006 Florida Supreme Court Appeal Brief, and the District Court to demonstrate that the suppressed notes went to the heart of the defense case. [The State's] sleight-of-hand argument that Green never appealed a non-appealable order to the Florida Supreme Court is wholly without merit.

 (First emphasis added).

The brief is correct in that Green's brief to the Florida Supreme Court in *Green II* did include the quotation from White's notes: "Mark and Diane suspect the girl did it, she changed her story a couple of times. . . [?] She [?] said that she tied his hands behind his back." *Green II,* 975 So. 2d at 1104 ("[S]he, rather than Green, had been the one to tie Charles Flynn's hands."). However, the quotation was included solely to support Green's argument that the Circuit Court erred in denying Claim III-F, not Claim III-H-4. Claim III-F alleged that *Parker rendered ineffective assistance of counsel* in failing to cross-examine Hallock with her statement to Deputy Walker that she was the one who tied Flynn's hands behind his back. At the outset, the brief referenced the evidentiary hearing that was held on Claim III-F and argued that Parker had failed "to investigate and present exculpatory and impeaching evidence relating to the initial police investigation." The brief relied

106                    Opinion of the Court                    18-13524

upon the hands-tying statement in the 1999 FDLE investigation to bolster the ineffectiveness claim. It also quoted that statement from White's notes, "She [?] said that she tied his hands behind his back," because, as the State points out, it was "consistent with Dep. Walker's recollection that Hallock said that she was the one who did the actual tying of Flynn's hands, and inconsistent with Hallock's subsequent statements and eventual trial testimony." Parker's alleged dereliction of duty was his failure to develop and impeach Hallock at trial with the inconsistent statement she supposedly gave Walker on the night of the murder, as indicated in the report he filed on April 5, 1989,[100] which had been disclosed to Parker prior to the trial. *Green II,* 975 So. 2d at 1104.

It is clear to us that in *Green II,* Collateral Counsel appealed and the Florida Supreme Court addressed only the Claim III-F *Strickland* allegation—founded on the statement Hallock purportedly made to Deputy Walker—not a *Brady* claim founded on the statement that, according to White's notes, Hallock made to someone other than Clarke and Rixey. Green alleged in Claim III-F that Parker should have known about the hands-tying statement because he had Walker's report.[101] He also had access to the notepad

---

[100] *See supra* part II.A.3., discussing Green's argument in support of Claim III-F in *Green II.*

[101] Recall White's comment at the *Huff* hearing suggesting that Collateral Counsel found the information contained in White's notes in "the records in the case Mr. Parker already ha[d]." Collateral Counsel did not disagree and ask the Court to hold an evidentiary hearing on, for example, whether Parker

18-13524 Opinion of the Court 107

on which Walker jotted down what Hallock told him. The Florida Supreme Court could not have read Green's brief as representing that Claim III-F alleged a *Brady* violation on the one hand—the State's withholding of Hallock's alleged prior inconsistent statement contained in White's notes—and a *Strickland* violation on the other hand—Parker's failure to use Hallock's alleged prior inconsistent statement contained in Walker's report in cross-examining Hallock. To conclude, Green failed to exhaust Claim III-H-4 in the state courts because he failed to "present the[] claim[]" to the Florida Supreme Court "such that the reasonable reader would understand [the] claim's particular legal basis and specific factual foundation." *Kelly*, 377 F.3d at 1344-45.

b.

But this is not the only problem with Green's argument that he exhausted Claim III-H-4 in the state courts, because the *Brady* claim that Green raised before the District Court is not the same claim that he presented to the state courts.

In fine, the Circuit Court decided the Claim III-F *Strickland* claim following a lengthy set of evidentiary hearings (April 2003–October 2004) in which Parker appeared and gave the exact same testimony quoted by the District Court in support of its habeas finding that White's notes "went to the heart" of the defense strategy. At that hearing, the Circuit Court was adjudicating a

---

actually knew of Hallock's hands-tying statement. Collateral Counsel accepted White's comment as true.

*Strickland* claim, not a *Brady* claim.[102]  The *Brady* claim the District Court granted habeas relief on was a brand spanking new "Claim III-H-4."  That *Brady* claim was actually the same claim Green presented to the Circuit Court in his Successive Motion in state court—a claim supported by the testimony given (principally by Parker) at the evidentiary hearings held in 2003 and 2004 and the affidavits Clarke and Rixey provided years later, in June 2010.  The Circuit Court denied this substantially expanded *Brady* claim as an impermissibly successive one under Florida Rule 3.850(h).[103]

The AEDPA forbids a district court from entertaining a claim that is not the *same* claim the prisoner presented to and adjudicated by the state courts on the merits.  *See Henderson*, 353 F.3d at 898 n.25.  Because the Claim III-H-4 claim presented on federal habeas review rests upon "different factual underpinnings," it was also unexhausted in state court and procedurally defaulted on federal habeas.  *Henderson*, 353 F.3d at 898 n.25.  Accordingly, the District Court's conclusion that Green exhausted Claim III-H-4, whether as it was originally presented to the state court or as presented to the District Court, cannot stand.

2.

The State's alternative argument assumes that the Claim III-H-4 presented in the first state postconviction motion was

---

[102] *See supra* part II.A.3.

[103] The state courts rejection of this new claim is not subject to federal habeas review.

18-13524            Opinion of the Court                 109

exhausted, but argues that the District Court erred in concluding that the Circuit Court's adjudication of the claim on the merits was unreasonable under §§ 2254(d)(1) and (d)(2), and erred in concluding, *de novo*, that the State's nondisclosure of two statements in White's notes— "Mark [Rixey] & Diane [Clarke] [1] suspect girl did it, She changed her story couple time . . . . [?] She [?] said [2] she tied his hands behind his back"—violated the *Brady* rule. We agree the District Court erred.[104]

a.

At the outset, we note that the District Court erred in considering evidence that was not before the state court when it adjudicated Claim III-H-4 on the merits. This includes, primarily, Parker's testimony and the affidavits of Rixey and Clarke that were executed in 2010 and submitted as "new evidence" in Green's Successive Motion in the state court. As *Cullen v. Pinholster* holds, "review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." 563 U.S. 170, 181, 131 S. Ct. 1388, 1398 (2011). The same limitation logically applies in review under § 2254(d)(2). Thus, in deciding whether the Circuit Court's Claim III-H-4 decision was "unreasonable" under

---

[104] Whether the District Court erred in concluding that the State violated the *Brady* rule in failing to disclose White's notes is a mixed question of law and fact. We review the Court's application of the law *de novo* and its findings of fact for clear error. As indicated in the following text, the factual findings on which the District Court based its conclusion that the State's withholding of White's notes violated the *Brady* rule are clearly erroneous.

the AEDPA standards, the District Court was restricted to "the evidence presented in the [Circuit Court] proceeding," *i.e.*, the *Huff* hearing which adjourned on May 13, 2002. The District Court disregarded the *Pinholster* limitation.

Accordingly, we review Green's Claim III-H-4 in his § 2254 petition *de novo,* but with the deference to the state habeas court's decision demanded by AEDPA, *Reed v. Sec'y, Fla. Dep't of Corr.,* 593 F.3d 1217, 1239 (11th Cir. 2010), and we do so based upon the record that was before the Circuit Court when it decided the claim, *Cullen,* 563 U.S. at 181, 131 S. Ct. at 1398.

b.

The Circuit Court ruled that the "opinion of Deputies Rixey and Clarke that they suspected that Hallock murdered Flynn would not have been admissible at Green's trial."[105] According to the District Court, once the Circuit Court so ruled, it ceased inquiring as to whether the officers' opinion was material in that it would have been helpful to the defense. The District Court considered this error on the Circuit Court's part, holding that *Brady* required the Circuit Court to take one step further and inquire into the "use

---

[105] Green made no attempt to convince the Circuit Court that the opinion was admissible under Florida law. At the *Huff* hearing, Collateral Counsel could have requested, but did not, an evidentiary hearing for two purposes: (1) so he could question Clarke and Rixey about their opinion and seek an evidentiary ruling on the admissibility of their testimony and (2) so he could question the officers involved in the homicide investigation in an effort to show that they focused their investigation on the wrong person.

[defense counsel] might have made" of the opinion. But the Circuit Court failed to take that step, and, according to the District Court, its failure to do so rendered its application of the *Brady* rule unreasonable under § 2254(d)(1).

We are not persuaded. First, the Circuit Court's Order of July 22, 2002, does not support the District Court's finding that the Circuit Court ceased its inquiry into *Brady* prejudice once it ruled Clarke's and Rixey's opinion inadmissible. It is obvious from a straightforward reading of the Circuit Court's order that the Court based its ruling on the fact that White's notes would have provided the defense with nothing it did not already have, and, therefore, Green "ha[d] shown no prejudice."[106] More to the point, Green failed to show how knowledge of the officers' opinion would have benefitted the defense.[107] Parker had the same opinion; Hallock was the culprit. He based his opinion on the same information the officers relied on in expressing their opinion. In his closing

---

[106] The finding of that fact is entitled to a presumption of correctness under 28 U.S.C. § 2254(e)(1).

[107] At the *Huff* hearing, Collateral Counsel, now in possession of White's notes and the officers' opinion, could have requested, but did not, an evidentiary hearing so he could question the officers and attempt to establish a basis for the admission of their opinion testimony at Green's trial. In addition, Collateral Counsel could have questioned the officers actually involved in the investigation, like Sergeant Fair Agent Nyquist, to show that they deliberately ignored the possibility that Hallock killed Flynn.

112                Opinion of the Court                18-13524

argument in the guilt-innocence phase of Green's trial, Parker all
but told the jury flat out that Hallock was the murderer.

In sum, the State's nondisclosure of the officers' opinion was
immaterial—it would have been of no demonstrable benefit to the
defense.  Because the opinions of Rixey and Clarke were not ad-
missible under state law, they were "not 'evidence' at all." *See*
*Wood v. Bartholomew*, 516 U.S. 1, 6, 116 S. Ct. 7, 10 (1995).[108] And
Green failed to argue or demonstrate that the suspicions would
have led to material, admissible evidence sufficient to create a "rea-
sonable probability" that the outcome of his trial would have been
different. *United States v. Bagley*, 473 U.S. 667, 682, 105 S. Ct. 3375,
3383 (1985).  The District Court's finding that the disclosure of the
opinion would have been helpful to the defense in "unknown and
unknowable" ways also falls well short of the *Brady* mark.  Alt-
hough a "reviewing court may consider directly any adverse effect
that the prosecutor's failure to respond might have had on the
preparation or presentation of the defendant's case," *Bagley*, 473
U.S. at 683, 105 S. Ct. at 3384, Green was still required to "specify
what particular evidence [he] had in mind," *Wood*, 516 U.S. at 6,
116 S. Ct. at 10.  The Circuit Court held that Green failed to meet

---

[108] The District Court also erred in finding that Parker might have been able
to circumvent Florida caselaw and the Circuit Court's ruling that the opinion
testimony of Clarke and Rixey was not admissible under that law. *See Estelle
v. McGuire*, 502 U.S. 62, 67–68, 112 S. Ct. 475, 480 ("We have stated many
times that federal habeas corpus relief does not lie for errors of state law.  To-
day, we reemphasize that it is not the province of a federal habeas court to
reexamine state-court determinations on state-law questions.").

his burden to demonstrate prejudice, and its adjudication is not contrary to or an unreasonable application of Supreme Court precedent.

c.

The Circuit Court also found that all the information contained in White's notes was disclosed to the defense and known by Parker prior to trial.  This included Hallock's hands-tying statement, "She [?] said she tied his hands behind his back."  Green was convinced that Parker had, or should have had, Hallock's statement because he had the report Deputy Walker filed on April 5, 1989, and it contained the statement.  *See Green II*, 975 So. 2d. at 1104; *see also supra* part II.C.2.  He also had access to the notepad in which Walker jotted down what Hallock told him.  This explains why Claim III-F alleged that Parker was ineffective under *Strickland* in failing to cross-examine Hallock with the statement.[109]

At the *Huff* hearing, White stated that Parker had the factual information contained in his notes because it was in "the records in the case Mr. Parker already ha[d]."  Collateral Counsel did not

---

[109] Green also alleged in Claim III-F that Parker was ineffective in failing to obtain Walker's notepad.  As we have explained, Green's allegations in Claim III-F are inherently contradictory; Green would have the Court believe that Parker was ineffective for not cross-examining Hallock with a statement he also alleged the prosecution never disclosed.  At most, only one of these two claims could be true, and the Circuit Court concluded that Parker had access to the notepad.  Therefore, Claim III-F must be a *Strickland* claim, not a *Brady* claim.

dispute this.  If Collateral Counsel had any doubt about whether Parker had access to the information in White's notes in the case records, he could have asked the Court to hold an evidentiary hearing to determine what Parker actually knew.  But Collateral Counsel did not do so.

In finding a *Brady* violation, the District Court overlooked the facts Collateral Counsel alleged in support of Claim III-F and Collateral Counsel's silent reaction to White's statement at the *Huff* hearing about the records Parker already had.  The District Court also overlooked what the Circuit Court was referring to when it found that the defense had all the information White's notes disclosed.  The Court *was not* referring to the notes themselves as those had not been disclosed.  Rather, the Court was referring to the *facts* the notes disclosed.[110]

Finally, and putting aside the question of whether Parker was aware of Hallock's hands-tying statement to Walker, Green failed to prove that the statement ever existed.[111]  That Hallock

---

[110] The only fact the notes did not disclose was Clarke's and Rixey's suspicion that Hallock killed Flynn.  Every other fact the notes disclosed was well known to those involved in the homicide investigation and amongst other officers in the Sheriff's Office.  Parker also learned of the facts in White's note via the extended pretrial discovery conducted in the case.

[111] Neither Clarke nor Rixey could have repeated Hallock's statement on the witness stand (as a prior inconsistent statement impeaching Hallock's testimony that Green tied Flynn's hands) because Hallock never spoke to them.  Indeed, they never saw her.  They learned of the statement from someone else, presumably Walker.

actually made the statement to Walker (or someone else who re-layed it to Clarke and Rixey) is the *sine qua non* of Claim III-H-4 and Claim III-F. If evidence of the statement—whether documentary or testimonial—never existed, its nondisclosure could not have violated the *Brady* rule and Parker could not have been ineffective in failing to use it in cross-examining Hallock.

The Circuit Court found that at the evidentiary hearing on Claim III-F, Collateral Counsel failed to introduce any evidence that Hallock told Walker she was the one who tied Flynn's hands behind his back. Collateral Counsel could have called Walker but did not. He could have presented the report Walker filed on April 5, 1989, which supposedly contained the statement, or Walker's notepad. He presented neither. Consequently, to find that Hallock actually made the hands-tying statement, the Circuit Court would have to speculate. And that it refused to do. So, it denied Claim III-F.

The Florida Supreme Court affirmed the denial foursquare. *Green II,* 975 So. 2d at 1104. Without proof that Hallock told someone that she was the one who tied Flynn's hands behind his back, the District Court could not have concluded that the State violated the *Brady* rule in failing to disclose to the defense that Clarke and Rixey told White what Hallock had said. The District Court's issuance of the writ based on Hallock's statement constituted reversible error.

VI.

Green asserts as an alternative basis for sustaining the District Court's judgment the second, third, and fourth claims the District Court found exhausted.   The District Court afforded the state courts' decisions denying the claims AEDPA deference.  Green argues that the District Court erred.  His argument lacks merit.  We explain why in the subparts that follow.

### A.

The second claim concerns Hallock's identification of Green as the perpetrator of the crimes in this case.  Green contends that the Circuit Court should have granted his pretrial motion *in limine* to suppress Hallock's identification of him in the photo lineup the police showed her on April 5, 1989, because the lineup was impermissibly suggestive, and the identification was unreliable.  Green argues that in denying his motion *in limine* and allowing the State to introduce the lineup identification into evidence, the trial judge denied him due process of law.[112]

We begin our discussion of the second claim with the hearing the Circuit Court held on May 31, 1990, on the motion *in limine.*[113]  Next, we consider sequentially the Circuit Court's adverse ruling on the motion, Hallock's subsequent identification of Green at trial, the argument Green advanced in the Florida

---

[112] Green brought the second claim under the Fifth, Sixth, and Fourteenth Amendments.

[113] At the hearing on the motion, Philip Williams and Robert Holmes represented the State.  John Parker represented Green.

18-13524                Opinion of the Court                117

Supreme Court in appealing the identification, the Florida Supreme Court's decision rejecting the argument, Green's presentation of his identification claim to the District Court, and its decision denying the claim. Lastly, we explain why the District Court's decision was not erroneous.

1.

Four witnesses testified at the May 31, 1990, hearing: Hallock, her father, Robert Hallock, who was present when she identified Green's photograph, Sergeant Fair, who conducted the photographic lineup, and Agent Nyquist, who put the lineup together under Fair's supervision. Parker questioned Hallock extensively about the photographic lineup when Parker took her deposition on February 13, 1990, and he used a transcript of the deposition to refresh her recollection in cross-examining her at the hearing on May 31.

The witnesses collectively described in detail what led up to Hallock's identification of Green's photograph on April 5. After arriving at the North Precinct early in the morning of April 4, Sergeant Fair had Hallock look at sixty-three to sixty-eight photographs of black males the Sheriff's Office had in its "intelligence files" to see if any depicted her assailant. She selected the photographs of "two or three" males who had facial hair features similar to the assailant's and showed the photographs to a sketch artist who prepared a composite sketch.

The sketch appeared with an article about the Flynn homicide in the <u>Florida Today</u> newspaper the following morning, April 5.  Dale Carlisle read the article, recognized the face shown in the sketch, and called the Sheriff's Office at around 1:00 p.m.  Carlisle spoke to Agent Nyquist and told him that the face portrayed in the sketch resembled that of a man he had seen at a Holder Park baseball game in the evening of April 3.  The man Carlisle identified was Crosley Green.  Nyquist, upon learning that Green had served time in a Florida prison, then obtained his photograph from the Florida Department of Corrections.

Under Sergeant Fair's supervision, Agent Nyquist prepared a lineup of six photographs of black males.  Sergeant Fair looked at the lineup and was concerned about the "skin tone of [Green's] photograph," that it was "a bit darker than the rest."  So, Nyquist obtained photographs of "darker skinned black males" and prepared another lineup that included their photographs along with Green's.  Responding to Parker's question at the hearing: "You are of the opinion this [lineup] was just fine?" Sergeant Fair answered "Yes."

Late in the evening of April 5, Hallock was summoned to the North Precinct to look at the photographic lineup.  She arrived with her father.  Agent Nyquist told her that she would be shown a photographic lineup that included a photograph of the suspect.  Sergeant Fair then had her view the lineup.  Hallock testified that she looked at the photographs for "three to four minutes."  She picked "number two" and said to Fair: "I'm pretty sure it [is]

number two." She was asked more than once if she was sure, and "finally" said: "I'm sure." Afterwards, she was told that number two was a photograph of the suspect.

Sergeant Fair recalled that Hallock looked at the lineup "and indicated within a very short period of time that number two was the individual who was responsible for the crimes against herself and Mr. Flynn." When he asked her if she was "certain," she "indicat[ed that] she was positively certain that the person depicted in position number two was in fact the killer of Chip Flynn."

At the close of the hearing *in limine*, the Court entertained counsel's arguments. Counsel agreed that the hearing presented two issues: whether the lineup was unnecessarily suggestive and if it was, whether the suggestive procedure created a substantial likelihood that Hallock would mistakenly identify Green at the trial.

2.

The Circuit Court found that the State did not employ an unnecessarily suggestive procedure in obtaining Hallock's photographic identification of Green.

The Court also found that Hallock's opportunity to observe Green at Holder Park and in the orange grove indicated that the identification was reliable enough that the jury could consider Hallock's identification. Assuming that the photographic lineup and Hallock's identification of Green's photograph were admitted into evidence at Green's trial, the jury could then decide the extent to which it wished to rely on Hallock's identification.

120                    Opinion of the Court                    18-13524

3.

At the trial, Hallock identified Green without objection. And the State introduced the photographic lineup into evidence, again without objection. After the State rested its case in chief, Green renewed his pretrial motion to suppress. Adhering to its pretrial ruling, the Circuit Court denied the motion. Green then moved the Court for a mistrial, which the Court also denied.

4.

In appealing his convictions (and death sentence) to the Florida Supreme Court in *Green I,* Green assigned as error the Circuit Court's denial of his motion to suppress made pretrial and renewed at trial. In his brief, he advanced two arguments sequentially. First, "the photo line-up . . . was unduly suggestive and . . . the procedures employed by the police in obtaining the identification were tainted." Second, because the procedures were unduly suggestive, the factors the United States Supreme Court listed in *Neil v. Biggers,*[114] for determining whether an unduly suggestive procedure created a "likelihood of misidentification," counseled suppressing the photo lineup identification and barring Hallock from identifying Green at trial.

Prior to addressing Green's first argument, the Florida Supreme Court observed what took place after Hallock and her father came to the North Precinct in the evening of April 5, 1989:

---

[114] 409 U.S. 188, 199–200, 93 S. Ct. 375, 382 (1972),

18-13524                 Opinion of the Court                 121

> Police conducted a photo lineup with six pictures that included a recent picture of Green. An officer told Hallock, "We have six pictures we want you to look at. We have a suspect within these six pictures. You can take as long as you want … and if you can't identify him, fine." Hallock said she was "pretty sure" Green was her assailant. After identifying Green, the police told her she had identified the right person.

*Green I,* 641 So. 2d at 394. With that, the Florida Supreme Court turned to Green's first argument, that the photo lineup procedure was "unnecessarily suggestive." *Id.* It applied a two-part test in assessing the argument:

> First, whether police used an unnecessarily suggestive procedure to obtain [the] out-of-court identification, and, second, if so, considering all the circumstances, whether the suggestive procedure gave rise to a substantial likelihood of irreparable misidentification [of Green at his trial]. *Grant v. State,* 390 So. 2d 341, 343 (Fla.1980), *cert. denied,* 451 U.S. 913, 101 S. Ct. 1987, 68 L.Ed.2d 303 (1981).

*Id.*[115] The Court found that "the police did not use an unnecessarily suggestive procedure to obtain Hallock's out-of-court

---

[115] *Grant v. State's* two-part test is based on the United States Supreme Court's holdings in *Neil v. Biggers*, 409 U.S. 188, 93 S. Ct. 375 (1972), *Simmons v. United States*, 390 U.S. 377, 88 S. Ct. 967 (1968), and *Stovall v. Denno*, 388 U.S. 293, 87 S. Ct. 1967 (1967). The Florida Supreme Court justified its test in *Grant* with the following:

[T]he primary evil to be avoided [in the introduction of an out-of-court identification] is a very substantial likelihood of misidentification . . . . It is the likelihood of misidentification which violates a defendant's right to due process . . . . Suggestive confrontations are disapproved because they increase the likelihood of misidentification, and unnecessarily suggestive ones are condemned for the further reason that the increased chance of misidentification is gratuitous." *Neil v. Biggers*, 409 U.S. at 198, 93 S. Ct. at 381-82. But as the analysis has evolved, a suggestive confrontation procedure, by itself, is not enough to require exclusion of the out-of-court identification; the confrontation evidence will be admissible if, despite its suggestive aspects, the out-of-court identification possesses certain features of reliability. *Manson v. Brathwaite*, 432 U.S. 98, 110, 97 S. Ct. 2243, 2250, 53 L.Ed.2d 140 (1977). Hence the appropriate test is twofold: (1) did the police employ an unnecessarily suggestive procedure in obtaining an out-of-court identification; (2) if so, considering all the circumstances, did the suggestive procedure give rise to a substantial likelihood of irreparable misidentification. *Id.* The factors to be considered in evaluating the likelihood of misidentification include

> the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation.

*Neil v. Biggers*, 409 U.S. at 199-200, 93 S. Ct. at 382.

*Grant v. State,* 390 So.2d at 343. This is the same two-part test this Court has consistently followed. *United States v. Smith*, 967 F.3d 1196, 1203 (11th Cir. 2020); *Cikora v. Dugger*, 840 F.2d 893, 895 (11th Cir. 1988). If an out-of-court

18-13524                Opinion of the Court                123

identification of Green." *Id.* Consequently, there was no need to consider the second part of the test. *Id.* As the Florida Supreme Court explained:

> The police showed Hallock an array of six photographs, all of which depicted men with similar characteristics. Although police indicated the suspect was in the photo lineup and Green's photograph was darker than the others, there is no indication that officers directed Hallock's attention to any particular photograph. *See Johnson v. State,* 438 So. 2d 774, 777 (Fla.1983) (photo lineup not impermissibly suggestive even though only the defendant had a suntan and his inmate uniform was a lighter blue than those of other inmates in the lineup), *cert. denied,* 465 U.S. 1051, 104 S. Ct. 1329, 79 L.Ed.2d 724 (1984). Thus, the trial court did not err in refusing to suppress the photo identification.

*Id.* at 394–95. Having disposed of Green's argument that the Circuit Court erred in denying his motion to suppress, the Florida Supreme Court dispatched his argument that the Court erred in allowing Hallock to identify him at trial. "Hallock's in-court

---

identification via a photo array is not unnecessarily suggestive and thus does not meet the first test, "we need not proceed to the five factors of the *Neil v. Biggers* test." *Cikora*, 840 F.2d at 895–96.

124                 Opinion of the Court               18-13524

identification was based on her observation of Green at the crime scene."[116] *Id.* at 395.

5.

The claim Green presented to the District Court was the same as the claim he presented to the Florida Supreme Court on direct appeal, to-wit: the Florida Supreme Court unreasonably applied United States Supreme Court precedent under § 2254(d)(1), namely *Neil v. Biggers*, and unreasonably determined the facts under § 2254(d)(2) in affirming the Circuit Court's denial of his motion to suppress. The argument under § 2254(d)(1) depends on whether the denial was based on an unreasonable determination of the facts under § 2254(d)(2). The District Court tacitly agreed. Accordingly, its analysis of Green's claim focused on whether the Florida Supreme Court's finding that the police did not use an unnecessarily suggestive procedure in obtaining Hallock's identification of Green as the assailant was entitled to a presumption of correctness under § 2254(e)(1). The presumption provides the standard for reviewing the finding because the finding resolved a question of fact. *See United States v. Smith*, 967 F.3d 1196, 1203 (11th Cir. 2020) (applying clear error standard when reviewing state trial court finding that the identification procedure was not unduly

---

[116] This observation was stated gratuitously since Green did not object to Hallock's in-court identification at trial. His position was, and is, that the Circuit Court should have granted his motion to suppress pretrial and ordered that Hallock would not be permitted to identify him at trial.

suggestive); *Cikora v. Dugger*, 840 F.2d 893, 896 (11th Cir. 1988) (applying clear error standard when reviewing state trial finding that "photo array was not impermissibly suggestive").

The District Court did not mention the presumption in deciding whether the photo array procedure used here was unduly suggestive.[117]    Instead, the Court effectively decided *de novo* whether the procedure was faulty as Green alleged.  In doing so, it responded to the pieces of evidence Green principally relied on.

One such piece was that Green's "photograph was darker than the others" and so Hallock probably selected it for that reason. The District Court observed that there was "no evidence that the darkness of Petitioner's picture influenced Hallock's selection of Petitioner's photograph."  Referring to Hallock's testimony at the May 31, 1990, suppression hearing, the District Court noted that "Hallock identified Petitioner's picture based on other factors, including Petitioner's nose, complexion, face, and eyes, which all matched Hallock's recollection of the shooter."  In fact, Hallock specifically stated that she made her photo lineup identification of Petitioner "based upon his face."

As for Hallock's in-court identification, the District Court agreed with the Florida Supreme Court that Hallock's in-court identification was based on her observation of the assailant at the

---

[117] Nor did Green mention the presumption while litigating the issue.

scene of the crime.  *Green I*, 641 So. 2d at 395.  As the District Court explained:

> Hallock testified that she was 'absolutely sure' that Petitioner was the perpetrator. Hallock's testimony reflects that there was sufficient time and light for her to view Petitioner at the crime scene. In fact, Hallock was able to provide law enforcement with a physical description of the perpetrator, a description of the perpetrator's clothing, and assist in putting together a sketch. Therefore, Petitioner . . . failed to demonstrate that the in-court identification should have been suppressed.

In sum, the District Court found no merit in Green's § 2254(d)(2) argument.  Since that argument failed, his § 2254(d)(1) argument necessarily failed as well; if the photo lineup was not unduly suggestive, then the trial court did not unreasonably apply Supreme Court precedent when it denied Green's motion to suppress.

6.

In his brief to us, Green argues that Hallock should have been precluded from identifying him at trial because the photo lineup from which she selected his photograph was "impermissibly suggestive" and the selection was "unreliable."  Regarding the latter point, Green says that the District Court's findings "to the contrary are incorrect and belied by the facts."  He implies the same with respect to the first point.  He acknowledges, however, that his

real burden is not to convince us that the District Court erred. Rather, it is to show that the Florida Supreme Court's adjudication of his claim fails scrutiny under § 2254(d)(1) or (2).

Green has the added burden under § 2254(e)(1) of rebutting by "clear and convincing evidence" the presumption of correctness given to state court factual findings, both express and implied. *Taylor v. Horn*, 504 F.3d 416, 433 (3d Cir. 2007) ("Implicit factual findings are presumed correct under § 2254(e)(1) to the same extent as express factual findings."). The Florida Supreme Court found that the procedures the police used to obtain Hallock's photo lineup identification were not unduly suggestive and that her identification of his photograph was reliable. Green's brief, however, makes no mention of his burden under § 2254(e)(1). Instead, it presents his claim of misidentification as if he were on direct appeal before the Florida Supreme Court. That observation aside, we consider what Green has to say.

His brief dwells on the fact that Hallock was informed that the suspect's photograph was included in the photo array she would be shown.[118] That happened in *Cikora*, 840 F.2d at 894–97.

---

[118] As Green's brief states, Hallock was told that "'a suspect was in the lineup before she viewed it.'" Green contends that this, together with the fact that she was "praise[d]" by law enforcement for her selection of Green, "tainted [her] ability to provide a fair, impartial identification both at the time of the photo array and later at trial." The Circuit Court was well aware of both points in passing on Green's pretrial motion to suppress.

There the police told the witnesses that the suspect's photo was in the photographic array, but they did not reveal which photograph it was. *Id.* We found no undue suggestiveness in the procedure. *Id.*

Informing an eyewitness that the suspect's photo will be part of the photo array is generally of no moment in the mine run of cases. When a witness is presented with a lineup and asked whether he or she can identify any of the individuals in the lineup, the witness will expect that the individual the police believes to be the suspect will be included. This is so whether the lineup consists of individuals in person or via their photographs. Why else would the police go to the trouble of summoning the witness to the stationhouse? Especially in circumstances like those here, in which an artist's sketch of the suspect made with the witness' considerable assistance has appeared in the local newspaper and hours later the police summon the witness to the police station.

Putting aside the fact that Hallock was aware that the lineup would include the suspect's photograph, there was nothing suggestive about this lineup. The Florida Supreme Court gave deference to the Circuit Court's finding that Hallock's identification of Green's photo was reliable. The deference was warranted. The suppression hearing the Circuit Court held was comprehensive. The Court observed Hallock testify about her interaction with Green at Holder Park and at the orange grove, as well as what took place during the photo lineup. Parker, armed with the testimony she gave when he deposed her three and a half months before,

cross-examined her at length about her ability to identify Green. At the suppression hearing and on deposition, she was questioned about the opportunities she had to observe the assailant's face. She was subjected to the same questioning at trial.

Although the Florida Supreme Court's opinion in *Green I* does not mention the sketch that appeared in Florida Today on April 5 and Hallock's involvement in its preparation, that the sketch prompted Carlisle and Hampton to call the police to say that Green was at Holder Park the evening of April 3, 1989, was significant. Carlisle recognized Green as a fellow junior high school student he knew from years earlier. Hampton had known the Green family and Crosley Green for years. The accuracy of the sketch no doubt buttressed the Circuit Court's finding that Hallock's identification of Green was reliable.

We close this discussion with the firm view that Green failed to rebut by clear and convincing evidence the presumption of correctness that attached to the Florida Supreme Court findings regarding procedures the police employed in conducting the photo lineup and the reliability of Hallock's identification of Green's photograph. The District Court did not err in affording the Florida Supreme Court's adjudication of Green's identification claim AEDPA deference.

*B.*

Green's third claim, Claim I-2, alleged that Parker rendered ineffective performance of counsel under *Strickland v. Washington*

in failing to challenge Juror Guiles for cause or to strike him from the jury venire peremptorily because Guiles' niece had been murdered three years earlier.[119]   Green asserted the claim in his first Rule 3.850 motion.  The Circuit Court held an evidentiary hearing on the claim and denied it on November 22, 2005, concluding that Green satisfied neither prong of the *Strickland* standard, performance or prejudice.  The Florida Supreme Court agreed and affirmed.  *Green II*, 975 So. 2d at 1104–05.

The District Court found the claim "without merit" and denied it.  As the District Court explained:

> First, Guiles informed the trial court the he [sic] would be able to set aside his feelings and not let them affect his decision-making. Second, Parker made a

---

[119] An ineffective assistance of counsel claim under *Strickland* requires proof of two elements: (1) the petitioner must show that his counsel's performance was constitutionally deficient, and (2) the petitioner must show that his counsel's deficient performance prejudiced his defense. *Strickland,* 466 U.S. at 687, 104 S. Ct. at 2064. Prejudice is established if there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694, 104 S. Ct. at 2068.

The *Strickland* standard for deficient performance is deferential to counsel.  "[C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.* at 690, 104 S. Ct. at 2066.  Additionally, in a habeas case, AEDPA creates a second layer of deference for defense counsel's performance—we must deny habeas relief on an ineffective assistance of counsel claim if "there is *any reasonable argument* that counsel satisfied *Strickland*'s [already] deferential standard." *Harrington v. Richter*, 562 U.S. 86, 105, 131 S. Ct. 770, 788 (2011) (emphasis added).

strategic decision not to challenge Guiles. Under the circumstances, there has been no showing that Parker acted deficiently with regard to this matter or that Petitioner sustained prejudice.

In his brief to us, Green devotes one paragraph to this claim:

> Juror Guiles's niece had recently been murdered, yet Parker inexplicably failed to challenge him. The District Court excuses this behavior as a "strategic decision," but nothing could be further from the truth. Parker himself admitted in post-conviction deposition testimony that he "can't tell you why" he did not strike Juror Guiles with his available peremptory challenge. Parker also essentially admitted to his own ineffectiveness, conceding that "if I didn't make a motion to excuse [Juror Guiles] for cause because of a family member['s murder], *I should have*." [120]

The Florida Supreme Court found that a for cause objection would have failed. *Green II*, 975 So. 2d at 1104–05. Guiles informed the trial judge that he would "be able to set aside [his niece's murder] and not let it affect the case." *Id.* The judge believed him, and the Florida Supreme Court accepted the judge's finding. *Id.*

---

[120] The words, "I should have," were taken from a deposition Parker had given earlier in the litigation of Claim I-2 at the behest of Collateral Counsel. Collateral Counsel used the words in an effort to impeach Parker's testimony at the evidentiary hearing held on Claim I-2.

The Florida Supreme Court's finding that the for cause objection would have failed is a finding of ultimate fact. This finding also necessarily included subsidiary findings that Guiles was truthful and that the trial judge based his belief on Guiles' statements and demeanor. A state court's findings on subsidiary factual questions are entitled to § 2254(e)(1)'s presumption of correctness.[121] *Austin v. Davis*, 876 F.3d 757, 783 (5th Cir. 2017). This is true even when the factual findings are merely implicit. *Taylor*, 504 F.3d at 433. Also entitled to the presumption is the Circuit Court's express finding that Parker's decision not to peremptorily excuse Guiles from the jury *venire* was a strategic decision made soundly.

As Green did not address his burden under § 2254(e)(1) and thus failed to rebut the presumption of correctness the state courts' factual findings were entitled to, the District Court's judgment on Green's third claim, Claim I-2, is accordingly affirmed.

## C.

Green's fourth claim is that the prosecution violated *Giglio v. United States* by "elicit[ing] or allow[ing] to go uncorrected critical false testimony from key witnesses," namely Sheila Green, Lonnie Hillery, and Jerome Murray. The District Court found the claim in Petitioner's Memorandum of Law in Support of Habeas Corpus Petition with Request for Evidentiary Hearing. Claim IV

---

[121] As noted *supra* part VI.A.6, Green's brief is silent regarding the application of § 2254 (e)(1).

18-13524          Opinion of the Court          133

of the first Rule 3.850 motion alleged that Green's convictions were "constitutionally unreliable" because they were based on the false testimony of the three witnesses which had recently recanted. *See supra* part II.A.4. The Circuit Court distilled Claim IV thus: "Under claim four . . . the Defendant makes a newly discovered evidence claim based upon the recantation of . . . trial testimony." The Circuit Court then denied this claim after finding that the recantations would not have changed the outcome at trial.

In his habeas petition, Green transformed Claim IV, a pure state law claim, into a *Giglio* claim founded on the Claim IV evidence, and the District Court treated it as such. It then denied the claim out of the "special deference . . . due when a trial court's findings are based on the credibility of witnesses." "Here, the trial court's credibility determination and implicit factual findings are supported in the record." Green failed to present "clear and convincing evidence that the trial court's findings were unreasonable."[122] We affirm the District Court's judgment on Claim IV on the ground that it was not cognizable under § 2254. As presented to the state courts in Green's first Rule 3.850 motion, it failed to allege the denial of a federal constitutional right.

## VII.

---

[122] The District Court was referring to the Florida Supreme Court's discussion of Green's motion for a new trial under the original, state law based Claim IV. *Green II*, 975 So. 2d at 1099–1101.

The District Court denied Green relief on three claims it found procedurally defaulted and thus unexhausted. Green contends that the Court should have decided the claims on the merits because he established a lawful excuse for the defaults, his actual innocence. In subpart A, we state the reasons why the Court denied the three claims as procedurally defaulted.[123] In subpart B, we turn to Green's argument that his procedural defaults should be excused. He contends, as a blanket matter, that all the procedural defaults are excusable under the fundamental miscarriage of justice—*i.e.,* the "actually innocent"—exception. We conclude that the procedural defaults are not excused under this exception.[124]

*A.*

The first of the three claims the District Court rejected as procedurally defaulted was Green's claim that the State violated

---

[123] In this part, we do not address claims the District Court rejected and that Green did not present here. They are abandoned. *See Access Now, Inc., v. Sw. Airlines Co.*, 385 F.3d 1324, 1330 (11th Cir. 2004) ("[A] legal claim or argument that has not been briefed before the court is deemed abandoned and its merits will not be addressed.").

[124] In addition to the claims the District Court expressly declared procedurally defaulted, we include in this discussion two other claims we analyzed earlier in this opinion: (1) the *Brady* claim based on the State's failure to disclose the statement in White's notes that Clarke and Rixey suspected that Hallock killed Flynn, and (2) the *Giglio* claim we refer to in part VI.C. *supra.* The *Brady* claim was part of Claim III-H-4, which we find defaulted. *See supra* part V.C.1. The *Giglio* claim was defaulted because Green never raised it in state court in the form he raised it before the District Court.

the *Brady* rule by suppressing a recording of a phone call between Hallock and Flynn's father.[125]  In this recording, Hallock described the events that led to Flynn's death.[126]  The District Court found this claim procedurally defaulted because (1) Green had not raised it in state court and (2) he was not entitled to the fundamental miscarriage of justice exception to excuse the default.

The second claim the District Court rejected consisted of three *Brady* subclaims.  These subclaims alleged that the State failed to disclose threats, promises, and special benefits the prosecution gave Sheila Green, Lonnie Hillery, and Jerome Murray to induce them to testify falsely against Green.  Specifically, Green alleged the prosecution threatened Sheila by telling her that she would lose custody of her four young children if she did not cooperate.  Moreover, Green alleged the prosecution led her to believe that she would receive leniency when sentenced on her federal drug conviction if she testified against Green.  Green further alleged that the prosecution secured special treatment for Sheila and Hillery,[127] such as the opportunity to speak privately on the

---

[125] In the District Court, Green also claimed that the prosecution suppressed a recording of Hallock's 911 call.  Green abandoned that claim by failing to raise it in his brief here. *See Access Now*, 385 F.3d at 1330.

[126] Before us, Green argues that Hallock's version of the events in this recording was materially different from her trial testimony and thus should have been disclosed to the defense for impeachment purposes.

[127] Recall that Hillery was a co-conspirator in the pending federal drug case against Sheila and the father of two of Sheila's children. *See supra* note 19.

prosecutor's phone twice a week before they testified, that the prosecution threatened to re-prosecute Hillery for committing federal drug offenses, and that the prosecution threatened to encourage the federal court to sentence Sheila to a lengthy term of imprisonment on her federal drug conviction. Lastly, Green alleged that Murray felt compelled to cooperate because there was a warrant outstanding for his arrest.

The District Court found these subclaims procedurally defaulted because Green had not raised them in state court. The Court also found that Green failed to establish that he was "entitled to the fundamental miscarriage of justice exception" to the exhaustion rule.[128]

Third, the District Court rejected Green's claim that Parker was constitutionally ineffective for failing to investigate and use Lori Rains, Cheryl Anderson, and Tyrone Torres as alibi

---

[128] Ruling in the alternative, the District Court rejected the defaulted claims on the merits. The Court found that Green was aware of the benefits that Sheila, Hillery, and Murray received in exchange for their testimony: (1) Sheila (a) acknowledged that she was awaiting sentencing for her federal drug offense and that the prosecutor had agreed to speak on her behalf at sentencing, and (b) testified that it was, in fact, her lawyer who initiated discussions with the prosecutor about her testifying against Green rather than vice versa, which contradicted any claim that the prosecutor "induced" her false testimony; (2) Hillery admitted that he was also charged in the federal drug case; and (3) Murray acknowledged that the prosecutor had talked to the judge on his behalf regarding the outstanding warrant for his arrest. We affirm, in the alternative, the District Court's denial of these claims because Green and the jury were aware of these benefits Sheila, Hillery, and Murray received.

witnesses.[129]  In Green's first Rule 3.850 motion, he argued that Parker was ineffective for failing to investigate or use Rains as a potential alibi witness.  The Circuit Court denied his claim, and Green did not appeal the ruling.  The District Court accordingly found that any claim involving Rains was procedurally defaulted.  Likewise, the Court found that Green procedurally defaulted any ineffective assistance of counsel claims based on Parker's failure to investigate or use Anderson and/or Torres as alibi witnesses because Green never asserted such claims in state court.  The Court denied these claims after finding that Green was not entitled to the fundamental miscarriage of justice exception to the exhaustion rule.[130]

Because Green does not argue that the District Court wrongly concluded that these three claims were procedurally defaulted, we turn to his argument that the District Court should have found his procedural defaults excused.

*B.*

---

[129] In the District Court, Green also argued that Parker was ineffective for failing to investigate and use Carleen Brothers, Brandon Wright, Reginald Peters, Randy Brown, Kerwin Hepburn, and James Carn as alibi witnesses.  Green abandoned these claims by failing to raise them here on appeal.  *See Access Now*, 385 F.3d at 1330.

[130] In the alternative, the District Court also denied on the merits Green's ineffective assistance claim regarding Rains.  Amended Order at 34–36.

Green argues that all his procedural defaults should be excused, as a blanket matter, because he is actually innocent of the crimes for which he stands convicted. We disagree.

Under *Schlup v. Delo*, 513 U.S. 298, 115 S. Ct. 851 (1995), a federal court may consider the merits of a habeas petitioner's procedurally defaulted constitutional claims if the petitioner can show his actual innocence. To make such a showing, a petitioner must "support his allegations of constitutional error with new reliable evidence [of actual innocence]—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." *Id.* at 324, 115 S. Ct. at 865. We then consider whether, in light of all of the evidence in the record, "old and new, incriminating and exculpatory," *House v. Bell*, 547 U.S. 518, 538, 126 S. Ct. 2064, 2077 (2006), the petitioner has established that "it is more likely than not that no reasonable juror would have convicted him." *Schlup*, 513 U.S. at 327, 115 S. Ct. at 867.

Green points to six pieces of evidence that show his innocence. In subpart 1, we examine each piece. In subpart 2, following *Schlup's* teaching, we consider the evidence of Green's guilt. In subpart 3, we analyze whether, considering all this evidence, Green has shown that no reasonable juror would have convicted him.

1.

Green argues that six pieces of newly discovered evidence show his innocence of the crime.[131] The new evidence of his innocence consists of (1) an audio tape of Hallock recounting her version of events to Flynn's father, which is allegedly inconsistent with her other testimony about the crime; (2) the recantations of Sheila's, Hillery's, and Murray's testimony that Green confessed to the crime; (3) the prosecution's alleged coercion of Sheila, Hillery, and Murray to testify against Green; (4) alibi witnesses that were not called at trial; (5) post-trial analysis of Flynn's truck, and (6) post-trial analysis of Flynn's revolver. We address these pieces of evidence in turn.

First, Green argues that "the audio tape of Hallock recounting her version of events to Flynn's father soon after Flynn was killed . . . contained statements materially different from Hallock's police interviews, deposition, and court testimony," and therefore could have been used to impeach her at trial. But Green never says how the audio tape is inconsistent with Hallock's other statements. And, having independently reviewed the transcript of the audiotape, we find no glaring inconsistencies.

Second, Green points out that Sheila, Hillery, and Murray recanted their trial testimony that Green confessed to shooting Flynn. However, the Circuit Court found Sheila's recantation not

---

[131] The following facts may seem similar to those discussed in other portions of this opinion because Green used many of these same facts to support his substantive constitutional claims.

credible.  In fact, "[i]t was obvious to [the Circuit] Court that based upon [Sheila's] responses, demeanor, and body language, [she] was not being forthright at the evidentiary hearing regarding the alleged falsification of her trial testimony."  Rather, "Sheila Green was presenting [her] unbelievable testimony at the evidentiary hearing in an effort now to please her brother [Green] and her family."

The Circuit Court likewise found Hillery's recantation not credible.  And regarding Murray's testimony, Murray stated that he did not remember making his postconviction recantations because he was either tired or drunk, and he thereafter exercised his privilege against self-incrimination.  It is accordingly unclear whether Murray, in fact, intended to recant his testimony.  As a result, it would not be unreasonable for a jury to credit these witnesses' original testimony and discredit their new versions, just as the Circuit Court did.  *See Schlup*, 513 U.S. at 327, 115 S. Ct. at 867 ("[I]t [must be] more likely than not that no reasonable juror would have convicted [the defendant].").

Third, Green argues that the prosecution coerced or induced Sheila, Hillery, and Murray to testify against him.  But the prosecution did not coerce Sheila.  It was Sheila's own attorney who contacted the prosecution about the possibility of her testifying against Green.  And, at trial, all three witnesses testified about the inducements they received for their testimony.  The jury at Green's first trial considered their ulterior motives in finding Green guilty.

Fourth, Green asserts that Reginald Peters, Brandon Wright, and Randy Brown contend that, on the night of the murder, they saw him in and around the residence of Lori Rains, which was roughly two miles away from the crime scene.[132]  Specifically, all three said they saw him that night from around 10:00 or 11:00 p.m. until between 1:30 and 4:30 a.m.[133]

Wright testified at an evidentiary hearing the Circuit Court held in 2011 that he saw Green at Rains' residence around 11:00 p.m.  He saw Green again around 3:00 a.m.  Wright insisted that Green never left the area long enough to go to Holder Park.  Wright acknowledged, though, that he was selling drugs that night and that he, Green, and several other people were moving freely between Rains' and Carleen Brothers' residences, which were separated by a field roughly a couple hundred feet long.  Peters' testimony at the evidentiary hearing was essentially the same as

---

[132] There is a circuit split regarding whether the testimony of these alibi witnesses qualifies under *Schlup* as "new" evidence of innocence.  In *Rozzelle v. Sec'y, Fla. Dep't of Corrs.*, we noted that some circuits require that the evidence be newly *discovered*, meaning it was not available or discoverable at the time of the trial, while others require that the evidence be merely newly *presented*, meaning its availability or discoverability at the time of trial is irrelevant.  672 F.3d 1000, 1018 n. 21 (11th Cir. 2012).  We declined in *Rozzelle* to adopt either approach because even if the evidence in *Rozzelle* had been "new," the petitioner failed to make the necessary showing under *Schlup* that no reasonable juror would have convicted him.  *Id.* at 1017–21.  Here, we decline to adopt either approach for the same reason.

[133] Recall that Officer Rixey received a call at around 1:12 a.m. to go to the orange grove, the scene of Flynn's murder.

Wright's. And while Brown did not testify at the hearing, he attested in an affidavit that he saw Green around Rains' residence "off and on" from around 9:00 or 10:00 p.m. until 1:30 or 2:00 a.m.

Green is correct that this evidence offers some support for his alibi, but its strength is questionable. For one thing, although Wright claimed that he knew for a fact that Green never left the area that night, his testimony, along with Peters' and Brown's, makes clear that people were coming and going between two residences (separated by a couple hundred feet) throughout the night, and that they saw Green only "off and on." Moreover, their testimony was potentially damaging to Green. Peters testified that Green was smoking crack that night, and Wright testified that he could tell Green was high. It would be a permissible inference for a jury to draw that someone who is high on crack cocaine—a powerful stimulant—is more likely to act aggressively, violently, or without regard to the consequences of his actions.

So, these three alibi witnesses placed Green only two miles from the crime scene, high on crack cocaine—and therefore more likely to act violently—on the night Flynn was killed. And they cannot establish that Green was indisputably in their presence throughout the entire night, leaving no opportunity for him to have killed Flynn. Such testimony could certainly hurt Green more than help.

And even if the jury ignored the potential damaging aspects of the testimony, the Circuit Court found Wright and Peters to be not credible:

Both Wright and Peters are convicted felons who have committed numerous felonies, admittedly were selling drugs the evening of the crime as juveniles, and given their demeanor at the evidentiary hearing before the undersigned judge, their credibility and memory recall is questionable at best. Mr. Wright's testimony that he did not know until last year that [Green] was convicted of murder and sentenced to death, was wholly unbelievable, given his other testimony that he was with [Green] on and off during the night of Chip Flynn's murder, observed the police in the area investigating Flynn's murder after it occurred, and saw the police sketch of the suspected murderer. Chip Flynn's murder was big news in Mims, Wright knew [Green] and his family, and Wright was living in Mims when the case came to trial.

It would not be unreasonable for a jury to make a similar credibility determination about these witnesses. See Schlup, 513 U.S. at 327, 115 S. Ct. at 867.

Fifth, Green points out that post-trial analysis failed to find Green's fingerprints on Flynn's truck. However, as we discuss in the next subpart, post-trial DNA evidence found in the truck undermines the value of this evidence.

Sixth, Green argues that "post-trial analysis by the Florida Department of Law Enforcement concluded that the .22 caliber bullet recovered from Flynn had 'similar class characteristics' to Flynn's revolver, which disproves the prosecution's main trial

theory that Flynn was shot by the 'black guy's' weapon." But this information is not new, and it does not disprove anything about the prosecution's case.

Recall that Flynn's revolver was recovered from the crime scene. In Flynn's revolver, the authorities found six unfired cartridges and three fired cartridges, meaning that Flynn's revolver had fired three bullets at some point. Part of the defense's theory was that Hallock was somehow involved in the shooting. Therefore, it would have been beneficial for the defense if an analysis of the revolver and the bullet recovered from Flynn's body suggested that he was shot by one of these three bullets. This would have suggested that Hallock was involved in the shooting, and it would have conflicted with her testimony that Green shot Flynn with Green's own gun.

Now, some background regarding firearm forensics is in order. When examining a bullet to determine if it could have been shot from a specific firearm, there are two types of relevant characteristics: class characteristics and individual characteristics.

Class characteristics merely establish the type or manufacturer of a firearm that could have fired a bullet. On the other hand, individual characteristics can identify—with near certainty—that a specific firearm fired a specific bullet. Individual characteristics are based on the imperfections of the lands and grooves in the barrel of a firearm, which are translated or transcribed onto the surface of a bullet when the bullet is fired. Essentially, if a forensic examination reveals that a fired bullet's markings correspond to a given

18-13524                Opinion of the Court                145

firearm's unique imperfections,[134] it is very likely that the bullet was fired from that firearm.

On appeal, Green does not argue that post-trial analysis revealed *individual characteristics* that matched the bullet recovered from Flynn's body to Flynn's revolver. Instead, he claims that post-trial analysis revealed that the bullet and Flynn's revolver had similar *class characteristics*. This merely means that, based on the make, model, and infrastructure of Flynn's revolver, it was capable of firing the bullet recovered from his body. But this evidence is not new because the fact that Flynn might have been shot with his own revolver was established at Green's trial; the prosecution's forensic firearm examiner explicitly testified that this was a possibility. And the post-trial analysis does not disprove the prosecution's theory that Green had a gun and fired the bullet that killed Flynn because, based on class characteristics, there were thirty or more types of weapons that could have fired that bullet.

2.

Having explored Green's new evidence of his innocence, we now consider the evidence of his guilt. First, Hallock—the only surviving victim of the crime—identified Green as the shooter. *See Green I*, 641 So. 2d at 393. Second, two witnesses, Willie Hampton and Dale Carlisle, testified that they saw Green at Holder Park

---

[134] These examinations are done by firing other bullets through the firearm and comparing them under a microscope with the bullet recovered from the crime scene.

watching a baseball game in the evening of April 3, 1989, and they both identified Green from the composite sketch that the police prepared from Hallock's description of the murderer.[135]  Third, a police dog tracked a scent from the crime scene to the nearby residence of Green's sister, Celestine Peterkin. *Green II*, 975 So. 2d at 1101.  Fourth, Sheila, Hillery, and Murray testified that Green admitted to the shooting.  And even though they recanted such testimony, if the case were retried, the jury would still hear the original versions of their testimony and would be free to credit those versions.  Fifth, post-trial DNA analysis was performed on a hair found in Flynn's truck,[136] and Green could not be ruled out as a contributor.  *See Green II*, 975 So. 2d at 1101.  The analysis revealed that the hair *could not have* come from 99.58% of the population.  However, Green is a member of the 0.42% of the population from which it *could have* come.

3.

Having laid out all the relevant evidence of guilt and innocence, we consider whether Green has shown that no reasonable juror would find him guilty on a retrial.  *See Schlup*, 513 U.S. at

---

[135] However, Hampton described Green's hair as "short," which was inconsistent with Hallock's description of Green as having a "geri-curl."

[136] We may consider new evidence of guilt along with new evidence of innocence when a petitioner makes a *Schlup* claim of actual innocence. *See House*, 547 U.S. at 538, 126 S. Ct. at 2077 (stating that all evidence, old and new, incriminating and exculpatory, is considered when deciding a *Schlup* claim).

327, 115 S. Ct. at 867.  We conclude that Green has failed to make that showing.

In our view, none of Green's new evidence of innocence is particularly compelling.  First, Green has not demonstrated how the recording of the conversation between Hallock and Flynn's father was inconsistent with her other testimony.  And even if he had, Hallock had been impeached "with numerous other inconsistent statements." *See Green II*, 975 So. 2d at 1104.  Therefore, additional, cumulative impeachment evidence would not have been particularly valuable. *See id.*

Second, a reasonable juror could have disbelieved Sheila's, Hillery's, and Murray's recantations, and credited their original testimony.  As the Circuit Court stated, Sheila and Hillery had strong incentives to please their family by recanting their original testimony, whether it was truthful or not. "[W]e repeatedly have noted that 'recantations are viewed with extreme suspicion by the courts,'" *In re Davis*, 565 F.3d 810, 825 (11th Cir. 2009) (quoting *United States v. Santiago*, 837 F.2d 1545, 1550 (11th Cir. 1988)), and it would not be unreasonable for a jury to be similarly suspicious of them.[137] *See Schlup*, 513 U.S. at 327, 115 S. Ct. at 867.  Moreover, the jury in Green's trial knew of the incentives that these witnesses had to testify. *See supra* note 128127.

---

[137] It is also unclear whether Murray's recantation was actually a recantation at all.  Recall, he claimed not to remember recanting his testimony, and thereafter exercised his privilege against self-incrimination.

Third, a reasonable juror would be free to find that Green's new alibi witnesses were not credible, as the Circuit Court did. *See Schlup*, 513 U.S. at 327, 115 S. Ct. at 867. But even if the jury credited their testimony, these witnesses cannot establish that they were with Green when the crime was committed. Rather, their testimony makes clear that they only saw him "off and on" throughout the night, leaving gaps in time during which Green could have killed Flynn. Moreover, Green ignores the potential damage that these witnesses' testimony could have on his defense. Their testimony establishes that, on the night Flynn was killed, Green was high on crack cocaine only two miles away from the crime scene.

Fourth, the post-trial DNA analysis of the hair found in Flynn's truck substantially undermines Green's lack-of-fingerprints claim. This DNA analysis, as mentioned above, ruled out 99.58% of the population as a contributor. However, Green is part of the 0.42% of the population that could not be ruled out as a contributor.

Fifth, post-trial analysis of Flynn's revolver provided no new information for a jury to consider on a retrial. At the original trial, the prosecution's expert specifically stated that Flynn could have been shot by his own revolver.

In contrast to this new evidence of innocence, the evidence of Green's guilt is compelling. First, the only surviving victim of the crime—Hallock—identified Green as the perpetrator. She told the police that he was wearing an army jacket and boots, which

was corroborated by two witnesses who saw Green in the park earlier that night. Second, a dog tracked a scent from the crime scene to Green's sister's residence. Third, three witnesses testified that Green confessed. While it is true that those witnesses have since recanted that testimony, a jury would be free to conclude that Green's sister (Sheila) and her fiancé (Hillery) would not have provided false testimony to help wrongfully convict Green of murder. Fourth, as mentioned above, DNA analysis revealed that a hair found in Flynn's truck could only have been left behind by 0.42% of the population, and Green is a member of that small portion of the population.

Summing up, Green has failed to meet *Schlup*'s demanding standard. Having considered Green's new evidence of innocence alongside the evidence of guilt, Green has failed to demonstrate that "it is more likely than not that no reasonable juror would have convicted [Green]." *Schlup,* 513 U.S. at 327, 115 S. Ct. at 867. Accordingly, the District Court ruled correctly in deciding not to entertain his procedurally defaulted claims.

## VIII.

In this opinion, we have attempted to lay out as clearly as possible the complex litigation history of Green's postconviction proceedings for a single reason: to demonstrate how his deliberately ambiguous litigation strategy in the Circuit Court, Florida Supreme Court, District Court, and this Court has delayed and confused the judicial system for decades, culminating in the District Court's erroneous decision to grant Green's habeas petition.

This strategy began with Green's very first Rule 3.850 motion. In that motion, Green (through Collateral Counsel) nominally presented five claims for relief from his conviction and six claims for relief from his death sentence. However, Green actually presented many more claims; Claim III alone had eight subclaims denoted "A" through "H," with subclaim "H" itself having five sub-subclaims. Green's first Rule 3.850 motion was the pleading equivalent of a Russian nesting doll—every claim contained more claims within it.

Adding to the confusion was how several of Green's claims were inherently contradictory. The heading of Claim III attempted to lump Green's *Strickland* claims for ineffective assistance of counsel (Claims III-A through III-G) with Green's very different *Brady* claims (which were contained in Claim III-H). Obviously, counsel cannot be constitutionally deficient under *Strickland* for failing to present evidence the prosecutor withheld in violation of *Brady*. Luckily for Green, however, Florida precedent forced the Circuit Court into effectively rewriting his Rule 3.850 motion for him at the *Huff* hearing, rewarding Collateral Counsel's poor pleading by having the Court draft Green's motion. *See Huff*, 622 So. 2d at 983. The Circuit Court found four claims for relief from Green's conviction plausible: I-2, III-F, III-H-4, and IV.

Not that Green presented these claims by those names to the Florida Supreme Court. Instead, Green renamed and reordered these claims on appeal, forcing the Florida Supreme Court to align Green's appeals claims with his Rule 3.850 claims as sorted

out by the Circuit Court. *See Green II*, 975 So. 2d at 1099; *see also supra* note 6666. The confusion caused by these litigation tactics in the state courts would later be leveraged by Green's new, private counsel in the federal courts to erroneously claim that Green exhausted Claim III-H-4—which Green did not appeal to the Florida Supreme Court—by appealing Claim III-F.

To make matters worse, the Claim III-H-4 that Green's new counsel presented to the District Court was not the same Claim III-H-4 that Green's Collateral Counsel litigated in his first Rule 3.850 motion. Instead, the "Claim III-H-4" that Green presented was really the second claim Green raised in his successive Rule 3.850 motion. *See supra* part V.C.1. Unlike Claim III-H-4, which the Circuit Court decided without an evidentiary hearing, this successive claim alleged the same grounds but utilized an expanded factual basis, including evidence that Green found in the Claims I-2, III-F, and IV evidentiary hearings under the first Rule 3.850 proceedings. The successive motion also relied on affidavits from Clarke and Rixey acquired in 2010. *See supra* part III.A.1. The Circuit Court denied the successive version of Claim III-H-4 as already addressed by the first Rule 3.850 motion. *See supra* note 7878 and accompanying text.

Green's habeas petition to the District Court employed the same "Russian nesting doll" pleading tactics as his first Rule 3.850 claim. While nominally alleging six "grounds" for relief, Green actually made nineteen separate claims. Of these nineteen claims,

the District Court found only four that were exhausted—and two of those four were transformed beyond recognition.

Green's "Issue One" of "Ground One," on which the District Court granted the habeas petition, asserts that the "State withheld evidence from the defense that [Clarke and Rixey] concluded . . . that Hallock's description of events lacked credibility and that it was she, not 'a black guy,' who killed Flynn." This aligns most closely with Claim III-H-4, which alleged a *Brady* violation stemming from the alleged suppression of White's notes containing Clarke and Rixey's suspicions. However, Claim III-H-4 was never exhausted in the Florida state courts because Green did not appeal it to the Florida Supreme Court following the Circuit Court's denial in its July 22, 2002, order. Green attempts to side-step this inconvenient fact by transforming his appeal of the Circuit Court's denial of Claim III-F into an appeal of the Court's denial of Claim III-H-4, but this is simply unsupported by the record. Neither Green's briefs to the Florida Supreme Court nor the Court's opinion contained any mention of Claim III-H-4, and both the Circuit Court and the Florida Supreme Court treated Claim III-F as a *Strickland* claim—Claim III-H-4, meanwhile, was treated by the Circuit Court as a *Brady* claim. Green can only argue that Claim III-F somehow covered Claim III-H-4 as well because the Claim III heading broadly referenced both *Brady* and *Strickland* violations, and the Claim III-F *Strickland* claim, which relied on Walker's report, referenced the prosecutor's notes disputed in Claim III-H-4 as being consistent with Walker's report. In effect, Green seeks to

18-13524                Opinion of the Court                153

leverage the ambiguity he created in his first Rule 3.850 motion to exhaust Claim III-H-4 through sheer vagueness alone. We cannot, however, treat the appeal of a *Strickland* claim as exhausting a separate, un-appealed *Brady* claim, shared heading or not.

Green performed an even greater transformation with his *Giglio* claim, which the District Court referred to as "Issue Four" of "Ground One." In the Circuit Court, this was Claim IV and alleged Green's convictions were "constitutionally unreliable" under the "Fifth, Sixth, Eighth, and Fourteenth Amendments" due to the State's use of Sheila, Hillery, and Murray's testimony. However, Green never cited any federal constitutional law when litigating Claim IV in the state courts; instead, both Collateral Counsel and the state courts treated Claim IV as a state law-based claim and cited Florida state court cases. *See Green II*, 975 So. 2d 1099–1101; *see also supra* note 7171. Yet because Green described the claim as "constitutional[]" in the heading of his Rule 3.850 claim, he proceeded to characterize Claim IV as a *Giglio* claim to the District Court.[138]

Such an approach runs afoul of the Supreme Court's holding in *Baldwin v. Reese*, 541 U.S. 27, 124 S. Ct. 1347 (2004). In *Baldwin*, an Oregon state prisoner claimed ineffective assistance of counsel

---

[138] Green never actually made the argument to this Court that Claim IV was exhausted. Instead, he seemed to rely on the District Court's finding that the argument was exhausted. We find his Claim IV exhaustion argument in Green's response to the State's answer to his amended habeas petition.

under both the state and federal constitutions to the trial court but only appealed the state constitutional claim to the Oregon Supreme Court. *Id.* at 29–30, 124 S. Ct. at 1349–50. The prisoner then sought habeas relief in federal court under the federal constitutional claim. *Id.* at 30, 124 S. Ct. at 1350. The Supreme Court held that the prisoner had failed to exhaust the federal constitutional claim in the Oregon Supreme Court because his argument to that court lacked any description of the claim as federal or any citations to federal law. *Id.* at 31, 124 S. Ct. at 1350. *Baldwin* teaches that state appellate courts are not required to read lower court briefing to exhaust a prisoner's habeas claims. *Id.* It stands to reason that the logic of *Baldwin* would not require a state appellate court to address every possible argument for relief under federal law to exhaust the prisoner's claims when the prisoner makes only a passing reference to a federal claim. While Green did nominally assert a federal claim to the Florida Supreme Court, he made no argument under any federal constitutional provision, statute, or case for why his conviction should be vacated due to the recantations, much less a *Giglio* argument. The mere mention of a "constitutional[]" claim cannot, standing alone, provide a state appellate court with a sufficient "opportunity to pass upon and correct" a federal constitutional violation. *Id.* at 29, 124 S. Ct. at 1349 (quoting *Duncan v. Henry*, 513 U.S. 364, 365, 115 S. Ct. 887, 888 (1995)).

Tellingly, Green spent very little time discussing exhaustion in his briefing to the District Court. In his habeas petition and its supporting memorandum of law, Green merely listed the headings

of his Rule 3.850 motions and then broadly stated that he exhausted all his claims.[139]  When this was challenged by the State in its reply, Green devoted only four short paragraphs to explaining how he exhausted both Claim III-H-4 and Claim IV—essentially, that appealing Claim III-F exhausted all Claim III subclaims and that Claim IV stated Green's convictions were "constitutionally unreliable" and so Claim IV must also be an exhausted *Giglio* claim.  In doing so, Green obscured the much more complex nature of the claims and arguments the state courts actually considered, from the *Huff* hearing onwards.

Green's litigation tactics ultimately paid off when the District Court granted his habeas petition based on Claim III-H-4.  Had the pleadings in both state and federal court been clearer, especially regarding the exhaustion issue, we have little doubt that the District Court would have recognized both Claim III-H-4 and Claim IV as unexhausted and thus unreviewable under AEDPA.

AEDPA exists to protect important interests of finality, federalism, and comity between state and federal courts.  *Williams v. Taylor*, 529 U.S. 420, 436, 120 S. Ct. 1479, 1490 (2000).  It is vital to the maintenance of those interests that federal courts do not entertain a state prisoner's claim challenging his sentence on constitutional grounds if the prisoner has not afforded the state courts an

---

[139] Green did, however, spend substantially more time (about ten pages) discussing why any procedural defaults should be excused by the actually innocent exception in his supporting memorandum.

opportunity to consider the claim and, if valid, to take corrective action. *Id.* at 436–37, 120 S. Ct. at 1490–91. Only then may the state prisoner present that exact same claim to the federal courts— adjacent claims or nominally similar claims do not make the cut. *Pickard v. Connor*, 404 U.S. 270, 276, 92 S. Ct. 509, 512 (1971). Federal courts may only consider unexhausted constitutional claims brought by state prisoners to the extent necessary to determine whether the state prisoner has excused the procedural default.

Had the State recognized the problem, it could have moved the District Court to require Green to replead his petition pursuant to Rule 12(e) of the Federal Rules of Civil Procedure, for the State's own benefit if not for the Court's. Rule 12(e) authorizes a party to move for a more definite statement "of a pleading to which a responsive pleading is allowed but which is so vague or ambiguous that the party cannot reasonably prepare a response."[140] A repleader would have revealed that Claim III-H-4 had not been

---

[140] Rule 12(e) was applicable. Nothing in the Rules Governing Section 2254 Cases would have precluded the State from filing a Rule 12(e) motion. Rule 81(a)(4) of the Federal Rules of Civil Procedure provides that the Rules of Civil Procedure "apply to proceedings for habeas corpus . . . to the extent that the practice in those proceedings . . . is not specified in a federal statute [or] the Rules Governing Section 2254 Cases. . . and has previously conformed to the practice in civil actions." Rule 12 of the Rules Governing Section 2254 Cases is to the same effect. It provides that "The Federal Rules of Civil Procedure, to the extent that they are not inconsistent with . . . these rules, may be applied to a proceeding under these rules." We see nothing in Rule 12(e) that could reasonably be considered inconsistent with the Rules Governing Section 2254 Cases.

exhausted in *Green II,* that Claim III-F (which was exhausted in *Green II*) did not allege a *Brady* violation based on the Clarke and Rixey statements in White's notes, and that Claim IV was nothing more than a state law motion for a new trial based on newly discovered evidence. A repleader would have revealed this information because the effect of the District Court order requiring it would have been to remind Green's counsel of his obligation under Rule 11 of the Federal Rules of Civil Procedure—in particular, his representation that his "allegations and other factual contentions have evidentiary support," and are "not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation."

The State did not seek a more definite statement; instead, it answered Green's petition. It was not until Green replied to the State's answer that Green's petition took shape and his claims actually appeared. Like with the *Huff* hearing in the Circuit Court, the District Court had to separate out Green's claims for him. The District Court identified nineteen claims, but as many claims were pled under multiple constitutional provisions, Green theoretically had more claims.[141]

---

[141] *Clisby v. Jones*, 960 F.3d 925 (11th Cir. 1992) (*en banc*), required the District Court to address these additional, implicit claims. *See Senter v. United States,* 980 F.3d 777, 781 (11th Cir. 2020) ("*Clisby* requires a federal district court 'to resolve all claims for relief raised in a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 (1988), regardless of whether habeas relief is granted or denied.'"). We must remand for further proceedings any case where a district court failed to address all claims raised in a habeas petition. *Id.* We

The District Court need not have waited for a Rule 12(e) motion from the State, either. District courts may require re-pleader *sua sponte* when counsel fails in its obligations under Rule 8(a) to provide a "short and plain statement." *Vibe Micro, Inc. v. Shabanets*, 878 F.3d 1291, 1294–95 (11th Cir. 2018). The repleaded petition must also comply with the good faith representation re-quirement of Rule 11(b). *Cramer v. State of Fla.*, 117 F.3d 1258, 1263 (11th Cir. 1997). Had the District Court required repleader here, Green (and especially his counsel) would have been forced to either clearly align Green's federal court claims with exhausted state court claims or attempt to otherwise excuse the procedural default. Doing so would have brought a quick resolution to this case.[142]

Judicial toleration of the litigation stratagems employed here by Green will lead inexorably to the abuse of the post-convic-tion process in both state and federal courts. While this Court can-not do more than recommend to the state courts that they consider requiring more straightforward post-conviction pleading, state prisoners seeking post-conviction relief in federal court may

_____

assume that the District Court here dismissed the implicit additional claims pursuant to Rule 4 of the Rules Governing Section 2254 Cases. That rule re-quires the dismissal of a petition or part thereof when it plainly appears the petitioner is not entitled to relief.

[142] In fact, the District Court had already *sua sponte* required Green to replead his petition once before in this case. Green's first petition and accompanying memorandum of law were struck for "greatly exceed[ing]" the Court's page limit.

consider themselves on notice that this Court will vigorously enforce both AEDPA and Rules 8 and 11.

## IX.

On the State's appeal, we reverse the District Court's grant of habeas relief.   On Green's cross-appeal, we affirm the District Court's denial of relief.

**AFFIRMED IN PART AND REVERSED IN PART.**

18-13524    JORDAN, J., dissenting in part & concurring in part    1

JORDAN, Circuit Judge, dissenting in part and concurring in part:

The majority opinion, which is 158 pages long, covers a huge swath of law. Without taking anything away from the exhaustive nature of the opinion, I do not join it. The reason is that, from my perspective, it is too long and says too much about too many things unnecessarily. As I see things, the case is not as complex as the majority makes it out to be.

Passages in judicial opinions tend to take on a life of their own as time passes. The danger is that they will later be used in cases far removed from the context in which they were written. *See Snyder v. Massachusetts*, 291 U.S. 97, 114 (1934). If "[b]revity is the soul of wit," William Shakespeare, Hamlet act 2, sc. 2, l. 90 (1603), it should also be the aspirational goal of legal writing.

That said, I concur in the judgment. Although I strongly disagree with the majority's conclusion that Mr. Green did not exhaust his *Brady* claim as to the handwritten notes, I do not believe that habeas relief is warranted on that claim. As to Mr. Green's other claims, I agree with the district court and the majority that they fail.

I

To exhaust available state remedies as required by 28 U.S.C. § 2254(b)(1), a habeas petitioner must "fairly present" his federal claim in "each appropriate state court (including a state supreme court with powers of discretionary review), thereby alerting that court to the federal nature of the claim." *Baldwin v. Reese*, 541

U.S. 27, 29 (2004). Exhaustion does not require a petitioner to "cite book and verse on the federal constitution." *Duncan v. Henry*, 513 U.S. 364, 365 (1995). It only demands that the "substance" of the federal claim be presented to the state courts. *See Picard v. Connor*, 404 U.S. 270, 278 (1971) (internal quotation marks and citation omitted). As we have put it, "[t]he petitioner must have presented the claim in a manner that affords the [s]tate a full and fair opportunity to address and resolve the claim on the merits." *Raleigh v. Secretary*, 827 F.3d 938, 956-57 (11th Cir. 2016) (internal quotation marks and citation omitted). "We are not so draconian or formalistic as to require petitioners to give a separate federal law heading to each of the claims they raise in state court to ensure exhaustion for federal review[;]" a claim is fairly presented for habeas purposes if it is set out in a fashion "such that the reasonable reader would understand [the] claim's particular legal basis and specific factual foundation." *Kelly v. Sec., Dep't of Corr.*, 377 F.3d 1317, 1344–45 (11th Cir. 2004).

With these principles in mind, I turn to the state-court record. I begin with what Mr. Green raised in the state post-conviction court, and then move on to the arguments he presented on appeal to the Florida Supreme Court. After reviewing the record in this case, I agree with the district court that Mr. Green properly exhausted his *Brady* claim concerning the handwritten notes.

## A

When he filed his federal habeas corpus petition, Mr. Green alleged in part that the state violated *Brady v. Maryland*, 373 U.S.

18-13524    JORDAN, J., dissenting in part & concurring in part    3

83 (1963), and its progeny by failing to turn over the handwritten notes of Assistant State Attorney Christopher White. Those notes reflected that the officers who responded to the scene suspected the murder victim's girlfriend (Kim Hallock) of the crime and noted that she initially told the police that she was the one who tied the hands of the victim (Charles Flynn) behind his back. So let's take a look at whether Mr. Green presented that *Brady* claim in the post-conviction proceedings.

In his first post-conviction motion—filed in November of 2001—Mr. Green asserted two independent grounds for relief in Claim III. First, he argued that he had been denied the effective assistance of counsel at the guilt phase of his trial. Second, he maintained that exculpatory evidence had been withheld in violation of *Brady* and *Giglio v. United States*, 405 U.S. 150 (1972).

As to the latter claim, the heading of Claim III read in relevant part that **"WHERE EXCULPATORY EVIDENCE WAS SUPPRESSED OR CONCEALED, MR. GREEN IS ENTITLED TO RELIEF UNDER *BRADY* AND/OR *GIGLIO.*"** D.E. 3-43 at 39 (emphasis added as to case names). In the body of Claim III, Mr. Green alleged the following facts over three pages:

> 39. A handwritten police statement dated 8/28/89 with the names Diane Clarke and Mark Rixey underlined on the front page was obtained through the Ch. 119 process [Florida's public records act] only after the [s]tate claimed it was

4     JORDAN, J., dissenting in part & concurring in part     18-13524

exempt from disclosure and the [c]ourt determined in camera that it was potentially *Brady* material. It was not disclosed to the defense at trial. It contains the following statement: Mark & Diane suspect girl did it, She changed her story couple times. . . . [?] She [?] said she tied his hands behind his back. This is consistent with Dep. Walker's recollection that Hallock said she was the one who did the actual tying of Flynn's hands, and inconsistent with Hallock's subsequent statements and eventual trial testimony.

40. Clark[e]'s police report contains no mention of any statements by Hallock, and in her deposition, Clark[e] said she 'never laid eyes on the girl [Hallock]. I never saw her at all. I left her with Deputy Walker and she stayed with Walker until Agent Nyquist – she was released to Agent Nyquist at that point on his arrival.' Deposition, page 13. . . . Rixie's police report does not mention anything about a drug deal gone bad or about who tied Flynn's hands. At trial he said he never saw Hallock. Tr. 518. These circumstances show that Walker told Rixie and Clarke what Hallock had told him at the time of the investigation,

18-13524    JORDAN, J., dissenting in part & concurring in part    5

> it is not something Walker came up with ten years later.
>
> 41. Defense counsel did not confront Hallock at trial with either the drug deal gone bad scenario or with Deputy Walker's report that she had been the one to tie up Flynn's hands. There is no indication anywhere in the record or in any disclosed records that defense counsel knew about the drug deal gone bad scenario. Defense counsel should have known about the hand tying issue because it was contained in Deputy Walker's report, but defense counsel did not ask any questions about it in Walker's deposition or at any time during the trial. Defense counsel did, however, argue to the jury that Flynn's hands appeared to have been tied 'for comfort.'" . . . . As the prosecutor put it, defense counsel was 'alluding' to the theory that [Ms.] Hallock[,] 'a jealous lover of [Mr.] Flynn,' was the real killer. Tr. Vol. X, 1875.

D.E. 3-43 at 58–60. The "handwritten police statement" referred to in Mr. Green's motion consisted of the handwritten notes of Mr. White, obtained by Mr. Green's counsel pursuant to a Chapter 119 public records request. *See* Fla. Stat. § 119.01.

6    JORDAN, J., dissenting in part & concurring in part    18-13524

In Paragraph H of Claim III, Mr. Green then set out a claim for **"Suppression of favorable impeaching and/or exculpatory evidence."** D.E. 3-43 at 62-65. With respect to that claim, Mr. Green alleged that the individuals "investigating this case . . . repeatedly suppressed evidence favorable to the defense in violation of *Brady v. Maryland*, 373 U.S. 83 (1963)." D.E. 3-43 at 62. As an example of the suppression of favorable or exculpatory evidence, Mr. Green referenced—for a second time—Mr. White's handwritten notes about what Ms. Hallock had told the police:

> 51. A handwritten police statement dated 8/28/89 with the names Diane Clarke and Mark Rixey underlined on the front page was obtained through the Ch. 119 process only after the [s]tate claimed it was exempt and the [c]ourt determined that it was potentially *Brady* material. It was not disclosed to the defense at trial. It contains the following statements:
>
> Found gun on ground around 4-5 ft. from W/M. There was no indication he had moved.
>
> Did see puddle of blood right under the V. Also saw clothes near the victim & another location saw blood on the ground a foot or two from the gun.
>
> . . . .

18-13524    JORDAN, J., dissenting in part & concurring in part    7

> *Mark and Diane suspect girl [Hallock]*
> *did it, She changed her story couple*
> *times. . . . [?] She [?] said she tied his*
> *hands behind his back.*
>
> [. . . . ]
>
> 52. The first sentence indicates that
> Flynn went down right where he was
> shot. That the gun was four to five feet
> away from the victim and that there was
> no indication that he had moved indi-
> cates that he was not in possession of the
> gun at the time he was shot. This con-
> tradicts Ms. Hallock's version of a gun-
> fight. The fact that Ms. Hallock refused
> to lead the police to the scene where her
> companion lay bleeding to death, gave
> bad directions, coupled with other evi-
> dence such as the fact that she drove
> past the hospital when supposedly flee-
> ing the scene, strongly suggest that she
> did not want the victim to live to tell the
> truth. The statements should have been
> disclosed to defense counsel, but were
> not.

*Id.* at 63–65 (emphasis added).

Given this level of detail, the state post-conviction court un-
derstood and addressed Mr. Green's *Brady* claim concerning the
handwritten notes on the merits when it issued its first order in July

of 2002. In Section H of that first order, which addressed **"Suppression of Favorable Impeaching and/or Exculpatory Evidence,"** the state post-conviction court expressly considered the *Brady* claim. Subsection 4 of Section H, entitled **"Handwritten police statement dated 8/28/89,"** explained that Mr. Green claimed a *Brady* violation based on the undisclosed handwritten notes and the statements contained in those notes. *See* D.E. 3-78 at 31 ("The Defendant next alleges that a handwritten police statement dated 8/28/89 with the names, Diane Clark and Mark Rixey, which the defense obtained through the Chapter 119 process[,] should have been disclosed pre-trial. The note contains the following statements . . . ."). The state post-conviction court denied the *Brady* claim on two grounds. First, "[a]ll of the information in the above notes was disclosed and known by defense counsel before trial; therefore[,] the Defendant has shown no prejudice." *Id.* at 32. Second, the undisclosed evidence was not admissible. *See id. See also id.* at 32–34 (further explaining reasoning for the denial of the *Brady* claim).[1]

In sum, Mr. Green devoted five to six pages of his post-conviction motion to laying out the facts underlying his *Brady* claim—the suppression of Mr. White's notes indicating that Ms. Haddock

---

[1] After issuing this order, the state post-conviction court held additional evidentiary hearings regarding certain other claims, after which it issued a second order granting Mr. Green's post-conviction motion for a new penalty phase trial and denying the motion insofar as it sought a new guilt phase trial. Once that second order was issued, Mr. Green's appeal to the Florida Supreme Court followed.

18-13524    JORDAN, J., dissenting in part & concurring in part    9

had said she was the one who tied Mr. Flynn's hands behind his back and that the officers on the scene suspected her of the murder. He cited to *Brady*, and explained why the evidence mattered (i.e., why it was material). The state post-conviction court correctly understood the claim and denied it on the merits with several pages of analysis. Mr. Green therefore exhausted the *Brady* claim in the state post-conviction court.

## B

In the Florida Supreme Court, Mr. Green presented his *Brady* claim in roughly the same way he had presented it to the state post-conviction court. Argument VI of his brief was entitled **"THE COURT ERRED IN DENYING GREEN'S CLAIM FOR RELIEF BASED ON INDIVIDUAL INSTANCES OF INEFFECTIVE ASSISTANCE OF COUNSEL AND *NONDISCLOSURE OF EXCULPATORY EVIDENCE*."** Mr. Green's Br. to the Florida Supreme Court, 2006 WL 2363999, at *81 (Aug. 2, 2006).

The introduction to Argument VI asserted that "[w]here exculpatory evidence was suppressed or concealed, Mr. Green is entitled to relief under *Brady* and/or *Giglio*," and explained that this claim was pled as Claim III in the state post-conviction court. *See id.* at *81–*82. Mr. Green did not again set out the elements of a *Brady* claim, as he had already done so in Argument II, which presented a different *Brady* claim. *See id.* at *41 ("There are three elements of a *Brady* claim . . . .") (citing, in part, to *United States v. Agurs*, 427 U.S. 97, 107 (1976)).

10    JORDAN, J., dissenting in part & concurring in part    18-13524

In the body of Argument VI, Mr. Green included a separate subsection entitled **"Exculpatory and impeaching evidence relating to the initial police investigation."** In that subsection, which was several pages long, Mr. Green set out the contents of the non-disclosed notes: "A handwritten police statement dated 8/28/89 with the names Diana Clarke and Mark Rixey underlined on the front page was obtained through the Ch. 119 [process.] . . . It contains the following statement: 'Mark & Diane suspect girl did it, she changed her story couple times . . . [?] She [?] said she tied his hands behind his back.'" *Id.* at *84. Mr. Green also argued that these notes were "not disclosed to the defense at trial." *Id.* Finally, Mr. Green explained that, due to the non-disclosure of the notes, defense counsel did not confront Ms. Hallock at trial with either the drug deal gone bad scenario or with her statement that she had been the one to tie Mr. Flynn's hands. The evidence set out in the notes, he continued, "was inconsistent with the [s]tate's entire theory of the case. It tends to show that the killing was the result of a prearranged plan committed by one or more persons who knew the victim, not a chance encounter robbery gone bad." *Id.* at *87.[2]

---

[2] At oral argument, the state conceded that Mr. Green raised a *Brady* claim in his brief to the Florida Supreme Court as to the improper withholding of Mr. White's handwritten notes but argued that he failed to raise a "discrete" theory with respect to the significance of the notes:

> JUDGE JORDAN: We need to go step by step . . . Did Mr. Green identify—if you want to say quote, that is fine too—[Mr. White's

18-13524    JORDAN, J., dissenting in part & concurring in part    11

handwritten notes] in his brief to the Florida Supreme Court?

STATE:  Yes.

JUDGE JORDAN:  Did he claim that there was an improper withholding of [Mr. White's handwritten notes] from the defense?

STATE:  His claim was entitled something to the effect of he was denied effective assistance of counsel, there was a *Brady* claim and there was a *Giglio* claim, and that was pretty much the extent of his argument.

JUDGE JORDAN:  Did he say that the *Brady* claim was based on the withholding of [Mr. White's handwritten notes]?

STATE:  If you really read into it, it could have. For example, Judge, the first question you asked me – the state trial court made this finding, is that a correct materiality finding?  That was never argued to the state court.  If that's the basis of his argument, that had to have been presented to the state court.  None of these arguments were ever presented to the state court.

JUDGE JORDAN:  So, your argument is that it wasn't a *Brady* claim that wasn't presented – it was the *Brady* theory that wasn't presented? Because what I'm hearing is that he made a *Brady* claim on appeal, whatever you thought of it.

STATE:  Yes, he said, "I have a *Brady* claim," and that's all he said.

12    JORDAN, J., dissenting in part & concurring in part    18-13524

Unlike the state post-conviction court, the Florida Supreme Court did not address Mr. Green's *Brady* claim concerning the non-disclosure of Mr. White's handwritten notes. *See Green v. State*, 975 So. 2d 1090, 1101-03 (Fla. 2008). Instead, the Florida Supreme Court discussed a separate *Brady* claim based on a box of loose photographs, but not the state's failure to disclose the notes. *See id.* The Florida Supreme Court's omission does not, however, change the fact that Mr. Green met the exhaustion requirement when he presented his claim in his brief. *See generally O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999) (holding that, to ensure exhaustion a petitioner must present their claims throughout "one complete round of the State's established appellate review process.").

## C

In his second state post-conviction motion—filed in February of 2011—Mr. Green again raised a *Brady* claim based on the

---

JUDGE JORDAN:   And he identified [Mr. White's handwritten notes]?

STATE:  And he said, "here's these notes." He didn't say why they were *Brady* material, how they provided any exculpatory evidence, or impeaching evidence, how they were material, no. He never argued any of that as a discrete point in his brief. Because if he had, we'd have all those findings to rely on now.

Oral Argument at 29:54, *Green v. Sec., Dep't Corr.*, No. 18-13524 (11th Cir. 2022), https://www.ca11.uscourts.gov/oral-argument-recordings?title=18-13524.

18-13524    JORDAN, J., dissenting in part & concurring in part    13

non-disclosure of the handwritten notes containing the impressions of Deputies Rixey and Clarke about the crime scene and Ms. Hallock.  Under the heading **"The State Withheld Exculpatory Evidence,"** Mr. Green quoted Mr. White's notes and the sworn affidavits of Deputies Rixey and Clarke, which "point[ed] out that . . . [Ms.] Hallock changed the details of her story several times that night, including . . . who tied [Mr.] Flynn's hands[.]"  D.E. 26-9  at 11–12.  Mr. Green argued that the notes were *Brady* material and that he suffered prejudice as a result of the state's non-disclosure. *See id.* at 13.

Both the state and the state post-conviction court understood that Mr. Green had already raised this *Brady* claim in his first state post-conviction motion.  The state's response to Mr. Green's motion reveals as much.  Under the heading **"EXCULPATORY EVIDENCE WAS WITHHELD,"** the state argued that Mr. Green sought to "revisit the allegations made in the prior post[-]conviction motion" regarding Mr. White's handwritten notes and asserted that the "argument [was] barred because it was previously heard" and "[a] successive 3.850 is not intended as a *second appeal.*" *Id.* at 47 (emphasis added).  The state post-conviction court agreed with the state, holding that Mr. Green's *Brady* claim regarding Mr. White's handwritten notes was barred as successive because it "was addressed in the first post-conviction motion . . . and *affirmed on appeal to the Supreme Court of Florida.*"  Order in *State v. Green*, No. 05-1989-CF-004942-AXXX-XX, at ___ (Fla. 18th Cir. Ct. Aug. 31, 2011) (emphasis added).  In 2011, then, both the state and

14    JORDAN, J., dissenting in part & concurring in part    18-13524

the state post-conviction court were satisfied that Mr. Green had exhausted his *Brady* claim concerning the handwritten notes in his first round of post-conviction proceedings. Nothing has changed since then.

In concluding that Mr. Green did not exhaust his *Brady* claim concerning the handwritten notes, the majority has focused (fixated might be a better word) on the numbering of the claims in the Florida post-conviction proceedings instead of analyzing the substance of the arguments that Mr. Green presented. That is not the correct approach, for "the 'policy of federal state comity' underlying the exhaustion doctrine does not compel the triumph of form over substance." *Henry v. Dep't of Corr.*, 197 F.3d 1361, 1367 (11th Cir. 1999) (citation omitted).

## II

On to the merits of the *Brady* claim concerning Mr. White's notes. As explained below, the issue is close, but I ultimately conclude that Mr. Green is not entitled to relief.

## A

The *Brady* materiality standard is well-settled. The "Constitution is not violated every time the government fails or chooses not to disclose evidence that might prove helpful to the defense." *Kyles v. Whitley*, 514 U.S. 419, 436–37 (1995). "[E]vidence is 'material' under *Brady*, and the failure to disclose it justifies setting aside a conviction, only where there exists a 'reasonable probability' that had the evidence been disclosed the result at trial would

18-13524    JORDAN, J., dissenting in part & concurring in part    15

have been different." *Wood v. Bartholomew*, 516 U.S. 1, 5 (1995). A reasonable probability is something more than a *possibility* that the evidence might have produced a different result. *See Kyles*, 516 U.S. at 433. We do not ask "whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Id.*

Our review on habeas of the *Brady* claim concerning the handwritten notes is not plenary. Although the Florida Supreme Court did not address the *Brady* claim, it affirmed the denial of post-conviction relief on all guilt-phase issues after the state post-conviction court had expressly rejected the *Brady* claim on the merits. *See Green*, 975 So.2d at 1116. Under these circumstances, there is a rebuttable presumption that the Florida Supreme Court adjudicated the *Brady* claim on the merits. *See Johnson v. Williams*, 568 U.S. 289, 292 (2013). Because Mr. Green does not attempt to rebut that presumption, and in fact agrees that AEDPA deference applies, we can grant habeas relief (as relevant here) only if the rejection of the *Brady* claim was unreasonable under clearly established federal law as determined by the Supreme Court. *See* 28 U.S.C. § 2254(d)(1). This means that the writ should be issued only if the state court's ruling on the claim "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair[-]minded disagreement." *Harrington v. Richter*, 562 U.S. 86, 102 (2011). If "some fair[-]minded jurists could agree with the state court['s]

16     JORDAN, J., dissenting in part & concurring in part     18-13524

decision . . . federal habeas relief must be denied." *Loggins v. Thomas*, 654 F.3d 1204, 1220 (11th Cir. 2011).

As noted, the Florida Supreme Court did not provide any reasons for its rejection of the *Brady* claim. In such a case, federal habeas law employs a "look through" presumption to figure out the basis for the denial. *See Wilson v. Sellers*, 138 S.Ct. 1188, 1193 (2018). In other words, when a state-court decision on the merits does not come accompanied with reasons for its decision, we "look though" the unexplained decision to the last related state-court decision that does provide a relevant rationale and then presume that the unexplained decision adopted the same reasoning. *See id.* at 1194. Because the Florida Supreme Court summarily affirmed the state post-conviction court's rejection of Mr. Green's *Brady* claim, we look through the Florida Supreme Court's decision to the rationale applied by the state post-conviction court in its order denying Mr. Green's *Brady* claim.

## B

To recap, the *Brady* claim at issue concerns the non-disclosure of Mr. White's handwritten notes reflecting that the officers who responded to the scene (Deputies Rixey and Clarke) suspected Ms. Hallock of the murder and noted that she initially told the police that she was the one who tied Mr. Flynn's hands behind his back. Because it is undisputed that the state did not disclose these notes to Mr. Green before or during trial, the critical question is whether they were material within the meaning of *Brady.*

18-13524    JORDAN, J., dissenting in part & concurring in part    17

The state post-conviction court rejected the *Brady* claim for two reasons. First, all of the information contained in the notes was disclosed to and known by Mr. Green's counsel before trial. Second, the opinion/suspicion of Deputies Rixey and Clarke that Ms. Hallock murdered Mr. Flynn would not have been admissible at trial.

Starting with the information about the tying of Mr. Flynn's hands by Ms. Hallock, Mr. Green's counsel had a report by Deputy Wade Walker prior to trial. According to that report, Ms. Hallock told the police that she "was told to tie Mr. Flynn's hands behind his back with a shoe string." Brevard Cnty. Sheriff's Dept. Supp. Report, Case No. 89033497, at 1 (April 5, 1989). When Mr. Green's counsel took her deposition, Ms. Hallock changed her story and said that she had given Mr. Flynn's shoelaces to the assailant, who then tied Mr. Flynn's hands with it. *See* Deposition of Kim Hallock at 78–79, 81–82 (Feb. 13, 1990). Be that as it may, Mr. Green's counsel knew from Deputy Walker's report that Ms. Hallock had said she was the one who was told to tie Mr. Flynn's hands. Although Deputy Walker's report does not state that Ms. Hallock expressly admitted tying Mr. Flynn's hands, that is a fair inference that the state post-conviction court could have drawn. When a defendant, "prior to trial, had within [his] knowledge the information by which [he] could have ascertained the alleged *Brady* material," *Maharaj v. Sec'y Dep't of Corr.*, 432 F.3d 1292, 1315 (11th Cir. 2005) (internal quotations and citation omitted), non-disclosed evidence is not material under *Brady*. The state post-conviction court's

18    JORDAN, J., dissenting in part & concurring in part    18-13524

adjudication as to the "tying" statement in the notes therefore was not unreasonable.

That leaves the information that Deputies Rixey and Clarke suspected that Ms. Hallock had murdered Mr. Flynn. The state post-conviction court ruled that this information would have been inadmissible at trial. That may be so as a matter of state law, *see Jackson v. State*, 107 So.3d 328, 339 (Fla. 2012), but admissibility is not the touchstone (or a requirement) of *Brady* materiality. *See Wood*, 516 U.S. at 7 (considering, under *Brady*, the effect of suppressing the results of polygraph examinations even though the results themselves would have been inadmissible under state law). Exculpatory information can exist in an inadmissible form (like a hearsay statement contained in a police report or details about a witness' prior inconsistent statements) but can be used by the defense to uncover evidence that is admissible or material that can be used at trial. *See Kyles*, 514 U.S. at 446 (evidence can be material under *Brady* if the defense can use it to "attack the reliability of the investigation"); *Wright v. Hopper*, 169 F.3d 695, 703 & n.1 (11th Cir. 1999) ("Inadmissible evidence may be material [under *Brady*] if the evidence would have led to admissible evidence.") (discussing *Wood* in footnote 1). Indeed, impeachment material comes within the ambit of *Brady* even though it is not itself admissible evidence. *See, e.g., United States v. Bagley*, 473 U.S. 667, 678 (1985). I agree with the district court that, insofar as the state post-conviction court grafted an admissibility requirement onto *Brady*, it unreasonably applied federal law as established by the Supreme Court. *See*

18-13524    JORDAN, J., dissenting in part & concurring in part    19

*Dennis v. Sec'y, Pa. Dep't of Corr.*, 834 F.3d 263, 309 (3d Cir. 2016) (en banc) ("[I]t is unreasonable to graft an admissibility requirement onto *Brady*'s traditional three-pronged inquiry.").

This error leads to the disappearance of AEDPA deference with respect to the suspicions of Deputies Rixey and Clarke, and results in de novo review. *See Williams v. Taylor*, 529 U.S. 362, 406 (2000); *Daniel v. Comm'r*, 822 F.3d 1248, 1260 (11th Cir. 2016). But this plenary review still does not lead to relief for Mr. Green under *Brady*. Playing out the sequence of hypothetical events, had Mr. Green's counsel been informed about the suspicions of Deputies Rixey and Clarke, he could have deposed them and found out the bases for their opinions. They, in turn, would have told him that they never met Ms. Hallock—they went to where Mr. Flynn's body was found and Ms. Hallock was not present there—but nevertheless suspected her because they had heard from Deputy Walker that Ms. Hallock had changed her story and said that she had tied Mr. Flynn's hands. The problem for Mr. Green is that his counsel knew about Ms. Hallock saying that she had tied Mr. Flynn's hands from Deputy Walker's report. And when he took her deposition, Mr. Green's counsel also learned that Ms. Hallock had changed her story. *See* D.E. 74 at 11 ("[P]rior to trial, [Mr.] Parker [(Mr. Green's counsel)] knew about much of the information relied on by [Deputies] Rixey and Clarke in suspecting [Ms.] Hallock's involvement in the crime."). Even under de novo review, Mr. Green's *Brady* claim fails.

20    JORDAN, J., dissenting in part & concurring in part    18-13524

### III

Because he prevailed in the district court on the *Brady* claim relating to the notes, on appeal Mr. Green can defend the judgment awarding him a new trial by asserting the claims on which he lost. And he is able to do that without filing a cross-appeal or obtaining a certificate of appealability. *See Jennings v. Stephens*, 574 U.S. 271, 276–83 (2016).

Mr. Green has presented three such claims in his brief: (1) a claim that Ms. Hallock's identification of him violated his Fifth, Sixth, and Fourteenth Amendment rights; (2) a claim that the state violated those same rights by suppressing evidence that it coerced witnesses into testifying and then eliciting or failing to correct false testimony; and (3) a claim that his counsel rendered ineffective assistance at trial by (a) failing to present several alibi witnesses and (b) failing to challenge one of the jurors. *See* Appellee's Br. at 41–57. As to these claims, I conclude that Mr. Green is not entitled to relief.

First, the Florida courts found that the photographic lineup shown to Ms. Hallock was not unduly suggestive and that her in-court identification of Mr. Green was based on her observation of him at the time of the murder. *See Green v. State*, 641 So.2d 391, 394–95 (Fla. 1994). I agree with the district court and the majority that this finding is entitled to a presumption of correctness that Mr. Green has not overcome. *See* 28 U.S.C. § 2254(d)(2); D.E. 74 at 24-29; Maj. Op. at Part VI.A.

18-13524    JORDAN, J., dissenting in part & concurring in part    21

Second, as to the alleged coercion of witnesses, the alleged elicitation and failure to correct false testimony, and the failure to present alibi witnesses, the district court concluded that these claims had not been properly presented to the Florida courts and were therefore not exhausted and procedurally defaulted. *See* D.E. 74 at 18, 32–33. Mr. Green does not challenge these rulings on appeal, and instead contests the district court's alternative denial of the claims on the merits. *See* Mr. Green's Br. at 47–53. Because the district court's procedural bar determinations have gone unchallenged, they stand: "When an appellant fails to challenge properly on appeal one of the grounds on which the district court based its judgment, he is deemed to have abandoned any challenge of that ground, and it follows that the judgment is due to be affirmed." *Sappupo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 680 (11th Cir. 2014).

I recognize that, at the end of his brief, Mr. Green has argued that he is entitled to overcome all of his procedural defaults because he has made a sufficient showing of actual innocence. *See* Mr. Green's Br. at 55–57. With respect to new evidence of innocence, Mr. Green points to the recantation of the three witnesses who testified that he had confessed to the murder, the alleged coercion of those same witnesses by the state, an audiotape of a conversation between Ms. Hallcock and Mr. Flynn's father, and certain alibi witnesses who never testified for the defense.

In my view, Mr. Green has not made the necessary innocence showing, which is to establish that, in light of new evidence,

22    JORDAN, J., dissenting in part & concurring in part    18-13524

it is more likely than not that no reasonable juror would have found him guilty beyond a reasonable doubt. *See House v. Bell*, 547 U.S. 518, 536–37 (2006). The state post-conviction court found that two of the recantations were not credible, and that finding is entitled to some weight. But even if the three recanting witnesses are completely removed from the evidentiary equation, that still leaves Ms. Hallock's eyewitness testimony to the murder and the testimony of the witnesses who saw Mr. Green at a baseball game until 10:00 p.m. the night of the murder. As for the alibi witnesses, the majority correctly explains that their testimony, though supportive of Mr. Green's innocence, is not airtight. *See* Maj. Op. at Part VII.B.

Third, with respect to counsel's failure to challenge a juror whose niece had recently been murdered, that juror explained at *voir dire* that he would be able to put that matter aside and not let it affect his participation in the case. Based on that testimony, the Florida Supreme Court concluded in part that Mr. Green could not show any prejudice from his counsel's failure to challenge that juror. *See Green*, 975 So.2d at 1104–05. The district court agreed, *see* D.E. 74 at 40, and Mr. Green does not challenge this prejudice determination in his brief, as he only argues that counsel's performance was deficient. *See* Mr. Green's Br. at 54. The denial of this claim, then, must also be affirmed. *See Sappupo*, 739 F.3d at 680.

## IV

Unlike the majority, I conclude that Mr. Green properly exhausted his *Brady* claim relating to Mr. White's handwritten notes.

18-13524    JORDAN, J., dissenting in part & concurring in part    23

But, for the reasons stated above, I do not think that he is entitled to habeas relief on that claim or on any of the others he raises in defense of the judgment.